**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | Case: 1:07-cv-01070 Urbina, Ricardo M. |
| v. | ) ) | |
| THE PAINTING COMPANY, | ) ) | |
| Defendant. | ) ) ) ) | |

**DEFENDANT'S NOTICE OF ERRATA**

Please take note that on September 27, 2007, Defendant, Painting Company, filed a

Motion to Dismiss Amended Complaint or in the Alternative to Transfer or Stay the Proceeding.

Defendant inadvertently failed to file all the exhibits referenced in its memorandum in support of

the motion.  All exhibits referenced in the memorandum are documents created by Plaintiff or

the unions that sponsored the pension plans at issue in this case.  Therefore, at all times, Plaintiff

has been in possession of the referenced exhibits and it has not been prejudiced by the

inadvertent failure to file all exhibits with the original motion.  Defendant now submits the

inadvertently omitted exhibits.

Dated: October 1, 2007

Respectfully submitted

Tess J. Ferrera, (D.C. 435469)
Thompson Hine, LLP
1920 N Street, N.W., Suite 800
Washington, D.C. 20036
(202) 973-2763 Direct line
(202) 478-2588 Fax

# INDEPENDENT
# TRADE
# AGREEMENT

Between

# DISTRICT COUNCIL NO. 9,

## INTERNATIONAL UNION
## of
## PAINTERS and ALLIED TRADES,
## A.F.L. - C.I.O.

And

COMPANY NAME: _____

## May 1st, 2005 through April 30th, 2011

1

AGREEMENT, hereinafter designated as the Trade Agreement, dated this_____day of _____,20__, by and between_____ (hereinafter designated as "the Employer") and District Council No. 9, International Union of Painters and Allied Trades ("I.U.P.A.T."), AFL-CIO (hereinafter designated as "the Union").

WHEREAS, the parties hereto desire to establish wages and other terms and conditions of employment upon which journeypersons and apprentices shall work for the Employer (it being agreed that the word "JOURNEYPERSON" shall mean an experienced painter, wall coverer, drywall finisher (where applicable), lead abatement worker, skim coater, glazier (this Trade Agreement covers glaziers to the extent that it is not inconsistent with or modified by a separate glaziers agreement), decorator and preparatory plasterer (referred to jointly hereinafter as "the Trades") or one who has completed one of the approved apprenticeship programs provided for herein). The term "experienced" shall be defined as the demonstration of four (4) year significant experience in the proposed Journeyperson's Trade;

NOW THEREFORE, the parties hereto agree as follows:

## JURISDICTION, RECOGNITION & SCOPE OF WORK

**Art. I. Sec. 1.** - The Employer, and all other employers who hereafter become signatories to this Trade Agreement, recognize, acknowledge, and agree that the Union is the exclusive representative for the purpose of collective bargaining within the meaning of Section 9(a) of the National Labor Relations Act and that the Union has demonstrated through the use of authorization cards executed by a majority of the Employer's bargaining unit employees that it possesses the support of a majority, of all employees of the Employer wherever such employees may be employed in the following classifications of work: all work described by the INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES General Constitution section 6, issued January 1, 2005.

The Union shall give principal recognition to the Association of Master Painters and Decorators of New York, Inc., the Wall, Ceiling and Carpentry Industries of New York, Inc. and the Window and Plate Glass Dealers Association (the "Associations") and any successor Employer Association during the life of this agreement which (i) may be established; (ii) is affiliated with a national association whose members employ union employees only; and (iii) represents employers in the same industries for which the Union negotiates collective bargaining agreements for work performed in the territorial jurisdiction defined in Art. I, Section 4, and any additional area the Union may be awarded by the I.U.P.A.T. General Executive Board.

**Art. I. Sec. 2.** - This Trade Agreement shall apply to all work involved in or related to the Painting and Coatings Industry, drywall finishing, skim coating, prepping, application of wall coverings, decorative work, plastering preparatory to painting, and any other work referred to in the I.U.P.A.T. General Constitution issued January 1, 2005, or which the General Executive Board of the I.U.P.A.T. puts into the work jurisdiction of the Union. This Trade Agreement will also include all work related to rigging, surface preparation and clean up of any kind as well as lead abatement and glazing.

**Art. I. Sec. 3.** - The Union agrees for the life of this Trade Agreement not to sign any agreements (through Local Union No. 1456 or otherwise) for direct hire of its members, unless there is no other way to protect its labor standards. Before agreeing to such a request, the Union agrees to refer any request of this type to the Joint Trade Board. The purpose of this referral is to allow an Association employer the timely opportunity to bid and perform the work required by the user with Union members.

2

The Union will not sign an agreement directly with any employer until after this review process by the Joint Trade Board. The review process must be timely instituted within 24 hours to allow the Union to maintain its established standards. This provision does not pertain to traditional maintenance agreements or to direct hire contracts signed prior to this Trade Agreement where the Union retains the sole right to make the final determination.

## TERRITORIAL JURISDICTION

**Art. I. Sec. 4. -** The territorial jurisdiction of this Trade Agreement shall include all areas in the New York Greater Metropolitan Region (Brooklyn, Queens, Bronx, Manhattan, Staten Island, Nassau, Suffolk, Westchester and Putnam counties), and all such areas authorized by the I.U.P.A.T. General Executive Board.

## OBLIGATIONS OF THE PARTIES

**Art. I. Sec. 4(a). -** Mutual Good Faith: The Employer obligates itself and the Union obligates itself and all its members that they and each of them will, in good faith, live up to and conform with all the provisions of this Trade Agreement, and to all rules, regulations, requirements, and all procedures promulgated under and pursuant to the terms of this Trade Agreement. Provided, however, that the Associations shall not be obligated to take any action to require compliance with the terms of the Trade Agreement on the part of any person or firm which has been expelled from or has resigned from any Association, except as a prerequisite for the reinstatement of such member. If any Association Employer is expelled or resigns from the Association for any reason, the Employer will, without further negotiation, cease being bound to this Association Trade Agreement and will instead be bound to the Independent Trade Agreement. Each Association will be responsible for securing each of their members' agreement to this effect either through a written acknowledgement or through an amendment to the Association's application. Each Association shall provide copies of such acknowledgement to the Union.

**Art. I. Sec. 4(b). -** Past Performance Clause: Except as otherwise provided in this Trade Agreement, the Employer agrees that all conditions of employment relating to wages, hours of work, overtime differentials, and general working conditions shall be maintained at no less than the highest standards in effect at the time of the signing of this Trade Agreement, and the conditions of employment shall be improved wherever specific provisions for improvement are made elsewhere in this Trade Agreement.

**Art. I. Sec. 4(c). -** Just Cause Clause: Although work in this industry is on a job-to-job basis, no employee may be discharged or laid-off by any Employer except for just cause. All grievances arising under this section shall be referred to the Joint Trade Committee as provided in Art. XIII, Section 1.

**Art. I. Sec. 4(d). -** Supremacy Clause: The Employer agrees not to enter into any agreement or contract with its employees, covered under this Trade Agreement, individually or collectively, which in any way conflicts with the terms and provisions of this Trade Agreement. Any such agreement shall be null and void.

**Art. I. Sec. 4(e). -** Non-Discrimination: Neither party to this Trade Agreement shall discriminate against any employee with respect to employment by reason of union membership or race, creed, color, sex, age, national origin, or any other characteristics protected by law. As applicable and appropriate, covered Employers will comply with the Federal Family and Medical Leave Act.

**Art. I. Sec. 4(f). -** Union Security: All present employees who are members of the Union on the effective date of this Trade Agreement or on the date of execution of this Trade Agreement, whichever is later, shall remain members of the Union in good standing as a condition of employment. All present employees who are not members of the Union and all employees who are hired hereafter shall become and remain members in good

standing of the Union as a condition of employment on and after the eighth day following the beginning of their employment, or on and after the eighth day following the effective date of this Trade Agreement or the date of execution of this Trade Agreement, whichever is later. No provision of this Article shall apply in any state to the extent that state law may prohibit it. If under applicable state law additional requirements must be met before any such provision may become effective, such additional requirements shall be first met.

**Art. I. Sec. 4(g).** - If any provision of this Article is invalid under the law of any state wherein this Trade Agreement is executed, such provision shall be modified to comply with the requirements of state law or shall be renegotiated for the purpose of adequate replacement. If such negotiations shall not result in mutually satisfactory agreement, either party shall be permitted all legal or economic recourse.

**Art. I. Sec. 4(h).** - In those instances in which Article I, Section 4(f) may not be validly applied, the Employer agrees to recommend to all employees that they become members of the Union and maintain such membership during the life of this Trade Agreement, to refer new employees to the Union representative and to recommend to delinquent members that they pay their dues since they are receiving the benefits of this Trade Agreement.

**Art. I. Sec. 4(i).** - It is understood and agreed that each employer must execute appropriate copies of this Trade Agreement, and pay a fee of $250.00 to defray the expenses of publication and execution thereof. Notwithstanding the execution of this Trade Agreement by the Associations, it is understood and agreed that each employer that is not member of one of the signatory Associations must separately execute appropriate copies of this Trade Agreement, and pay a fee of $250.00 to defray the expenses of publication and execution thereof.

**Art. I. Sec. 4(j).** - The Union shall have full authority to modify the terms of this Trade Agreement, and to pinpoint, maintain and/or organize work covered under this Trade Agreement, with respect to organizing work, repaint recovery and maintenance of work, as defined in Article V, Sections 1 through 3.

**Art. I. Sec. 4(k)** - The Union and the Employer recognize that the use of non-union labor threatens our industry and that it is their mutual interest to identify those situations in which the Trade Agreement is being violated in this manner. Thus, consistent with the requirements of Art. IX, Section 1(B)(d), the parties agree that THERE SHALL BE NO RETALIATION AGAINST ANY MEMBER WHO PROVIDES INFORMATION CONCERNING POTENTIAL VIOLATIONS OF THIS TRADE AGREEMENT.

## HIRING PROCEDURES

**Art. II. Sec.1.** - The Union shall be the sole and exclusive source of referrals of applicants for employment. The Employer will hire the Union members only through the Union.

**Art. II. Sec.2.** - The Employer shall have the right to reject any applicant for employment; provided, that on any job organized solely by District Council No. 9, District Council No. 9 shall supply 50% of the employees on that job.

**Art. II. Sec.3.** - The Union shall select and refer applicants for employment without discrimination. Such selection and referral shall not be affected in any way by I.U.P.A.T. or the Union rules, regulations, bylaws, constitutional provisions, or any other aspect or obligation of the I.U.P.A.T. or the Union membership policies or requirements. All such selection and referral shall be in accordance with the following procedure:

a). The Union shall maintain a register of applicants for employment. Applicants shall be listed in chronological order of the dates they register. If the registration list is exhausted, and the Union is unable to refer applicants for employment within twenty-four (24) hours from the time of receiving the request,

4

Saturdays, Sundays, and holidays excepted, the requesting employer shall be free to secure applicants without using the referral procedure and shall notify the Union promptly of the names, addresses, and Social Security numbers of such directly-hired employees.

b). The hiring employer shall advise the Union of the number of applicants needed. The Union shall refer applicants to the hiring employer in the chronological order of their dates on the register.

c). Any applicant who is rejected by the hiring employer shall be returned to his/her appropriate place on the register, and shall be referred to other employment in accordance with their position on the register.

d). The only exceptions which shall be allowed in this order of referral are as follows: (i) when the hiring employer states bona fide requirements for special skills and abilities in the request for applicants, the Union shall refer the first applicant on the register possessing such skills and abilities; (ii) the hiring employer may request any member of the Union regardless of that member's position on the register, who was formerly employed in any of the Trades in the Greater New York Metropolitan Region by any signatory employer.

e). Apprentices shall be hired and transferred in accordance with Article VII of this Trade Agreement and as defined in the apprenticeship curriculum.

f). No current member of the Union will be required to work on any Organizing Work, Market Recovery, or Maintenance Work. However, a current member of the Union may work on these jobs if he/she agrees to be referred to this work by the hiring employer or the Union.

g). The hiring employer, after exhausting paragraph (a) above, shall report the hiring of a non-union journeyperson to the Union prior to the commencement of employment. As an additional condition of hiring a worker from outside the Union, the hiring employer shall guarantee said worker their first five hundred hours of continuous employment as Union Members.

**Art. II. Sec. 4.** Any Journeyperson who is also an owner of a signatory employer shall guarantee and provide contributions to all Article XX fringe benefit funds for him or herself in an amount of at least 52 weeks per year and 35 hours per week for the duration of this Trade Agreement (provided that the rate of contributions shall be the full scale rate and not the maintenance or any other reduced rate). An "owner" shall be defined as an individual with any ownership interest or in actual control of the signatory employer. The payment of any Article XX contributions on behalf of such owner shall be conclusive proof that the owner is a Journeyperson covered under this Trade Agreement and will subject the signatory employer to liability hereunder for such owner.

**Art. III. Sec. 1.** – The prevailing wage rates for JOURNEYPERSONS covered under this Trade Agreement, but not wall coverers or glaziers (refer to wall coverers and glaziers addenda), shall be as follows:

| As of 5/1/2005, per hour: | Wage* | H&W | Pens | Annu | Supp. Vac* | DC9 JAATF | IUPAT FTI | LMCF | IUPAT PAT* | IPF | Total Benefit Pkg | Total Package | Total Tax* Package | Check Off 3% | Stamp Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Base rate | 33.00 | 5.94 | 5.00 | 4.50 | 2.02 | 0.35 | 0.05 | 0.05 | 0.05 | 0.18 | 18.14 | 51.14 | 35.07 | $1.05 | 19.19 |
| Spray, Scaffold, Motorized Manlifts, Décor. & Sandblast | 36.00 | 5.94 | 5.00 | 4.50 | 2.02 | 0.35 | 0.05 | 0.05 | 0.05 | 0.18 | 18.14 | 54.14 | 38.07 | $1.14 | 19.28 |

| As of 5/1/2006, per hour: | Wage* | H&W | Pens | Annu | Supp. Vac* | DC9 JAATF | IUPAT FTI | LMCF | IUPAT PAT* | IPF | Total Benefit Pkg | Total Package | Total Tax* Package | Check Off 3% | Stamp Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Base rate | 33.50 | 6.93 | 5.00 | 4.50 | 2.02 | 0.35 | 0.05 | 0.05 | 0.05 | 0.19 | 19.14 | 52.64 | 35.57 | $1.07 | 20.21 |
| Spray, Scaffold, Motorized Manlifts, Décor. & Sandblast | 36.50 | 6.93 | 5.00 | 4.50 | 2.02 | 0.35 | 0.05 | 0.05 | 0.05 | 0.19 | 19.14 | 55.64 | 38.57 | $1.16 | 20.30 |

| As of 5/1/2007, per hour: | Wage* | H&W | Pens | Annu | Supp. Vac* | DC9 JAATF | IUPAT FTI | LMCF | IUPAT PAT* | IPF | Total Benefit Pkg | Total Package | Total Tax* Package | Check Off 3% | Stamp Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Base rate | 34.50 | 7.92 | 5.00 | 4.50 | 2.02 | 0.35 | 0.05 | 0.05 | 0.05 | 0.20 | 20.14 | 54.64 | 36.57 | $1.10 | 21.24 |
| Spray, Scaffold, Motorized Manlifts, Décor. & Sandblast | 37.50 | 7.92 | 5.00 | 4.50 | 2.02 | 0.35 | 0.05 | 0.05 | 0.05 | 0.20 | 20.14 | 57.64 | 39.57 | $1.19 | 21.33 |

| As of 5/1/2008, per hour: | Wage* | H&W | Pens | Annu | Supp. Vac* | DC9 JAATF | IUPAT FTI | LMCF | IUPAT PAT* | IPF | Total Benefit Pkg | Total Package | Total Tax* Package | Check Off 3% | Stamp Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Base rate | 35.00 | 7.92 | 5.00 | 5.00 | 2.51 | 0.35 | 0.05 | 0.05 | 0.05 | 0.21 | 21.14 | 56.14 | 37.56 | $1.13 | 22.27 |
| Spray, Scaffold, Motorized Manlifts, Décor. & Sandblast | 38.00 | 7.92 | 5.00 | 5.00 | 2.51 | 0.35 | 0.05 | 0.05 | 0.05 | 0.21 | 21.14 | 59.14 | 40.56 | $1.22 | 22.36 |

| As of 5/1/2009, per hour: | Wage* | H&W | Pens | Annu | Supp. Vac* | DC9 JAATF | IUPAT FTI | LMCF | IUPAT PAT* | IPF | Total Benefit Pkg | Total Package | Total Tax* Package | Check Off 3% | Stamp Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Base rate | 36.00 | 7.92 | 5.00 | 5.00 | 3.50 | 0.35 | 0.05 | 0.05 | 0.05 | 0.22 | 22.14 | 58.14 | 39.55 | $1.79 | 23.33 |
| Spray, Scaffold, Motorized Manlifts, Décor. & Sandblast | 39.00 | 7.92 | 5.00 | 5.00 | 3.50 | 0.35 | 0.05 | 0.05 | 0.05 | 0.22 | 22.14 | 61.14 | 42.55 | $1.28 | 23.42 |

| As of 5/1/2010, per hour: | Wage* | H&W | Pens | Annu | Supp. Vac* | DC9 JAATF | IUPAT FTI | LMCF | IUPAT PAT* | IPF | Total Benefit Pkg | Total Package | Total Tax* Package | Check Off 3% | Stamp Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Base rate | 36.50 | 7.92 | 5.00 | 5.00 | 4.50 | 0.35 | 0.05 | 0.05 | 0.05 | 0.22 | 23.14 | 59.64 | 41.05 | $1.23 | 24.37 |
| Spray, Scaffold, Motorized Manlifts, Décor. & Sandblast | 39.50 | 7.92 | 5.00 | 5.00 | 4.50 | 0.35 | 0.05 | 0.05 | 0.05 | 0.22 | 23.14 | 62.64 | 44.05 | $1.32 | 24.46 |

**Art. III. Sec. 2. - Drywall Finishing (where applicable):** The prevailing wages of Drywall Finishers shall be those set forth in this Trade Agreement for the Counties of Nassau, Suffolk, Westchester, Putnam and any other area granted by the I.U.P.A.T. General Executive Board.

**Art III. Sec. 3. - Wall covering:**

a). Wages, fringe benefits and work rules applicable specifically to wall coverers are contained in the wall coverer's Price List set forth in Article XXVII of this Trade Agreement.

b). Wages for wall covering shall be paid weekly directly to the wall coverers performing the work and to no other person.

c). Wall coverers are employees and shall be entitled to the benefits required by federal and state laws and all other benefits included in this Trade Agreement.

**Art. III. Sec. 4. - Decorating:** Any JOURNEYPERSON who performs the work of decorating shall be paid as per Article III, Section 1. It is expressly understood that decorating work shall consist of designing, ornaments, flowers and figures, stenciling, fresco painting, marbleizing, graining, decorative stenciling, glazing, and the application of gold, silver, metal leafing, encaustic finishes and graphics.

**Art III. Sec. 5. - Show Up Time:** Employees who are not put to work after having been instructed to come to work shall be paid for four (4) hours, except when they are not put to work because of an act of God or other circumstances beyond their employer's control.

**Art. III. Sec. 6. - Layoffs:**

a). JOURNEYPERSONS laid off shall be paid the full day's wages if laid off during the day, except when the lay-off is caused by weather conditions.

6

b). JOURNEYPERSONS laid off shall be paid their wages one-half hour before quitting time, and fringe benefits must follow within the next forty-eight (48) hours.

**Art. III. Sec. 7. - Foremen:**

a). For each day of work on which there are five (5) or more JOURNEYPERSONS on a job, including the foreman, the foreman shall receive one (1) hour's pay in addition to the regular wages.

b). All foremen shall be required to attend classroom instruction on O.S.H.A. rules and regulations. The classroom instruction will be provided through the Union.

c). No foreman shall be paid the foreman's rate of pay unless he/she has complied with the foregoing instructional requirement.

d). For the purpose of this section, a foreman is a JOURNEYPERSON so designated by his/her employer who is paid eight (8) hours pay for a seven (7) hour day.

e). All foremen shall be bargaining unit employees designated by the employer and shall for all purposes be agents solely of the Employer. No foreman shall be made nor shall deemed to be an agent of the Union.

## COST OF LIVING ADJUSTMENT

**Art. III. Sec. 8. -** Cost of living Increase: Shall include all JOURNEYPERSONS and apprentices covered by this Trade Agreement.

**Art. III. Sec. 8(A). -** Effective Dates: Cost of Living wage adjustments shall be made effective at 12 month anniversary date intervals from the effective date of this Agreement until the expiration date of this Agreement.

**Art. III. Sec. 8(B). -** Basis for Adjustment: The amount of the cost-of-living adjustment shall be determined and redetermined as provided in (C) below on the basis of the official New York City Consumer Price Index for Urban Wage Earners and Clerical Workers (including single workers) published by the Bureau of Labor Statistics, US Department of Labor (1967=100) and referred to herein as the index.

**Art. III. Sec. 8(C). -** Amount of Allowance: The amount of the cost-of-living adjustment shall be computed as follows: April 1, 2005, April 1, 2006, April 1, 2007, April 1, 2008, April 1, 2009, and April 1, 2010 the most recent and available (i.e., March) index number shall be compared to the Index number 12 months prior and that a percent change shall be applied to all wage rates on May 1, 2005, May 1, 2006, May 1, 2007, May 1, 2008, May 1, 2009 and May1, 2010. The percent change shall be compared to the Index number 12 months prior and the percent change computed minus 6.5% shall be applied to all wage rates on May 1, 2005, on all wage rates in the Schedule A classification of Art. III. Sec. 1; and on May 1, 2006, the percent change as arrived at by Index number 12 month prior minus 6.5% shall be applied to all wage rates in the schedule A classification of Art. III. Sect. 1; and on May 1, 2007, the percent change as arrived at by Index number 12 month prior minus 6.5% shall be applied to all wage rates in the schedule A classification of Art. III. Sect. 1; and on May 1, 2008, the percent change as arrived at by Index number 12 month prior minus 6.5% shall be applied to all wage rates in the schedule A classification of Art. III. Sect. 1; and on May 1, 2009, the percent change as arrived at by Index number 12 month prior minus 6.5% shall be applied to all wage rates in the schedule A classification of Art. III. Sect. 1; and on May 1, 2010, the percent change as arrived at by Index number 12 month prior minus 6.5% shall be applied to all wage rates in the schedule A classification of Art. III. Sect. 1.

EXAMPLE: On July 1, 1975, the Bureau of Labor Statistics will publish their May index number on or about June 20, 1975. This May index number for New York City will be compared with the May index number for 1974, which were 152.5. Assuming that the index number of May 1975 is 164.7. A percentage change is calculated by dividing the 164.7. By 152.5, which yields an 8.0 percent increase. According to the attached cost of living clause, Section. C above, 6.5% would be deducted from this, and the 1.5% percentage increase remaining would apply to the wage rate section of the agreement and increase the rate accordingly.

## WORKING CONDITIONS

**Art. IV. Sec. 1(A).** - Standard Work Week: The regular time shall consist of thirty-five (35) hours per week divided into five (5) work days (from Monday to Friday inclusive) of seven (7) hours each, i.e., from 7:00 a.m. to 11 a.m. and from 11:30 a.m. to 2:30 p.m. OR 8:00 a.m. to Noon and from 12:30 p.m. to 3:30 p.m. Any job wishing to have a one (1) hour lunch period shall request special permission from the Union before instituting this procedure.

**Art. IV Sec. 1(B).** - A JOURNEYPERSON shall be permitted to take a ten minute rest period at 10:00 a.m. for coffee time, provided the JOURNEYPERSON does not leave the work site.

**Art. IV Sec. 1(C).** - In Nassau and Suffolk Counties, the morning break will be 15 minutes between the hours of 9:00 a.m. to 10:00 a.m. The employees will be permitted to sit and have coffee and a meal at their discretion not to exceed 15 minutes.

## OVERTIME AND OVERTIME PERMITS

**Art. IV Sec. 2(A).** - All work outside of the standard workweek as set forth in Art. IV. Sec.1. (A), or on Holidays as defined below, shall be considered as overtime and paid for at the rate of time and one-half of the regular rate for wages and fringe benefits. However, no overtime work shall be permitted without the Union's permission.

**Art. IV. Sec. 2(B).** - Overtime permits shall be granted for hours of work performed between the hours of 3:30 p.m. through 7:00 a.m., and all work performed on Saturday, Sunday, and Holidays. The Employer shall obtain an overtime permit from the Union at least forty-eight (48) hours in advance, whenever possible.

**Art. IV. Sec. 2(C).** - During the course of a year, all JOURNEYPERSONS in the shop shall be given an equal share of all overtime work whenever possible, and the assignment of such work shall be done in consultation with the Union.

**Art. IV. Sec. 2(D).** - All work performed on New Year's Day, Memorial Day, President's Day, Independence Day, Thanksgiving Day, the Day after Thanksgiving and Christmas Day, and all work performed on new construction and alteration work, outside regular hours, is to be paid at the rate of time and one-half. NO WORK SHALL BE PERFORMED ON LABOR DAY. If any of the holidays herein are designated by federal law to be celebrated on a day other than that on which they regularly fall, then for the purpose of this Trade Agreement the holiday shall be celebrated on the day set by said federal law with the same force and effect as if the day on which the holiday is celebrated was actually the holiday date. Any employee may individually elect to observe Martin Luther King, Jr. Day and shall be allowed the day off without penalty or compensation. The Sunday preceding Labor Day, of each year, shall be set aside as Memorial Sunday, in tribute to those brothers and sisters who have passed away.

**Art. IV. Sec. 2(E).** - Overtime Violations. In the event the Joint Trade Committee shall find an employer in violation of the overtime provisions of this Trade Agreement, excluding the failure to secure an overtime

permit, it may authorize the Union to place fifty percent (50%) of the overtime workers on the employer's job for the period of one (1) year. Further, during the six (6) months following such violation, the Joint Trade Committee may require that the overtime compensation due to the employees be paid in the form of a separate check payable to each employee for the full overtime compensation, which is paid directly to the employee.

# ORGANIZING WORK, MARKET RECOVERY,
## AND MAINTENANCE OF WORK

**Art. V. Sec. 1.** - Organizing Work Definition:

Any work of any type where no established or recognized union standards prevail (rates, fringes, and conditions to vary as needed).

**Art. V. Sec. 2.** - Market Recovery Definition:

a). Work where no general contractor or other building trades on the job site are involved;

b). Work where an Employer is the prime contractor;

c). Work where the Union has not historically done the work or can no longer maintain its presence (rate and fringes to be set). The maximum allowable alteration in said space shall be no more than 10% of total square footage or floor space of said job.

**Art. V Sec. 3.** - Maintenance of Work Definition:

a). Work where no general contractor is involved, where no other building trade crafts are working on the job site, and an Employer is the prime contractor; or

b). Work where the Employer can obtain at least a yearly contract to maintain a property or properties. Said contract will not cover alteration work or any form of new construction, and must guarantee annual employment for at least one employee where work is performed (rate and fringes to be set).

**Art. V. Sec. 4.** - New Work Definition:

Where work is built from the ground up and/or is bid through the General Contractor, or before the first finished coat of paint has been applied.

**Art. V Sec. 5.** - Alteration Work Definition:

a). When the General Contractor or other Trades are involved on the job site; or

b). Where the original, or existing, character or configuration has been changed with or without the issue of a Building Department Permit.

**Art. V. Sec. 6.** - The "Organizing Work, Market Recovery, and Maintenance of Work" language shall not be utilized on any work which is currently being performed by members of the Union and which can be maintained at the established rates and conditions.

**Art. V. Sec. 7.** - The "Organizing Work, Market Recovery and Maintenance of Work" clauses will only be used to organize new work opportunities, recover work formerly performed by the Union members and/or maintain work opportunities for Union members.

**Art. V Sec. 8.** - The standard workweek for Organizing Work, Market Recovery and Maintenance of Work shall be a five (5) day week, seven (7) hours per day. The regular time shall consist of thirty-five (35) hours per week, divided into five (5) workdays (from Monday to Friday inclusive) of any continuous seven (7) hour shift as follows:

a). Day Shift - Any continuous seven (7) hours at the regular rate of pay between 7:00 a.m. to 4:30 p.m.

b). Evening Shift - 4:30 p.m. to 12:00 Midnight (regular rate of pay).

**Art. V. Sec. 9.**

a). All work outside of the regular working hours, or workweek, as set forth in Art. V, Section 8 shall be considered as overtime and paid for at the rate of time and one-half of the regular rate for wages and fringe benefits. However, no overtime or shift work shall be permitted without written permission issued by the Union.

b). Any work performed beyond any seven (7) hours shift shall be compensated at the rate of time and one-half of the regular base rates, (in both wages and benefits).

c). The Employer must guarantee the payment of benefits for the entire seven hour evening shift, regardless whether the employee works part or full shift.

d). The Employer must indicate at the time of job registration if the job is being performed on day or evening shift, or both. If the Employer fails to do so, any or all hours worked in the evening shift must be paid at the overtime rate of time and one-half, plus the fringe benefits of the full shift.

e). Any work performed on Saturday, Sunday, or Holidays, or beyond seven (7) hours in a 24-hour time period, shall be paid at time and one-half of the regular base rate of pay, plus benefits, from the first hour of such work.

f). A JOURNEYPERSON shall be permitted to take a fifteen (15) minute rest period at 10 a.m. for coffee, provided the JOURNEYPERSON does not leave the work site, during the day shift. For the evening shift, the coffee break shall be at 6:30 p.m. and mealtime shall be at 8:30 p.m.

g). In Nassau and Suffolk Counties, the morning break will be 15 minutes between the hours of 9 a.m. and 10 a.m. The employees will be permitted to sit and have coffee and a meal at their discretion, not to exceed 15 minutes. The evening shift provisions of this Trade Agreement shall not apply in Nassau and Suffolk Counties.

**Art. V. Sec. 10.** - New work and alteration work is to be considered on all jobs where other trades are involved, and where an Employer is not the primary contractor.

**Art. V. Sec. 11.** - The Joint Trade Board will be provided with a report of every market recovery job and every newly signed job employing Union members. All newly signed employers will be encouraged to join the appropriate Association. The Union shall review with the Joint Trade Board all organizing and market recovery efforts. This review process is for Employers only as long as they are an all-union member and belong to the Finishing Contractors Association or its I.U.P.A.T. recognized successor.

10

**Art. V. Sec. 12.** - When the Employer notifies the Union of the presence on a job of a non-union painting contractor working in the Trades, the Union shall respond to the Employer within forty-eight (48) hours of receipt of the notification; provided, that the Employer's notification is in writing and includes the best available address of the job in question.

## OUT OF JURISDICTION WORK

**Art. VI. Sec. 1.** - Out of Jurisdiction Work - The Contractor or the Employer party to this Agreement, when engaged in work outside the geographical jurisdiction of the Union party to this Agreement, shall employ not less than fifty percent (50%) of the workers employed on such work from among the residents of the area where the work is performed, or from among persons who are employed the greater percentage of their time in such area; any others shall be employed only from the Employer's home area. It is further provided that these men must be qualified to meet job requirements.

The Employer party hereto shall, when engaged in work outside the geographic jurisdiction of the Union party to this Agreement, comply with all of the lawful clauses of the Collective Bargaining Agreement in effect in said other geographic jurisdiction and executed by the Employers of this industry and the affiliated Local Unions in that jurisdiction, including, but not limited to, the wages, hours, working conditions, fringe benefits, and procedure for settlement of grievances set forth there in; provided, however, that as to employees employed by such Employer from within the geographic jurisdiction of the Union party to this Agreement and who are brought into an outside jurisdiction, such employees shall be entitled to receive the wages and conditions effective in either the home or outside jurisdiction, whichever are more favorable to such employees, and fringe benefit contributions on behalf of such employees shall be made to their home funds in accordance with their governing documents. This provision is enforceable by the Local Union or District Council in whose jurisdiction the work is being performed, both through the procedure for settlement of grievances set forth in its applicable Collective Bargaining Agreement and through the courts, and is also enforceable by the Union party to this Agreement, both through the procedure for settlement of grievances set forth in this Agreement and through the courts.

## JURISDICTIONAL WORK RULES

**Art. VI. Sec. 2.** - On all work performed in (a) the five Counties of New York City; (b) Westchester and Putnam Counties; and (c) Nassau and Suffolk Counties, fifty percent (50%) of all manpower must come from the local unions in the respective area.

**Art. VI. Sec. 3.** - Out of Town Expenses. On all out-of-town jobs, the JOURNEYPERSON shall be provided with transportation by his/her employer. Commuting time in excess of one (1) hour shall be paid for at the regular wage rate, but shall not exceed eight (8) hours in every twenty-four (24)-hour period. A JOURNEYPERSON who commutes out of town at night shall not be paid for such commuting time, but sleeping accommodations and meals shall be provided.

**Art. VI. Sec. 4.** - Employees required to remain out-of-town overnight or longer shall be paid one (1) hour additional pay per day and an allowance of not less than $100.00 per day for room and board, unless his/her employer provides equivalent room and board acceptable to the employee.

**Art. VI. Sec. 5.** - Any Union member required by his/her employer to use his/her own automobiles for work outside the Union's jurisdiction shall be reimbursed at the rate of not less than thirty-two (32) cents per mile for expenses.

11

# APPRENTICE REGULATIONS

**Art. VII. Sec. 1.** - The wage rates for all apprentices shall be based upon JOURNEYPERSON wages provided in Articles III, and shall be as follows:

### 1st YEAR APPRENTICE

| per hour | 5/1/05 - 4/30/2006 | 5/1/06 - 4/30/2007 | 5/1/07 - 4/30/2008 | 5/1/08 - 4/30/2009 | 5/1/09 - 4/30/2010 | 5/1/10 - 4/30/2011 |
|---|---|---|---|---|---|---|
| Wage* | 12.70 | 12.70 | 12.70 | 13.25 | 13.25 | 13.25 |
| H & W | 5.94 | 6.93 | 7.92 | 7.92 | 7.92 | 7.92 |
| Pension | 0.75 | 0.75 | 0.75 | 0.75 | 0.75 | 0.75 |
| Annuity | === | === | === | === | 0.75 | 0.75 |
| Vacation* | 0.50 | 0.50 | 0.50 | 0.75 | 0.75 | 0.75 |
| DC9 - JAATF | 0.35 | 0.35 | 0.35 | 0.35 | 0.35 | 0.35 |
| IUPAT - FTI | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 |
| I.P.F. | 0.18 | 0.19 | 0.20 | 0.21 | 0.22 | 0.23 |
| L.M.C.F. | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 |
| PAT* | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 |
| Total Benefit Pkg | 7.87 | 8.87 | 9.87 | 10.13 | 10.14 | 10.15 |
| Total Taxable* | 13.25 | 13.25 | 13.25 | 14.05 | 14.05 | 14.05 |
| Check-off | 0.40 | 0.40 | 0.40 | 0.42 | 0.42 | 0.42 |
| Stamp Price | 8.27 | 9.27 | 10.27 | 10.55 | 10.56 | 10.57 |

### 2nd YEAR APPRENTICE

|  | 5/1/05 - 4/30/2006 | 5/1/06 - 4/30/2007 | 5/1/07 - 4/30/2008 | 5/1/08 - 4/30/2009 | 5/1/09 - 4/30/2010 | 5/1/10 - 4/30/201 |
|---|---|---|---|---|---|---|
| Wage* | 16.50 | 16.75 | 17.25 | 17.50 | 18.00 | 18.25 |
| H & W | 5.94 | 6.93 | 7.92 | 7.92 | 7.92 | 7.92 |
| Pension | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 |
| Annuity | 0.75 | 0.75 | 0.75 | 1.00 | 1.00 | 1.00 |
| Vacation* | 0.61 | 0.61 | 0.61 | 0.86 | 1.36 | 1.86 |
| DC9 - JAATF | 0.35 | 0.35 | 0.35 | 0.35 | 0.35 | 0.35 |
| IUPAT - FTI | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 |
| I.P.F. | 0.18 | 0.19 | 0.20 | 0.21 | 0.22 | 0.23 |
| L.M.C.F. | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 |
| PAT* | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 |
| Total Benefit Pkg | 9.98 | 10.98 | 11.98 | 12.49 | 13.00 | 13.51 |
| Total Taxable* | 17.16 | 17.41 | 17.91 | 18.41 | 19.41 | 20.16 |
| Check-off | 0.51 | 0.52 | 0.54 | 0.55 | 0.58 | 0.60 |
| Stamp Price | 10.49 | 11.50 | 12.52 | 13.04 | 13.58 | 14.11 |

### 3rd YEAR APPRENTICE

|  | 5/1/05 - 4/30/2006 | 5/1/06 - 4/30/2007 | 5/1/07 - 4/30/2008 | 5/1/08 - 4/30/2009 | 5/1/09 - 4/30/2010 | 5/1/10 - 4/30/2011 |
|---|---|---|---|---|---|---|
| Wage* | 19.80 | 20.10 | 20.70 | 21.00 | 21.60 | 21.90 |
| H & W | 5.94 | 6.93 | 7.92 | 7.92 | 7.92 | 7.92 |
| Pension | 2.50 | 2.50 | 2.50 | 2.50 | 2.50 | 2.50 |
| Annuity | 2.30 | 2.30 | 2.30 | 2.60 | 2.60 | 2.60 |
| Vacation* | 1.03 | 1.03 | 1.03 | 1.32 | 1.92 | 2.52 |
| DC9 - JAATF | 0.35 | 0.35 | 0.35 | 0.35 | 0.35 | 0.35 |
| IUPAT - FTI | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 |
| I.P.F. | 0.18 | 0.19 | 0.20 | 0.21 | 0.22 | 0.23 |
| L.M.C.F. | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 |
| PAT* | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 |
| Total Benefit Pkg | 12.45 | 13.45 | 14.45 | 15.05 | 15.66 | 16.27 |
| Total Taxable* | 20.88 | 21.18 | 21.78 | 22.37 | 23.57 | 24.47 |
| Check-off | 0.63 | 0.64 | 0.65 | 0.67 | 0.71 | 0.73 |
| Stamp Price | 13.08 | 14.09 | 15.10 | 15.72 | 16.37 | 17.00 |

### 4th YEAR APPRENTICE

|  | 5/1/05 - 4/30/2006 | 5/1/06 - 4/30/2007 | 5/1/07 - 4/30/2008 | 5/1/08 - 4/30/2009 | 5/1/09 - 4/30/2010 | 5/1/10 - 4/30/201 |
|---|---|---|---|---|---|---|
| Wage* | 26.40 | 26.80 | 27.60 | 28.00 | 28.80 | 29.20 |
| H & W | 5.94 | 6.93 | 7.92 | 7.92 | 7.92 | 7.92 |
| Pension | 4.50 | 4.50 | 4.50 | 4.50 | 4.50 | 4.50 |
| Annuity | 4.00 | 4.00 | 4.00 | 4.40 | 4.40 | 4.40 |
| Vacation* | 1.80 | 1.80 | 1.80 | -2.20 | 3.00 | 3.80 |
| DC9 - JAATF | 0.35 | 0.35 | 0.35 | 0.35 | 0.35 | 0.35 |
| IUPAT - FTI | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 |
| I.P.F. | 0.18 | 0.19 | 0.20 | 0.21 | 0.22 | 0.23 |
| L.M.C.F. | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 |
| PAT* | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 |
| Total Benefit Pkg | 16.92 | 17.92 | 18.92 | 19.73 | 20.54 | 21.35 |
| Total Taxable* | 28.25 | 28.65 | 29.45 | 30.25 | 31.85 | 33.05 |
| Check-off | 0.85 | 0.86 | 0.88 | 0.91 | 0.96 | 0.99 |
| Stamp Price | 17.77 | 18.78 | 19.80 | 20.64 | 21.50 | 22.34 |

**Art. VII. Sec. 2.** - All apprentices shall be indentured for a four (4) year apprenticeship. A year shall be completed upon performance by the apprentice of 1500 hours of on the job training with signatory employers and 144 hours of instruction conducted by the District Council No. 9 Joint Apprenticeship and Training Fund. Upon completion of the apprentice program such apprentice shall be considered a full fledged JOURNEYPERSON and shall receive full JOURNEYPERSON wages, provided the apprentice complied with the rules of the Joint Apprentice Committee, as defined in Article VII, Section 8.

**Art. VII. Sec. 3.** - Employers shall not require that an apprentice work when the apprentice is required to attend Apprentice Training School unless the Employer has received permission in advance from the Apprentice Training Coordinator.

**Art. VII. Sec. 4.** - All submitted bills covering wall coverer apprentices shall state the classification of apprenticeship and the number of hours worked. Bills must be submitted and paid weekly.

12

**Art. VII. Sec. 5. - Apprentice Ratio.** For the term of this Trade Agreement, the ratio of apprentices to JOURNEYPERSONS must be maintained at one (1) apprentice for every three (3) JOURNEYPERSONS employed per shop.

**Art. VII. Sec. 6. - Violations.** Upon the failure of an Employer to comply with the terms of Sections 4 and 5 above, the Joint Apprentice Committee, after due notice to the Employer, shall designate the appropriate number of apprentices to be employed in the shop.

**Art. VII. Sec. 7. -** No apprentice receiving less than 60% of JOURNEYPERSON wages shall be placed in a shop unless that shop already employs at least one apprentice receiving the 80% rate. This rule may be waived when there are no apprentices available in the category of 80%. No apprentice receiving less than 80% of the JOURNEYPERSON wages shall work by himself on a job. No apprentice receiving less than 80% of the Journeyperson wages shall be permitted to spray paint.

**Art. VII. Sec. 8. -** The Joint Apprentice Committee shall consist of six (6) members, three of whom shall be designated by the Association of Master Painters and Decorators of New York, Inc. and three shall be designated by the Union. One of the three designated by each party shall include a representative of the wall coverers craft. The Joint Apprentice Committee shall be responsible for the placement and training of apprentices in the trades as work is available, and in accordance with any rules adopted by the Joint Apprentice Committee.

**Art. VII. Sec. 9. -** The conditions of employment of apprentices shall be regulated by the Joint Apprentice Committee, which shall also have the power to formulate regulations for a system of required employment for apprentices. All apprentices shall be bound by the Agreement they sign and by all the rules and regulations of the Joint Apprentice Committee.

**Art. VII. Sec. 10. -** All wall coverer apprentices must be chosen from the ranks of painter apprentices, who have served not less than one (1) year as a painter apprentice.

# PAYMENT OF WAGES

**Art. VIII. Sec. 1. -** Wages shall be paid on the job, during regular working hours. Payday shall be on Thursday. Wages shall be paid by check. In the event that the payday falls on a holiday, payment shall be made on the day before the holiday. If payment by check is made on a Friday or on the day before a holiday, the employees shall be allowed one half hour off to cash their checks. Workweek ending must be on Tuesday. Employers who have previously disbursed payroll checks without sufficient funds (one offense) shall be liable for a 20% penalty, or in an amount determined by the Joint Trade Committee. The penalty shall be paid to the employee in addition to the amount for which the check was written.

**Art. VIII. Sec. 2. -** JOURNEYPERSONS and apprentices not paid on the day provided in the preceding Sec.1 shall be paid two (2) hours pay in addition to the wages due them. If the JOURNEYPERSONS and apprentices are not paid by the following Monday at 8:00 a.m., upon notification from the Union to the Employer, no JOURNEYPERSON or apprentice shall start work on that job until payment is made in full to all JOURNEYPERSONS and apprentices. In addition to all other sums due them, the JOURNEYPERSONS and apprentices shall not be paid less than a full day's wages for that day.

**Art. VIII. Sec. 3. -** Not more than two day's pay shall be held back.

**Art. VIII. Sec. 4. - Wage Statements.** At the time of payment of wages, the Employer shall give to each Employee a statement in ink or indelible pencil showing the amount of each and every deduction from the

13

wages, including administrative dues check-off as provided in Article XX, section 10. The statement shall also show the Employer's name and the employee's Social Security number.

**Art. VIII. Sec. 5.** - Time sheets may be provided by the Employer. If provided, time sheets shall be filled out by each JOURNEYPERSON and apprentice, upon request of the Employer.

## JOB STEWARDS

**Art. IX. Sec. 1(A).** - Job Stewards - On any job employing two (2) or more employees, the Union shall select a Job Steward from among the employees working on the job. Once the job steward is selected, he shall remain on the job as the second to last man on the job. All employers outside the jurisdiction of this District Council must have a Job Steward from the Union Hall on each job.

**Art. IX. Sec. 1(B).**

a). If the Union files a grievance in accordance with Article XIII of this Trade Agreement for (i) the use of non-union employees on the job; or (ii) non-payment of wages or fringe benefit stamps or shortages thereof, the Joint Trade Committee shall conduct a hearing within forty-eight (48) hours. All work shall continue on said job pending the hearing. No postponements of the hearing shall be granted under any circumstances. If the hearing does not take place within 48 hours because of management's unavailability, the Union reserves the right to stop the job.

b). If the Joint Trade Committee finds that the Employer has committed either of the violations set forth in sub-section (a) above, the remedies shall be as follows:

    i.    First violation for use of non-Union employee(s): the Union will appoint a job steward from the Union Hall on all the Employer's jobs employing two (2) or more employees for a period of one year.

    ii.    Second violation for use of non-Union employee(s): the Union will appoint a job steward from the Union Hall on all of the Employer's jobs employing two (2) or more employees for the life of this Trade Agreement.

    iii.    First violation for non-payment or shortage of wages: the Union will appoint a job steward from the Union Hall on all the Employer's jobs employing two (2) or more employees for a period of one year.

    iv.    Second violation for non-payment or shortage of wages: the Union will appoint a job steward from the Union Hall on all of the Employer's jobs employing two (2) or more employees for the life of this Trade Agreement.

    v.    First violation for non-payment of fringe benefit stamps or shortages thereof for all employees on the job: the Union will appoint a job steward from the Union Hall for the duration of the job on which the violation was committed.

    vi.    Second violation for non-payment of fringe benefit stamps or shortages thereof for all employees on the job: the Union will appoint a job steward from the Union Hall on all of the Employer's jobs employing two (2) or more employees for a period of one year.

    vii.    In the event that a job steward has been removed from a job, the placed job steward will be of the same status (e.g., journeyman, apprentice) as the job steward being removed.

14

c). In the event that there is an individual stamp or wage shortage for an employee working on a job, the Union will notify the Employer in writing and demand that the employee be made whole. The Employer will then have forty-eight (48) hours from verified receipt of the Union's written demand to make the employee whole. If the Employer fails to make the employee whole within forty-eight (48) hours, the Union may remedy the violation in accordance with sub-sections (a) and (b) above.

d). No Retaliation: There shall be no retaliation by the Employer against any employee who reports to the Union any alleged violation of this Trade Agreement. The employee must report the violation to the Union within fourteen (14) days of the date of the occurrence of the violation. The Union must file a grievance on said violation in accordance with Article XIII of this Trade Agreement within thirty (30) days of the date it receives the complaint from the employee. The grievance and arbitration procedures of Article XIII of the Trade Agreement must be exhausted before the employee may individually commence an action in any other forum to remedy any alleged violation of this Trade Agreement.

e). Nothing contained in this Article XI, Section 1(B) shall limit the authority of the Joint Trade Committee and Joint Trade Board to impose the fines and other remedies set forth in Article XIII, Section 11.

## SHOP STEWARDS

**Art. IX. Sec. 2(A).** - Shop Stewards: The Employer and all new Employers who become parties to this Agreement shall have a shop steward appointed by the Union.

**Art. IX. Sec. 2(B).** - Duties of the Shop Steward shall be as follows:

a). The duties of a Steward shall consist of examining the dues books, work cards, and reviewing and reporting for stamp program compliance of the Journeypersons and apprentices on the job and enforcing Union conditions and proper working conditions.

b). It is the responsibility of every employer to submit weekly reports provided by the Union and designated or called "Shop Steward Reports". Failure to submit such reports will result in a fine of five hundred dollars ($500) for each missing report.

**Art. IX. Sec. 2(C).** - If any Steward is paid and receives any money or other things of value over and above his regular JOURNEYPERSONS wages for work actually performed in accordance with the provisions of this Agreement, the Joint Trade Board shall impose appropriate penalties upon both Employer and the Steward. All the JOURNEYPERSONS on the job shall receive the same wages as the Steward has received during the period of his violation, and the Steward shall be removed from the Steward List for a period of at least five (5) years.

## TIME FOR STEWARDS' DUTIES

**Art. IX. Sec. 3(A).** - A Steward shall perform a fair day's work as a working JOURNEYPERSON.

**Art. IX. Sec. 3(B).** - No Steward shall be discriminated against for the proper performance of their duties. Said Steward shall be allowed for the performance of their Steward's duties not less than one hour per day, on jobs having five or more men.

## STEWARDS' COMMITTEE

15

**Art. IX. Sec. 4.** - There shall be a Stewards' Committee composed of two representatives appointed by the Associations and two representatives appointed by the Union.

**Art. IX. Sec. 5.** - The Stewards' Committee shall hear Employer complaints against Stewards on charges of misconduct or Union complaints of abuse of Steward's rights and shall meet within 48 hours. The Steward may not be suspended pending the disposition of charges if such failure is due to the absence of the Employer's representatives. He may be so suspended, however, if the Committee's failure to meet is due to the absence of the Union's representatives. A quorum of the Committee shall consist of one representative from each side and its finding shall be decided by unit vote.

**Art. IX. Sec. 6.** - Deadlock: In the event the Stewards Committee deadlocks or otherwise fails to decide any complaint, either party may, within thirty days, refer the complaint to the Joint Trade Board for final and binding decision, in accordance with the rules and regulation of the Board.

## JOB REGISTRATION

Art. X. - Registration of Jobs.

a). Every Employer must register with the Union prior to the commencement of any unscheduled job, on a written, numerically ordered job registration form that shall be provided by the Union. The completed registration form shall state the exact location and nature of the job or operation. The Employer on a scheduled job or operation shall, within twenty-four (24) hours after the commencement of the job or operation, file with the Union a written statement of the exact location and nature of the job or operation, and shall not thereafter be required to make any further report with respect to such job or operation within that calendar year. In the event that any work on said job or operation is done by any other employer, such other Employer shall, within forty-eight (48) hours after commencement of the work, file with the Union a written statement of the work to be performed by the other employer. All exterior work shall be reported each time, prior to starting the job. The number of registrations filed must coincide with dates of the work performed.

b). All job registrations from all areas under the jurisdiction of the Union must be faxed to 212-255-1151 or 212-255-2968, or mailed by overnight express to the Union's offices at 45 West 14th Street, New York, NY 10011, prior to commencement of any job or operation requiring registration.

c). Failure to register all jobs on a timely basis will result in fines as established and amended by the Joint Trade Committee.

d). Scheduled buildings shall be registered when work commences and thereafter re-registered with the Union on January 1 of each year.

e). Every Employer shall report the loss of any scheduled building to the Union in writing within twenty-four (24) hours.

## BUSINESS REPRESENTATIVES

Art. XI. - Business Representatives of the Union, and other duly authorized representatives of the Union, may visit all jobs and shops for the purpose of ascertaining compliance with the provisions of this Trade Agreement. Employers will make their best efforts to gain access to buildings where they are working for Business Representatives to investigate compliance with the provisions of this Trade Agreement.

16

## GRIEVANCES AND DISPUTES

**Art. XII. Sec. 1.** – The Employee Grievance Procedure shall be as follows:

a). Foreman Review: An employee's grievance shall first be presented by his Steward to the foreman. If no satisfaction is reached within twenty-four (24) hours, that matter shall be referred to the Employer and the Union.

b). Steward's Review: The Steward shall review the grievances with the supervisor or any other representative designated by the Employer. If a satisfactory settlement is not reached within twenty-four (24) hours, the matter shall then be reduced to writing and referred to the Joint Trade Committee for hearing and decision pursuant to Article XIII of this Trade Agreement.

## JOINT TRADE COMMITTEE & JOINT TRADE BOARD

**Art. XIII. Sec. 1.** – Joint Trade Committee.

The Joint Trade Committee is hereby created, serving the geographic locations covered by this Trade Agreement. The Joint Trade Committee shall consist of not less than two (2) Association of Master Painters and Decorators Association of New York, Inc. representatives and two (2) Union representatives.

**Art. XIII. Sec. 2.** – Joint Trade Board

A Joint Trade Board is hereby created, which shall be comprised of the President of the Association of Master Painters and Decorators of New York, Inc., and the Secretary-Treasurer of the Union, or representatives, respectively designated by each of them.

**Art. XIII. Sec. 3.** – Jurisdiction of the Joint Trade Committee and Joint Trade Board.

a). The Joint Trade Committee and Joint Trade Board are empowered to hear and decide in arbitration as hereinafter provided, all grievances and disputes which arise between the parties as to the interpretation or application of this Trade Agreement and to make such awards or assess remedies, damages and penalties for violations of this Trade Agreement. The Joint Trade Committee and Joint Trade Board shall have the authority to issue awards with respect to all grievances and disputes in any manner which they deem reasonable. The Joint Trade Committee and the Joint Trade Board shall have all powers necessary to remedy complaints brought before them including, but not limited to (i) liquidated damages; (ii) interest on monies due; (iii) attorneys' fees; and (iv) the cost and expenses of arbitration.

b). All grievances or disputes against either party to this Trade Agreement, for alleged violations of the same, which have not been adjudicated by a Joint Trade Committee for any reason, shall be adjudicated by the Joint Trade Board.

c). The Joint Trade Committee and Joint Trade Board upon hearing any grievance alleging an Employer's failure to pay fringe benefit contributions shall not issue an award requiring the payment of such contributions or late charges. Rather, the Joint Trade Committee or Joint Trade Board shall deliver a written finding of delinquency to the Funds for further enforcement. The judgment by the Joint Trade Committee or Joint Trade Board shall be a recommendation and not binding on the Funds. The Joint Trade Committee or Joint Trade Board, upon issuing a finding of delinquency, may also issue an award requiring the payment of the fines set forth in Article XIII, Section 11, Violation 9 and order the remedies set forth in Article IX.

17

d). The Joint Trade Committee and the Joint Trade Board are also empowered to (i) issue interpretive rules or other rules and regulations as they deem necessary to give full force and effect to their decisions; (ii) conduct audits of Employers' records; (iii) upon request of both parties, recommend amendments or changes to this Trade Agreement; and (iv) appoint such persons or committees as may be necessary to aid in the performance of their duties.

## Art. XIII. Sec. 4. - Procedures

a). The Joint Trade Committee and Joint Trade Board may, when deemed necessary, promulgate amendments and revisions to the rules and regulations set forth in this Article governing their own conduct. The parties to this Trade Agreement agree to be bound by any such amendments and revisions.

b). The Joint Trade Committee and Joint Trade Board shall meet at their discretion.

c). When the Joint Trade Committee votes on a question, complaint or finding, the Association and the Union shall each have one (1) vote and these votes shall be equal regardless of the number of representatives present and voting.

d). The decisions, findings and award of the Joint Trade Committee and/or the Joint Trade Board shall be final and binding upon the Employer and the Union, all members thereof, and all interested parties.

## Art. XIII. Sec 5. - Rules and Regulations

a). Filing of the Demand to Arbitrate a Grievance or Dispute.

    i.    A demand to arbitrate a grievance or dispute shall be in writing and shall be filed by mail or hand-delivered to the Joint Trade Committee. Demands shall be filed at the Joint Trade Committee's offices located at 45 West 14th Street, 3rd Floor, New York, New York. The demand shall state the name of the aggrieved party, and the name of the party against whom the grievance or dispute is asserted. The party filing the grievance or dispute shall thereafter be called the complainant. The party against whom the grievance or dispute is asserted shall thereafter be called the respondent.

    ii.    Each demand shall set forth only one alleged grievance or dispute in simple and concise form, and shall set forth the basis of the grievance or dispute, with appropriate reference to the Trade Agreement provisions at issue, to the extent known. The demand shall also set forth the date of the particular incident and, if known, the name(s) of the person and/or Employer(s) involved. The demand may also set forth the remedy sought.

    iii.    Every demand to arbitrate shall specify the name of the party serving the demand, or of an officer or agent thereof if such party is an association or corporation, and shall state that unless the party served applies to stay the arbitration within twenty (20) days after such service or, in the case of Article IX grievances, 48 hours after such service, he/she shall thereafter be precluded from objecting that a valid agreement was not made or has not been complied with, and from asserting in court the bar of a limitation of time.

b). Service of the Demand to Arbitrate a Grievance or Dispute and Setting of the Date of Hearing.

    i.    Simultaneously with the filing of the demand with the Joint Trade Committee, the complainant will serve a copy of the demand upon the respondent. Within fourteen (14) days of the filing of the demand, the Joint Trade Committee shall notify the complainant and respondent of the date and time for the hearing of the grievance or dispute before the Joint Trade Committee. Service upon the

18

respondent of the complainant's demand to arbitrate, and service upon the complainant and respondent by the Joint Trade Committee of the notice of the date of the hearing of the arbitration, shall be by certified mail and return receipt requested, or overnight express mail. The mailing to an Employer shall be made to the Employer's address on file with the Union.

ii.    The date set for the hearing by the Joint Trade Committee shall not be less than twenty (20) days, nor more forty-five (45) days, from the date the notice was mailed by the Joint Trade Committee.

## Art. XIII. Sec. 6. – Respondent

The respondent may submit to the Joint Trade Committee and to the complainant a response to the complainant's demand to arbitrate, provided that the response is received by the Joint Trade Committee no less than three (3) days before the date of the hearing fixed in the notice.

## Art. XIII. Sec. 7. - Arbitration Hearings

a). Representation of the Complainant and Respondent. The Union as a complainant or respondent shall be represented at the hearing by an officer or representative of the Union authorized by its Secretary-Treasurer to act in such capacity, or by the business representative of the local union having jurisdiction over the geographical area where the incident giving rise to the demand to arbitrate occurred. An Employer as a complainant or respondent, if a corporation, shall be represented at the hearing by an officer thereof, or, if a sole proprietorship, partnership or unincorporated business association, by a principal thereof. If a complainant or respondent is a member of an employer association recognized by the Union, it may also be represented at the hearing by a duly authorized member of such association. A party has the right to be represented at the hearing by legal counsel.

b). Hearing procedures. The arbitration hearing shall be conducted by two (2) chairpersons who shall be members of the Joint Trade Committee, one of whom shall be an Association representative and the other a Union representative. The grievance or dispute, proof of due service of same, and any response thereto by the respondent will be presented at the inception of the hearing. The complainant may present witnesses and other evidence in support of the request, and the respondent may present witnesses in its defense. The respondent and complainant will both have the right of cross-examination. The Joint Trade Committee shall be the judge of the relevance and materiality of the evidence offered, and conformity to the state or federal rules of evidence shall not be necessary.

c). Nature of Hearings. Hearings shall be as informal as may be reasonable and shall be conducted in the manner considered appropriate by the chairpersons. The chairpersons shall have the authority to vary the procedures, as they deem necessary in order to insure that each party is afforded a full and fair opportunity to present any and all material and relevant evidence.

d). Minutes of Proceedings. Any party desiring a stenographic record shall make arrangements directly with a stenographer and shall notify the other party and the Joint Trade Committee at least three (3) days in advance of the scheduled hearing date. The requesting party shall pay the cost of the transcript and a copy of it must be made available at no cost to the Joint Trade Committee upon the conclusion of the hearing.

e). Postponements. Except as provided in Article IX, Section 1(a) and (c), the Joint Trade Committee may, for good cause shown, postpone any hearing upon the request of a party or upon the Joint Trade Committee's own initiative, and shall also grant such postponement when all of the parties agree.

f). Hearings in the Absence of a Party. The hearing may proceed in the absence of a party or representative who, after due notice, fails to appear or fails to obtain a postponement. A decision and award of the Joint

19

Trade Committee or Joint Trade Board shall not be made solely on the default of a party. The Joint Trade Committee shall require the party who is present to submit such evidence as may be required for the making of a decision.

g). Interpretation and Application of Procedures, Rules and Regulations. The Joint Trade Committee and Joint Trade Board shall interpret and apply the above procedures, rules and regulations insofar as they relate to the power and duties of the Joint Trade Committee and the Joint Trade Board, respectively. If an unresolvable difference arises between the Union and Association representatives on a Joint Trade Committee concerning the meaning or application of these procedures, rules and regulations, it shall be resolved and decided by the Joint Trade Board.

## Art. XIII. Sec. 8. - Awards

a). The Joint Trade Committee will, no later than thirty (30) days after the close of the hearing, adjust or dispose of the grievance or dispute by rendering an award which may include the imposition of fines and/or penalties. The fines or penalties which may be imposed by the Joint Trade Committee are set forth in the schedule of standardized fines which are made a part of this Article as Section 11. If a demand for arbitration seeks the recovery of wages and /or benefits, the calculation of those wages and benefits shall be presented and determined at the hearing and the total amounts owed shall be reflected in the award.

b). In the event the Joint Trade Committee fails to render an award within the time provided in the preceding sub-section (a) or a decision cannot be made due to deadlock of the Joint Trade Committee, the Joint Trade Committee shall submit the grievance or dispute to the Joint Trade Board, and the Joint Trade Board shall render an award. The failure of the members of the Joint Trade Board to be present at the arbitration hearing before the Joint Trade Committee shall not preclude the issuance of an award by the Joint Trade Board.

c). The awards of the Joint Trade Committee and/or the Joint Trade Board, including an award of fines or penalties, shall be final and binding upon the complainant and respondent and all interested parties, and judgment may be entered upon the award in accordance with applicable law in any court having jurisdiction thereof.

## Art. XIII. Sec. 9. - Fines and Penalties

a). All fines and penalties awarded by the Joint Trade Committee and/or the Joint Trade Board, less the reasonable administrative cost and expenses actually incurred, shall be used to advance the industry, to sponsor educational programs for the members in good standing of the Union and their children, and to aid and assist in the establishment of programs to increase business activity within the industry and develop and maintain maximum job opportunities for those Union members.

b). When a Joint Trade Committee or the Joint Trade Board finds that an Employer is guilty of violating the Trade Agreement, the Joint Trade Committee or the Joint Trade Board may, at its discretion, authorize the Union to designate up to fifty percent (50%) of the JOURNEYPERSONS in the employ of such Employer for a period not exceeding six (6) months, provided that, with respect to violations of Article IV, the remedies set forth in Article IV, Section 2(E) shall be applicable.

## Art. XIII. Sec. 10. - Protection of Complainants

No Employer shall dismiss any JOURNEYPERSON for giving evidence at an arbitration hearing. Such person giving evidence or testimony shall have the protection of the Joint Trade Committee and Joint Trade Board.

**Art. XIII. Sec. 11. – Schedule of Fines**

The schedule of fines which shall be in effect for the duration of this Trade Agreement, or until such time as amended by the Joint Trade Board, will be not less than the following:

**Violation 1:** No Registration.
  1st Offense = $500.00
  2nd Offense = $750.00
  3rd Offense = $1,500.00
  within 12 months, plus the Joint Trade Committee has discretion to implement 50% of the men on the job from the Union.

**Violation 2:** No registration and non-union men on the job.
  1st Offense = $750.00 - no registration , plus $750.00 - each non-union man
  2nd Offense = $1,000.00 - no registration, plus $1500.00 for each non-union man,
  plus the Joint Trade Committee has discretion to implement 50% of the men on the job from the Union.

**Violation 3:** No overtime permit.
  1st Offense = $500.00
  2nd Offense = $1,000.00
  3rd Offense = $1,500.00
  within 12 months, plus the Joint Trade Committee has discretion to implement 50% of the men on the job from the Union.

**Violation 4:** No overtime permit with non-union man on the job.
  1st Offense = $1,500.00 - no permit, plus $750.00 - each non-union man
  2nd Offense = $2,500.00 - no permit, plus $1,000.00 - each non-union man
  3rd Offense = $ $3,000.00 - no permit, plus $1,500.00 - each nonunion man
  within 12 months, plus the Joint Trade Committee has discretion to implement 50% of the men on the job from the Union.

**Violation 5:** Unregistered legal spraying.
  1st Offense = $250.00
  2nd Offense = $500.00
  3rd Offense = $1,000.00
  within 12 months, plus the Joint Trade Committee has discretion to implement 50% of the men on the job from the Union.

**Violation 6:** No spray permit - illegal spraying.
  1st Offense = $1,500.00 plus advantage gained
  2nd Offense = $2,500.00 plus advantage gained
  3rd Offense = $3,000.00 plus advantage gained
  plus the Joint Trade Committee has discretion to implement 50% of the men on the job from the Union.

**Violation 7:** No spray permit with non-union men.
  1st Offense = $500.00 no permits

**Violation 8:** Discrimination against Job or Shop Steward or retaliation against "whistleblowers".
  1st Offense = Wages and fringe benefits $500.00 liquidated damages.

**Violation 9:** Non-Union man

21

1st Offense = $1,000.00 for each non-union man plus $500.00 liquidated damages
2nd Offense = $2,500.00 for each non-union man plus $750.00 liquidated damages
plus the Joint Trade Committee has discretion to implement 50% of the men on the job from the Union.

**Violation 10:** Subcontracting to non-union employer.
1st Offense = Penalty contingent upon size and scope of project, plus $1,500.00 liquidated damages.

**Violation 11:** Failure to submit Shop Steward reports or remittance reports.
1st Offense = $500.00 each missing report.

**Violation 12:** Failure to pay wages and/or fringe benefits or payment in cash for wages and/or fringe benefits.
1st Offense = Any wages and fringe benefits owed plus liquidated damages in an amount equal to the unpaid (or cash paid) fringe benefits only, but no less than $1,000.00.

Applicable to all violations above:

In addition to the penalty for the final offense listed above with respect to the violations set forth in the Section 11 above, with the exception of violations 1, 3 and 11 (addressed below), the Joint Trade Committee and/or the Joint Trade Board may direct the Union to appoint a job steward from the Union Hall on all of the Employer's jobs employing two (2) or more employees for the life of this Trade Agreement. With respect to violations 1, 3 and 11, in addition to the penalty for the final offense listed above with respect to the violations set forth in Section 11, above, the Joint Trade Committee and/or Joint Trade Board may direct the Union to appoint a job steward from the Union Hall on all of the Employer's jobs employing two (2) or more employees for one year.

**Art. XIII. Sec. 12.** - Deadlock or Failure of the Joint Trade Board to Render a Decision

If the Joint Trade Board deadlocks or otherwise fails to render an award deciding any grievance or dispute within fourteen (14) days of submission to it by the Joint Trade Committee, either party may, within thirty (30) days of the expiration of said fourteen (14) day period, refer the grievance or dispute to arbitration by filing a written request with the Joint Trade Board, with a copy served upon the opposing party. Upon receipt of such request, the Joint Trade Board shall promptly submit such grievance or dispute to arbitration pursuant to the Labor Arbitration Rules of the American Arbitration Association ("AAA"). The decision of the AAA arbitrator shall be final and binding.

## STRIKES AND LOCKOUTS

**Art. XIV. Sec. 1.** - There shall be no strikes or lockouts in the shops or upon the work of any Employer, nor shall the members of the Union collectively leave the job of an Employer. The Union reserves its constitutional right not to work with non-union journeypersons. It is further agreed that before the Union removes any JOURNEYPERSON or apprentice from a job site under this reserved right, the Union shall give at least twenty-four (24) hours' notice to the Joint Trade Board or the Joint Trade Committee. It is agreed that no support is to be given to a union that has removed its journeypersons in violation of any applicable no-strike clause.

**Art. XIV. Sec. 2.** - Any Employer who has been judged by the Joint Trade Board or the Joint Trade Committee to be in violation of this Trade Agreement or guilty of any charge brought against it before the Joint Trade Board or the Joint Trade Committee shall be outside the protection of Art. XIV, Sec. 1, until such time as it is in compliance.

Art. XIV. Sec. 3. - If an Employer fails to comply with a decision of the Joint Trade Board or a Joint Trade Committee, the Union must order its JOURNEYPERSONS and apprentices to cease work until that Employer is in compliance on any and all jobs.

Art. XIV. Sec. 4. - Employees covered by this Trade Agreement shall have the right to respect any legal primary picket line validly established by any bona fide labor organization, and the Union has the right to withdraw employees covered by this Trade Agreement whenever the Employer is involved in a legitimate primary labor dispute with any bona fide labor organization.

Art. XIV. Sec. 5. - For any foreman who receives a minimum of 48 weeks of pay from one Employer, District Council No. 9 will, upon written request from that Employer, make arrangements so that mandatory picketing by that foreman will not interfere with his or her work schedule. The Employer must identify the foremen on its roster at the time of its written request, which must be made during the month of January for that year. In connection with this paragraph only, the Employer shall notify the Union in writing if a foreman's status changes.

## SUBCONTRACTS

Art. XV. Sec. 1. - To protect and preserve for the employees covered by this Trade Agreement all work they have performed and all work covered by this Trade Agreement, and to prevent any device or subterfuge to avoid the protection and preservation of such work, it is agreed that if any Employer performs on-site construction work of the type covered by this Trade Agreement, under its own name or the name of another, as a corporation, company, partnership, or other business entity, including a joint venture, wherein the Employer, through its officers, directors, partners, owners, or stockholders, exercises directly or indirectly (through family members or otherwise), management, control, or majority ownership, the terms and conditions of this Trade Agreement shall be applicable to all such work.

Art. XV. Sec. 2. - All charges of violations of Section 1 of this Article shall be considered as a dispute and shall be processed in accordance with the provisions of this Trade Agreement on the handling of grievances and the final and binding resolution of disputes as provided in Articles XII and XIII. As a remedy for violations of this Article, the Joint Trade Committee, the Joint Trade Board or a AAA Arbitrator shall, at the request of the Union, be able to require an Employer (i) to pay to affected employees covered by this Trade Agreement, including registered applicants for employment, the equivalent of wages those employees have lost because of the violations; and (ii) to deposit into the affected Joint Trust Funds to which this Trade Agreement requires contributions any delinquent contributions that resulted from the violations. The Joint Trade Committee or Joint Trade Board or AAA Arbitrator shall also be able to provide any other appropriate remedies, whether provided by law or this Trade Agreement. The Union shall enforce a decision of the Joint Trade Committee, Joint Trade Board, or AAA Arbitrator under this Article only through arbitral, judicial, or governmental (e.g., the National Labor Relations Board) channels.

Art. XV. Sec. 3. - If an Employer violates this Article, and the Union and/or the Trustees of one or more Joint Trust Funds to which this Trade Agreement requires contributions institutes legal action to enforce an award by the Joint Trade Committee, Joint Trade Board or AAA Arbitrator remedying such violation, or has to defend an action that seeks to vacate such award, the Employer shall pay any accountants' and/or attorneys' fees incurred by the Union and/or the Joint Trust Funds, plus the costs of the litigation that have resulted from such legal action. This section shall not affect other remedies, whether provided by law or this Article, that may be available to the Union and/or the Joint Trade Trust Funds.

Art. XV. Sec. 4. - JOURNEYPERSONS shall neither directly nor indirectly, whether through their spouse or through any other subterfuge, contract to perform any of the Trades' work covered by this Trade Agreement.

23

**Art. XV. Sec. 5.** - Any Employer who shall perform work in a joint venture or through a subsidiary or affiliated company shall be responsible and liable for the compliance with the terms of this Trade Agreement by such joint venture or subsidiary or affiliated company.

# SPRAY PERMITS FOR ALTERATION AND NEW WORK

**Art. XVI. Sec. 1.** - Spraying of all paint, varnish, lacquer or other paints containing injurious solvents without prior permission from the Union is prohibited.

**Art. XVI. Sec. 2.** - The spraying of whitewash or water dispersed paints in dumbwaiter shafts and rough masonry surfaces in areas such as garages, basements, storage rooms, fan rooms, mechanical equipment rooms, lofts and rehabs, is permitted upon receiving permission from the Union. Concrete ceilings must be primed by brush or roller before a spray permit is issued.

**Art. XVI. Sec. 3.** - The spraying of acoustic ceilings and inaccessible surfaces for decorative effects which are impossible to brush or roll shall be permitted only upon securing permission of the Union.

**Art. XVI. Sec. 4.** - Where spraying of multi-color is permitted, i.e., in public corridors and stairwells, a full base coat of paint must be applied by brush or roller applicator on new and alteration jobs before the multi-color may be sprayed on.

**Art. XVI. Sec. 5.** - A Spray Committee composed of two (2) members representing the Employer and two (2) members representing the Union shall be formed to determine any discrepancy with this Article and to review any veto or modification the Union may impose with regard to applications for spray permits. The Spray Committee's decision shall be binding on all parties to this Trade Agreement. Information on spray permits must be factual and specific and also shall include the name of the sprayer.

**Art. XVI. Sec. 6.** - Remedies for spray work performed without a permit or in violation of the terms of an issued permit shall be determined by the Joint Trade Committee or the Joint Trade Board. Such remedies may consist of requiring the re-painting with authorized tools, and/or liquidated damages. In the event of the failure to comply with an order under this provision, the Union shall stop the job and the employees shall be paid in full for that day.

**Art. XVI. Sec. 7.** - In Nassau, Suffolk, Westchester and Putnam Counties only: Employers are free to spray all surfaces. There shall be no fee for spray permits. On all spraying jobs, the Employer shall take one JOURNEYPERSON from the Hall and teach him/her how to spray. This on-the-job training shall not interfere with the trainee's productivity or prevent him/her from performing such other tasks, as he/she is required by the Employer. The trainee shall receive spray pay for the time he/she is actually working with the sprayer or spray equipment.

**Art. XVI. Sec. 8.** - In Nassau, Suffolk, Westchester and Putnam Counties: The following tools shall not be used: paste machines, bazookas, banjos, etc., and any other mechanical automated tools for the Drywall Finishing and Paperhanging Industries.

# HEALTH & SAFETY: GENERAL PROVISIONS

**Art. XVII. Sec. 1.** - In accordance with the requirements of the Occupational Safety and Health Act of 1970, it shall be the exclusive responsibility of Employers to ensure the safety of their employees and compliance by their employees with any safety rules contained in this Trade Agreement or those established by the Employers. Nothing in this Trade Agreement will make the Union liable to any employees or to any other persons in the

24

event of work-related disease, sickness, accident, injury or death. Employers will not engage in any litigation against the Union, on a subrogation theory, contribution theory, or otherwise, so as to obtain a money judgment from it in connection with any work-related disease, sickness, accident, injury or death.

**Art. XVII. Sec. 2.** - Employers shall, at all times, provide safe tools, materials and equipment and safe working conditions. If at any time, in the opinion of an employee, such tools, materials, equipment or working conditions are unsafe and constitute a hazard to health or physical safety, the employee shall have the right to refuse to work with such tools, materials and equipment or under such hazardous conditions unless and until they are made safe. No employee shall be dismissed, disciplined, or otherwise discriminated against, nor shall pay be withheld, for refusal to work with such unsafe tools, materials, or equipment or under such unsafe or hazardous working conditions.

**Art. XVII. Sec. 3.** - The Employers agree that, during the life of this Trade Agreement, they will comply with all applicable federal and state laws concerning occupational safety and health, including all applicable standards, rules and regulations issued pursuant thereto.

**Art. XVII. Sec. 4.** - Employers shall provide, at no cost to the employees, all necessary personal protective equipment and instructions on proper use of such equipment. Employers shall provide for the proper maintenance and cleaning of all necessary personal protective equipment. If, at any time, in the opinion of an employee, such personal protective equipment is defective, has not been properly maintained, or is not the appropriate personal protective equipment under the particular working conditions, the employee has the right to refuse to work with such equipment. No employee shall be dismissed, disciplined, or otherwise discriminated against, nor shall his pay be withheld for refusal to work with such defective, improperly maintained, or inappropriate personal protective equipment. The employee shall immediately report to the Employer such defective, improperly maintained, or inappropriate personal protective equipment.

**Art. XVII. Sec. 5.** - Except as clearly and specifically required by law or regulation, no Employer shall require any employee to sign a form or statement dealing with health and safety, hazards in the workplace, or instruction and training relating to hazards in the workplace, unless that form or statement has been negotiated with and agreed upon by the Union.

**Art. XVII. Sec. 6.** - Employers may require employees to attend all classes concerning the Industry when offered by the Union.

## HEALTH & SAFETY RULES

**Art. XVIII.** Health & Safety Rules

**Rule No. 1.** - With respect to all potentially hazardous or toxic materials, the Material Safety Data Sheets and all O.S.H.A requirements shall be made available and all manufacturers precautions and O.S.H.A mandates shall be strictly adhered to.

**Rule No. 2.** - Regulation & Elimination of Paint Materials Injurious to Health. It shall be unfair and discriminatory to discharge a JOURNEYPERSON or apprentice for refusing to handle materials which are determined by competent authority to be injurious to health. If the Joint Trade Committee shall, after hearing, determine that such a violation has occurred, reinstatement shall be ordered where possible, with a view towards adequately compensating the JOURNEYPERSON or apprentice for any damages sustained, and ensuring that the problem will not reoccur.

**Rule No. 3.** - Adequate Washing Facilities. Where running hot or cold water is not available in or about the clothes locker, a sufficient supply of hand cleaner shall be furnished to the JOURNEYPERSONS and

25

apprentices twice a day to provide adequate facilities for clean washing. Five (5) minutes shall be allowed for washing up at noon, and at quitting time.

**Rule No. 4.** - Drinking water. Fresh drinking water and sanitary cups shall be provided to all JOURNEYPERSONS twice a day during working hours.

**Rule No. 5.** - Drop Cloths. Drop cloths shall be maintained in a sanitary condition by the Employer.

**Rule No. 6.** - Uniforms.

a). The uniform purchased by all eligible members through the Union must be worn by such members. The uniform shall be white overalls with blue-striped pants and white shirts with blue collars and a white cap with the Union emblem. All work clothes shall be kept clean by the JOURNEYPERSON and apprentices. The failure of any such member to wear the uniform and picture I.D. of the Union may be deemed just cause for dismissal. If a member comes to work without a uniform or I.D., the Employer will warn the member not to return to work the following day or thereafter without a uniform and I.D. If the Union discovers the member without a uniform or I.D., it will give prompt notice to the Employer. If, after being warned, the member comes to work, without a uniform or I.D., the employer may be fined $500.00 and the member will be fined $100.00 by the Joint Trade Committee.

In order to give appropriate notification to all Union member and Employers, this system of fines shall not take effect until September 1, 2005. No such fines will be levied in situations where it is not appropriate for members to wear the uniform. The parties agree that it is always appropriate for Union members to carry their I.D.

b). The Industry Promotional Fund(s) shall reimburse the Union for no more than $150,000 per year for the life of this Trade Agreement, for 50% of the cost for providing uniforms for Union members.

**Rule No. 7.** - Injuries. Any injury, no matter how slight, must be reported immediately to the Employer's representative and the Union's representative, and shall be immediately taken care of by the employee's physician, if required. On all jobs where there are five (5) JOURNEYPERSONS and apprentices or more, a first aid kit shall be provided.

**Rule No. 8.** - Use of Elevators. On all buildings in which elevator service is provided for any other trade, such service shall be made available to all Union members.

**Rule No. 9.** - Scaffolds. The scaffold work rate shall be paid for (i) interior and exterior swing scaffold work, which shall include any work on an exterior job where a swing scaffold is used during the performance of the job (whether or not the particular work is done from the scaffold, on a fire escape, or otherwise); (ii) any interior portion of the work on a job where a swing scaffold is required in the performance of that interior work; (iii) work done with window belts or from boatswain chairs; and (iv) work performed twenty (20) feet or more from the floor or ground, including such work when done from extension ladders, or from stationary or rolling platforms, but not including such work when done from completely decked-over platforms. In determining the height of the work, the highest point of work on the surface shall govern, and all work on that surface shall be compensated at the rate so determined.

**Rule No. 10.** - Blood Testing. Whenever blood testing, urine analysis or any other form of testing is a condition of employment on a job, all costs related to said testing shall be borne by the Employer.

**Rule No. 11.** - O.S.H.A. Training. No employer shall permit any JOURNEYPERSON or apprentice to work unless such Journeyperson or apprentice has completed the appropriate O.S.H.A, training as per O.S.H.A

26

regulations, and will comply with any other statutorily required training programs. The Employer shall have the burden of proving that the Journeyperson or apprentice satisfied this requirement.

**Rule No. 12.** - Safety Training for Foremen. In addition to the training required in Rule 11, all foremen must attend a minimum of eight (8) hours of safety training per calendar year.

## INSURANCE

**Art. XIX.** - Every Employer shall carry all insurance required under state and/or federal laws and shall be required to keep a Certificate of Worker's Compensation on file with the Union.

## FRINGE BENEFIT CONTRIBUTIONS

**Art. XX. Sec. 1.** - Notwithstanding any other provision of this Agreement, the Board of Trustees of the Painting Industry Insurance Fund (the "Insurance Fund") shall administer benefit contributions paid by employers who are signatories to this Trade Agreement ("Signatory Employers") for work performed within the jurisdiction of this Trade Agreement, pursuant to the rules, regulations and procedures set forth in this Article. The Board of Trustees of the Insurance Fund shall also administer benefit contributions paid by members of the Window and Plate Glass Dealers Association and the Association of Wall, Ceiling and Carpentry Industries of New York, Inc. for work performed on account of which contributions are required to be made to the Funds set forth below, which members and contributions shall be subject to the rules, regulations and procedures set forth in this Article (and Articles XXI and XXII).

**Art. XX. Sec. 2.** - Contribution Rates

a). All Signatory Employers shall make contributions as defined in this Trade Agreement, for each hour worked and paid for including hours applicable to show up time and other hours for which pay is received and for overtime hours (for which fringe contributions shall be made at the rate of time and one-half), by their employees covered under this Trade Agreement, except where contribution amounts are based upon the amount of gross wages paid to an employee. In such a case, gross wages shall be defined as set forth in subsection (b) herein.

b). "Gross Wages" and "Gross Wages Payable" as used in this Trade Agreement shall mean and include whichever of the two definitions below may be greater:

    i.      The actual total gross earnings of any JOURNEYPERSON or apprentice; or

    ii.     A gross estimated wage figure, subject to readjustment as hereinafter provided, equivalent to two (2) times the Signatory Employer's cost of all materials used by it during the fiscal accounting period, as finally computed and assessed at the close thereof. After review by the auditors and trustees of the present industry wage costs, and upon their recommendation, the above-stipulated formula may be adjusted.

**Art. XX. Sec. 3.** - Trust Administration

a). Contributions - Each Signatory Employer shall pay to the Insurance Fund under Agreements and Declarations of Trust heretofore and hereafter created or amended, the terms and provisions of which are specifically incorporated herein by reference, contributions for each trust fund in such amounts as are set forth in the schedule of wages and benefit contributions in this Trade Agreement for all JOURNEYPERSONS and apprentices employed by the Signatory Employer, for the most recent pay period.

27

Each Signatory Employer shall be bound by and to the Agreements and Declarations of Trust of such trust funds, and all interpretations of and rules and regulations issued there under, as though they had actually signed the same. Such contributions shall be deposited, in accordance with the terms of this Trade Agreement, into the following trust funds and administered as set forth hereafter:

i.    Insurance Fund (to provide health and welfare and vacation benefits). (See Art. XX, Sec. 6B)

ii.   District Council No. 9 Painting Industry Annuity Fund. (See Art. XX, Sec. 6C)

iii.  International Union of Painters and Allied Trades Union and Industry National Pension Fund. (See Art. XX, Sec. 5)

iv.   District Council No. 9 Joint Apprenticeship and Training Fund. (See Art. XX, Sec. 6A)

v.    International Union of Painters and Allied Trades Finishing Trades Institute. (See Art. XX, Sec. 6A)

vi.   The Painters and Allied Trades Labor Management Cooperation Initiative.(See Art. XX, Sec. 7)

vii.  District Council No. 9 Political Action Together - Political Committee. (See Art. XX, Sec. 8)

viii. International Union of Painters Allied Trades Political Action Together - Political Committee. (See Art. XX, Sec. 9)

ix.   Association of Master Painters and Decorators of New York Industry Promotion Fund, Association of Wall, Ceiling and Carpentry Industries of New York, Inc. Promotion Fund, Window and Plate Glass Dealers Association Promotion Fund. (See Art. XX, Sec. 11)

b). **Administration of Contributions.** Each Board of Trustees shall administer and expend said contributions pursuant to the aforesaid Agreements and Declarations of Trust and this Trade Agreement, and shall have the authority to increase or decrease any benefits payable hereunder in their sole and absolute discretion, and as they may determine from time to time.

## Art. XX. Sec. 4. - Stamp System

a). Method of Operation

i.    Stamps - Each Signatory Employer employing a JOURNEYPERSON or apprentice shall make benefit contributions for said JOURNEYPERSON or apprentice by purchasing benefits contribution stamps from the Funds on a weekly basis. Stamps shall represent payment for hourly benefit contributions in such denominations as the Trustees of the Funds shall deem appropriate.

ii.   Purchase of Stamps - The Signatory Employer shall file with the Funds a weekly requisition for stamps accompanied by the exact amount of payment to the Funds for all stamps purchased. In the event that a Signatory Employer defaults on any specific remittance for any reason, payment for stamps thereafter shall be by certified or bank check only. Stamps shall be issued by the Funds in person or by mail so as to insure timely delivery of stamps to JOURNEYPERSONS and apprentices.

iii.  Delivery of Stamps - Stamps representing the number of hours of work credited to each JOURNEYPERSON and apprentice weekly shall be given to each JOURNEYPERSON and apprentice with his or her wages. In the event a JOURNEYPERSON or apprentice is laid off prior to the end of the payroll week, all fringe benefit contributions stamps for hours of work credited to the

28

JOURNEYPERSON and apprentice must be delivered and received by the Union or the JOURNEYPERSON and apprentice before the close of business of the following business day. The Union shall require its members to bring their stamp books to the Fund office once each month.

iv.   Weekly remittance reports - The Signatory Employer shall file with the Funds a weekly remittance report in a form provided by the Funds, setting forth the name of each JOURNEYPERSON and apprentice employed by the Signatory Employer, the prior work week, the number of hours of work credited, and the fringe benefit contribution stamp serial numbers issued to each JOURNEYPERSON and apprentice.

b).   Violations - In the event a Signatory Employer fails to remit stamps to any JOURNEYPERSON or apprentice at the time such stamps must be given to the JOURNEYPERSON or apprentice, sells stamps, duplicates stamps, or in any manner avoids the requirements of the stamp system, such act or inaction shall constitute a failure to pay benefits contributions under this Trade Agreement. In such event, the Union and the Funds shall each have the right to any and all remedies provided for in this Trade Agreement for a breach of the Trade Agreement and/or failure to pay fringe benefit contributions, as well as any remedies provided for under state or federal law.

c).   Unused stamps - In the event a Signatory Employer retains undistributed stamps for any reason, the Signatory Employer may redeem said stamps in new stamp denominations for the following reporting period, or obtain a refund. Refunds will be given to Signatory Employers who are not in violation of any of the terms and conditions of the Trade Agreement, and any refund shall be made within sixty (60) days of application therefore. No application under this subsection shall be permitted (1) if not permitted under the Employee Retirement Income Security Act of 1974, as amended, or Internal Revenue Code or (2) after six years from the date of the purchase of the stamps for which the employer seeks a refund.

d).   Shop Steward Reports - In addition to the remittance report referred to in sub-section (a)(iv) above, each Signatory Employer shall prepare and give to the Shop Steward for each job by close of business of the business day following the end of the payroll week, a Shop Steward weekly payroll report. Such report shall list each JOURNEYPERSON or apprentice at the subject job for the preceding payroll week, hours of work credited, fringe benefit contribution stamp serial numbers received by the JOURNEYPERSON or apprentice, social security number, and location of the job site.

e).   Signatory Employer Withholding Obligation - The Signatory Employer hereby agrees to withhold all taxes, benefit contributions and check-off from each member JOURNEYPERSON and apprentice, and to remit it to the funds as set forth herein.

**Art. XX. Sec. 5.** - International Union of Painters and Allied Trades Union and Industry National Pension Trust ("Pension Fund").

a).   The Trustees as described in Art. XX, Sec. 1 shall pay all contributions received from Signatory Employers for pension benefits to the Trustees of the International Union of Painters and Allied Trades Union and Industry National Pension Fund (the "National Trustees").

b).   The National Trustees shall administer and expend said contributions pursuant to the provisions of an Agreement and Declaration of Trust dated April 1967, as amended, and also in accordance with the Merger Agreement dated June 1, 1978, by and between the Trustees of the District Council No. 9 Painting Industry Pension Fund and the National Trustees.

c).   Upon receipt of payment from a Signatory Employer, the Trustees of the Insurance Fund shall remit to the National Trustees the pension contributions collected by the Trustees of the Insurance Fund for the most

29

recent pay period, together with a list of JOURNEYPERSONS and apprentices for whom pension contributions have been received and are covered hereby, and the number of hours and/or days worked by each JOURNEYPERSON and apprentice during the applicable period.

Art XX. Sec. 6A. - The District Council No. 9 Joint Apprenticeship and Training Fund and the International Union of Painters and Allied Trades Finishing Trades Institute.

a). For the duration of this Trade Agreement, and any renewals or extensions thereof, the Signatory Employers and any Employer as defined in the Agreement and Declaration of Trust dated June 1, 1993 between the Union and the Association of Master Painters and Decorators of New York, Inc., agree to make payments to the District Council No. 9 Joint Apprenticeship and Training Fund (the "Apprenticeship and Training Fund"), and further agree to make payments to the International Union of Painters and Allied Trades Finishing Trades Institute, established under an Agreement and Declaration of Trust dated May 1, 1995. All of the aforesaid payments shall be made in such amounts as set forth in the following sub-section (b), and as set forth in the schedules of wages and contributions in this Trade Agreement.

b). Contributions

    i.    For each hour worked or portion thereof, for which a JOURNEYPERSON or apprentice receives pay, the Signatory Employer shall make a contribution to the Apprenticeship and Training Funds in the amount set forth in the schedule of wages and benefit contributions in this Trade Agreement.

    ii.    For each hour worked or portion thereof, for which a JOURNEYPERSON or apprentice receives pay, the Signatory Employer shall make a contribution to the International Union of Painters and Allied Trades Finishing Trades Institute in the amount set forth in the schedule of wages and benefit contributions in this Trade Agreement. Such payments shall be made in the manner and form as shall be determined by the Trustees of the International Union of Painters and Allied Trades Finishing Trades Institute.

    iii.    For the purposes of this Article, contributions shall be paid for each hour a JOURNEYPERSON or apprentice receives pay, including hours attributable to show up time and other hours for which pay is received by the JOURNEYPERSON or apprentice in accordance with this Trade Agreement.

    iv.    Contributions shall be paid on behalf of any JOURNEYPERSON or apprentice, including probationary employees, starting with his/her first hour of employment in a job classification covered by this Trade Agreement.

    v.    The Employer hereby irrevocably designates as its representatives on the Board of Trustees of the I.U.P.A.T.F.T.I, such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors, as provided for in the May 1, 1995 Agreement and Declaration of Trust.

    vi.    The Union hereby irrevocably designates as its representatives on the Board of Trustees of the I.U.P.A.T.F.T.I., such Trustees as are now serving, or who will in the future serve, as Union Trustees, together with their successors, as provided for in the May 1, 1995 Agreement and Declaration of Trust.

    vii.    The parties hereto further agree to be bound by all of the lawful actions taken by the Trustees of the I.U.P.A.T.F.T.I. in accordance with and pursuant to the May 1, 1995 Agreement and Declaration of Trust.

30

**Art. XX. Sec. 6B.** - Painting Industry Insurance Fund.

a). For the duration of this Trade Agreement, and any renewals or extensions thereof, the Signatory Employers agree to make payments to the Insurance Fund under an Agreement and Declaration of Trust dated May 28, 1969, as amended thereafter from time to time, the terms of which are herein specifically incorporated by reference, for contributions in such amounts as are set forth in the schedule of wages and benefit contributions in this Trade Agreement and to be bound by said Agreement and Declaration of Trust as though they had actually signed the same.

b). The Signatory Employers hereby irrevocably designate as their representatives on the Board of Trustees of the Insurance Fund such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors, as provided for in the Agreement and Declaration of Trust establishing the Insurance Fund.

c). The Union hereby irrevocably designates as its representatives on the Board of Trustees of the Insurance Fund such Trustees as are now serving, or who will in the future serve, as Union Trustees, together with their successors, as provided for in the Agreement and Declaration of Trust establishing the Insurance Fund.

d). The parties hereto further agree to be bound by all of the lawful actions taken by the Trustees of the Insurance Fund in accordance with and pursuant to the Agreement and Declaration of Trust establishing the Insurance Fund.

**Art. XX. Sec. 6C.** - Painting Industry Annuity Fund.

a). For the duration of this Trade Agreement, and any renewals or extensions thereof, the Signatory Employers agree to make payments to the Painting Industry Annuity Fund under an Agreement and Declaration of Trust dated May 28, 1969, as amended thereafter from time to time, the terms of which are herein specifically incorporated by reference, for contributions in such amounts as are set forth in the schedule of wages and benefit contributions in this Trade Agreement and to be bound by said Agreement and Declaration of Trust as though they had actually signed the same.

b). The Signatory Employers hereby irrevocably designate as their representatives on the Board of Trustees of the Painting Industry Annuity Fund such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors, as provided for in the Agreement and Declaration of Trust establishing the Painting Industry Annuity Fund.

c). The Union hereby irrevocably designates as its representatives on the Board of Trustees of the Painting Industry Annuity Fund such Trustees as are now serving, or who will in the future serve, as Union Trustees, together with their successors, as provided for in the Agreement and Declaration of Trust establishing the Painting Industry Annuity Fund.

d). The parties hereto further agree to be bound by all of the lawful actions taken by the Trustees of the Painting Industry Annuity Fund in accordance with and pursuant to the Agreement and Declaration of Trust establishing the Painting Industry Annuity Fund.

**Art. XX. Sec. 7.** - I.U.P.A.T. Labor-Management Cooperation Initiative.

a). For the duration of this Trade Agreement, and any renewals or extensions thereof, the Signatory Employers and any employer as defined in an Agreement and Declaration of Trust establishing the Painters and Allied Trades Labor-Management Cooperation Initiative (the "Labor-Management Cooperation Fund"), agree to

make payments to the Labor-Management Cooperation Fund for the JOURNEYPERSONS and apprentices covered by this Trade Agreement, and to be bound by and to said Agreement and Declaration of Trust.

b). Contributions. For each hour worked or portion thereof, for which a JOURNEYPERSON or apprentice receives pay, the Signatory Employers shall make a contribution in the amount set forth in the schedule of wages and benefit contributions in this Trade Agreement. For the purposes of this section, contributions shall be paid for each hour a JOURNEYPERSON or apprentice receives pay, including hours attributable to show up time and other hours for which pay is received by the JOURNEYPERSON or apprentice in accordance with this Trade Agreement.

c). All contributions shall be made in the same manner as contributions are made to the other funds provided for in Art. XX. The Trustees shall have the authority to have an independent Certified Public Accountant audit the financial books and records of the Signatory Employer for the purpose of determining the accuracy of contributions to this fund.

Art. XX. Sec. 8. - District Council No. 9 Political Action Together — Political Committee.

Each individual member of District Council No. 9 may, by written instructions, direct the Trustees of the Insurance Fund to deduct from the Journeyperson's or apprentice's vacation account, one cent per hour of each hourly contribution made by the signatory Employer to the employees account, and remit same to the District Council No. 9 Political Action Together - Political Committee. It is specifically understood and agreed by the parties to this agreement that the employer has no involvement whatsoever with the establishment or operation of this program. The Trustee's responsibility hereunder is limited solely to facilitating the collection and remission of such amounts to the D.C.9 PAT.

Art. XX. Sec. 9. - International Union of Painters and Allied Trades Political Action Together — Political Committee.

Authorization. Each Signatory Employer shall agree to deduct from every Journeyperson's or apprentice's wages in the amount set forth in the schedule of wages and benefit contributions in this Trade Agreement per hour, and to pay same as a contribution to the International Union of Painters and Allied Trades Political Action Together Fund. Each Signatory Employer agrees to honor authorization for check-off of political contributions from all JOURNEYPERSONS or apprentices who are Union members and who supply such authorization in the form or such other similar form as the International Union of Painters and Allied Trades Political Action Together Fund shall deem acceptable.

Art. XX. Sec. 10. - Check-off of Administrative Dues.

a). Dues Check-Off System. Every Signatory Employer hereby agrees to check-off from the gross taxable wages, defined herein as total wages, vacation, and Political Action Together contributions, of each JOURNEYPERSON and apprentice employed by such Signatory Employer during the term of this Trade Agreement, administrative dues in the amounts set forth in the Union Bylaws and any amendments thereto.

b). Administration of Dues Check-Off. Upon receipt of payment from the Signatory Employer, the Trustees of the Insurance Fund shall remit to the Union the entire amount of administrative dues collected by said Trustees for the most recent pay period, together with a list of JOURNEYPERSONS and apprentices covered hereby for whom dues have been received, and the number of hours worked by each during the applicable period. The Trustees' responsibility hereunder is limited solely to facilitating the collection and remission of such amounts to the Union.

32

c). **Employee Authorization.** At the time of the employment of any JOURNEYPERSON or apprentice, the Signatory Employer will submit to each JOURNEYPERSON or apprentice a dues deduction authorization card in triplicate for his/her voluntary signature, one copy of which is to be retained by the Signatory Employer, one copy retained by the JOURNEYPERSON or apprentice, and the other returned to the Union. The form is to be supplied to the Signatory Employer by the Union.

d). **Signatory Employer's Obligations.** The obligations of the Signatory Employers under sub-section (a) above shall only be as to JOURNEYPERSONS and apprentices who have voluntarily signed a valid dues deduction and authorization card as referred to in sub-section (c) above.

e). **Liability of the Trustees and Cost of Administration.** Sections 8, 9 and 10 of Art. XX is only for the convenience of the Union to better facilitate the collection of its administrative dues and the collection and remission of contributions to the District Council No. 9 Political Action Together - Political Committee and the International Union of Painters and Allied Trades Political Action Together - Political Committee concurrently with collecting Signatory Employer Fringe Benefit Contributions. Neither the Insurance Fund nor any of the fringe benefit funds to which contributions are required to be made under this Trade Agreement (nor any of their Boards of Trustees or fiduciaries) will incur any liability for any failure to collect any such administrative dues or contributions. For its services, the Union hereby agrees to reimburse the Insurance Fund for all reasonable costs of administration of the check-off of administrative dues or the collection of contributions to the District Council No. 9 Political Action Together – Political Committee and the International Union of Painters and Allied Trades Political Action Together - Political Committee, and to indemnify and hold harmless the Funds, their Trustees and/or the other fiduciaries against any and all claims, demands, suits and liabilities that may arise out of such administration. It is specifically understood and agreed by the parties to this Trade Agreement that no Association nor any Signatory Employer has any involvement whatsoever with the establishment or operation of this program.

**Art. XX. Sec 11. - Industry Promotion Funds.**

a). **Administration.** The Association of Master Painters and Decorators of New York Industry Promotion Fund shall be administered by the Association of Master Painters and Decorators of New York, Inc. The Association of Wall, Ceiling and Carpentry Industries of New York, Inc. Industry Promotion Fund shall be administered by the Association of Wall, Ceiling and Carpentry Industries of New York, Inc. The Window and Plate Glass Dealers Association Industry Promotion Fund shall be administered by the Window and Plate Glass Dealers Association.

b). **Contributions.** For each hour worked or portion thereof, for which a JOURNEYPERSON or apprentice receives pay, the Signatory Employers shall make a contribution in the amount set forth in the schedule of wages and benefit contributions in this Trade Agreement. Contributions shall be paid to the Association of Master Painters and Decorators of New York Industry Promotion Fund, the Association of Wall, Ceiling and Carpentry Industries of New York Industry Promotion Fund or the Window and Plate Glass Dealers Association Industry Promotion Fund (collectively, the "Industry Promotion Funds"), to be determined as follows:

i.      For drywall work performed in the historical geographic jurisdiction of Local Union No. 1486, contributions shall be made to the Association of Wall, Ceiling and Carpentry Industries of New York Industry Promotion Fund.

ii.      For glazing work performed under this Trade Agreement, contributions shall be made to the Window and Plate Glass Dealers Association Industry Promotion Fund.

33

iii. For all other work performed under this Trade Agreement, contributions shall be made to the Association of Master Painters and Decorators of New York Industry Promotion Fund.

c). No Anti-Union Activity - The Associations and their employer members agree that no moneys collected by the Industry Promotion Funds shall be used for any anti-union activity or any actions detrimental to union membership.

d). Liability of the Trustees and Cost of Administration. Section 11 of Art. XX is only for the convenience of the Associations to better facilitate the collection and remission of contributions to the Industry Promotion Funds concurrently with collecting Signatory Employer Fringe Benefit Contributions. Neither the Insurance Fund nor any of the fringe benefit funds to which contributions are required to be made under this Trade Agreement (nor any of their Boards of Trustees or fiduciaries) will incur any liability for any failure to collect any such contributions. For its services, the Associations hereby agree to reimburse the Insurance Fund for all reasonable costs of administration of the collection of contributions to the Industry Promotion Funds and hold harmless the Funds, their Trustees and/or the other fiduciaries against any and all claims, demands, suits and liabilities that may arise out of such administration. It is specifically understood and agreed by the parties to this Trade Agreement that the Union does not have any involvement whatsoever with the establishment or operation of this program.

**Art. XX. Sec. 12. - Wages, Fringe Benefits, Hours, Travel Subsistence and Working Conditions**

a). Every Signatory Employer, when working in the jurisdiction of a District Council or Local Union affiliated with the International Union of Painters and Allied Trades, where the projects are located, shall, with respect to employees hired from within said jurisdiction, make contributions on behalf of such employees to all pension, health, welfare, apprenticeship and training funds, and other fringe benefit funds provided for in the collective bargaining agreement currently in effect between said District Council or Local Union and area contractors. For all JOURNEYPERSONS and apprentices a Signatory Employer employs on a job outside the Union's territorial jurisdiction, the Signatory Employer shall make such contributions to their "home area" fringe benefit funds as are provided for in the collective bargaining agreement of the employees' "home area" District Council or Local Union.

b). For the foregoing purpose, the Signatory Employers hereby:

i. Agree that such contributions shall be made at the rate, in the manner and under the terms and conditions specified in the applicable Collective Bargaining Agreement;

ii. Agree that where the International Union of Painters and Allied Trades Union and Industry National Pension Trust Fund is applicable, contributions shall be made in the manner and under the terms and conditions specified in the Standard Form of Participation Agreement issued by the National Trustees;

iii. Agree to be bound to all Trust Agreements or other Trust Documents establishing said fringe benefit funds;

iv. Irrevocably designate as their representative on the Boards of Trustees of said Funds, such Trustees as are presently serving pursuant to said Trust Agreements or other Trust Documents as Union and Employer Trustees, together with their successors selected in the manner provided in said Trust Agreements or other Trust Document; and

v. Agree to be bound by all actions of said Boards of Trustees pursuant to the said Trust Agreements or other Trust Documents.

34

**Article XX, Sec. 13**

- Signatory employers shall, with respect to any and all contributions or other amounts that may be due and owing to the IUPAT and its related or affiliated Funds or organizations including, but not limited to, the IUPAT Industry Pension Plan, the IUPAT Industry Annuity Plan, the IUPAT Finishing Trades Institute, the Painters and Allied Trades Labor-Management Cooperation Initiative, the IUPAT Political Action Together (and any and all other affiliated International organization as they may be created or established in the future), upon receipt of a written directive to do so by the affiliated Funds and organizations, make all required payments either directly or through an intermediate body to the 'Central Collections Unit' of the International Union and its affiliated Funds and organizations. Such contributions shall be submitted on appropriate forms, in such format and with such information as may be agreed to by Central Collections.

## ENFORCEMENT OF ARTICLE XX

**Art. XXI, Sec. 1. - Payments**

a). All Art. XX Fringe Benefit Contributions shall be made at such times and in such manner as the Boards of Trustees (collectively, the "Trustees") and/or the National Trustees shall prescribe in accordance with the applicable Trust Agreement, as amended from time to time. The Signatory Employers agree that the Trustees shall have the authority to have an independent Certified Public Accountant audit the payroll records, payroll tax returns, cash disbursement records, bank statements, vendor invoices and any and all union reports for all other trades, wages, and general ledger of any Signatory Employer for the purpose of determining the accuracy of such contributions, provided, however, that the compensation and social security number of the senior management of the signatory employer may be redacted from all such records. "Senior management" shall be defined as any officer, director, partner(s) or owner(s).

Unless otherwise provided by the Trustees, payments for all fringe benefit contribution stamps must be made by certified or bank checks. No cash currency, personal or business checks shall be accepted, except by Signatory Employers in good standing of a recognized Association or other Signatory Employers, who shall be able to pay with regular business account checks on a New York State licensed bank with a branch located in the geographic jurisdiction of this Trade Agreement. If any Signatory Employer shall have its check dishonored, then this privilege shall be withdrawn.

b). For the purpose of this Article, Article XX and Article XXII, each hour worked and paid for, including hours attributable to show up time, and other hours for which pay is received and for overtime hours (for which fringe benefits contributions shall be made at the rate of time and one half) by a JOURNEYPERSON or apprentice in accordance with this Trade Agreement, shall be counted as hours for which Art. XX Fringe Benefit Contributions are payable.

c). Art. XX Fringe Benefit Contributions shall be paid on behalf of any JOURNEYPERSON or apprentice, including, but not limited to, probationary employees, starting with his/her first day of employment in a job classification covered by this Trade Agreement.

d). The failure of an Employer to make fringe benefit contributions or pay interest, liquidated damages or fees related thereto as provided for in this Article and Article XXII and Article XX, shall be attributed to any officer, stockholder, partner or proprietor in actual control of said Employer, and execution of this Trade Agreement by any such person shall bind said person individually to the terms and conditions set forth herein. A default in payment of any fringe benefit contributions or pay interest, liquidated damages or fees related thereto due pursuant to this Article and Article XX and Article XXII shall follow said officer,

35

stockholder, partner, and / or proprietor into any succeeding enterprise entered into by said person. Where the Trustees determine that an Employer is being operated in the name of a nominee, family member, successor entity or alter ego of an individual actually controlling the Employer, the Trustees may consider any default of the obligations set forth in such Articles to be the default of said controlling individual.

e). Art. XX Fringe Benefit Contributions Payment Method. Signatory Employers must make Art. XX Fringe Benefit Contributions under the Stamp System. The amount of the security payment shall be $5,000.00.

f). As of May 1, 2001, all fringe benefit stamp for a week must be included with the wage payments for such week, as already provided in this Trade Agreement.

g). Regardless of the ability or inability of a Signatory Employer to pay its required Fringe Benefit Contributions, the Signatory Employer shall be required to submit remittance reports weekly. The failure to submit such reports will subject the Signatory Employer to fines by the Joint Trade Committee.

Art. XXI. Sec. 2. - Penalties.

a). The required Art. XX Fringe Benefit Contributions constitute a consideration for entering into this Trade Agreement and constitute its very essence. Failure by any Signatory Employer to pay to the Trust Funds amounts due under this Trade Agreement shall be deemed a breach of this Trade Agreement, and thereupon a termination notice shall be served by the Trustees upon the Union. In such event, the Union must enforce the foregoing and following provisions relating to payment to the Trustees. In the event a Signatory Employer fails to make the required payments or reports for more than forty-eight (48) hours after such notice of termination, the Union must order its JOURNEYPERSONS and apprentices to cease work on all the delinquent employer's projects until all required payments and/or reports have been rendered. Such Signatory Employer must pay all such JOURNEYPERSONS and apprentices for all time lost, not to exceed one (1) week of wages per JOURNEYPERSON or apprentice.

b). If a Signatory Employer fails to make contributions to the Pension Fund within the date required by the National Trustees, or fails to make any other Art. XX Fringe Benefit Contributions when due in a timely manner pursuant to this Trade Agreement, the Union shall have the right to take whatever steps are necessary to secure compliance with this Trade Agreement, notwithstanding any other provisions hereof to the contrary. The Signatory Employer shall be liable for all costs of collection of the payments due together with attorneys' fees and such penalties as may be assessed by the Trustees and/or National Trustees, as set forth in Art. XXII, Sec. 2(a), (b), (c) and (d). The Signatory Employer's liability for payment of Pension Fund contributions under this Trade Agreement shall not be subject to or covered by the grievance or arbitration procedure in Articles XII and XIII, nor the "no strike" clause set forth in Art. XIV

c). Any job action taken by the Union pursuant to the procedures in foregoing Article XXI, Sections 2(a) and(b) shall not be covered by the "no strike" clause set forth in Article XIV. The Union shall suffer no liability for ordering its members to cease work upon demand from the Trustees and each signatory employer expressly waives any right it may have to bring suit for damages or other relief against the Union for breach of the no-strike clause in the event the Union orders its members to cease work after demand from the Trustees.

Art. XXI. Sec. 3. - Qualification for Income Tax Deductions. Each of the Trust Funds set forth in Article XX which are intended to qualify under the Internal Revenue Code shall at all times conform with the currently applicable requirements of the Internal Revenue Code so as to enable each Signatory Employer at all times to treat Art. XX Fringe Benefit Contributions as a current deduction for income tax purposes. In the event that an Art. XX Fringe Benefit Contribution is not currently deductible, the Signatory Employer shall not be required to make such payment.

36

# BONDS, DAMAGES, FEES AND INTEREST

## Art. XXII. Sec. 1. – Bonds

a). Security - The Signatory Employer shall provide security to the Trustees for the faithful performance by it of the requirements under this Trade Agreement for the payment of Signatory Employer Benefit Contributions, liquidated damages, interest, attorneys' fees, costs of collection and other monetary obligations under this Trade Agreement. The Trustees shall be entitled to retain any interest that accrues on such security during the time such security is deposited with the Trustees.

b). Form of Security - Such security deposited with the Trustees shall be in the form of cash, surety bond acceptable to the Trustees, or other security acceptable to the Trustees.

c). Amount of Security - The amount of security which the Signatory Employer is required to deposit with the Trustees under the stamp system shall be $5,000.00. The security provided in accordance with the foregoing shall be available to satisfy any delinquency in Article XX fringe benefit contributions and any interest and liquidated damages resulting from such delinquency. In the event that a former signatory employer does not report any work covered by this Trade Agreement (or its successor) for a two year period and such employer refuses or fails to make records available to the Certified Public Accountant as described in Article XXI, Section 1(a), the entire amount of such employer's security shall apply and be paid to the Fringe Benefit Funds (in proportion to their respective contribution rates) to the signatory employer's credit.

d). If at any time a Signatory Employer's security on deposit with the Trustees shall, for any reason, be in an amount less than the amount required by this Section, the Signatory Employer shall immediately deposit with the Trustees additional security so that the Signatory Employer's security on deposit shall at all times comply with this subsection.

e). The Trustees shall not accept any surety bond or other non-cash collateral from any Signatory Employer who shall have failed in the past to make payment of any sums found by the Trustees or National Trustees to be due under this Trade Agreement or under any prior Trade Agreement. In such cases, compliance with the security requirements hereof shall be by cash deposit only.

f). Additional Security — In the event the Trustees determine that a Signatory Employer is guilty of violating any provision of this Trade Agreement, or in the event the Trustees bring suit against a Signatory Employer to collect unpaid Art. XX Fringe Benefit Contributions or interest, liquidated damages or fees related thereto, the Signatory Employer shall provide additional security in such form and amount, as the Trustees shall determine. The Trustees may, but are not required to, assess such additional security in an amount no less than the amount of the Signatory Employer's potential, existing or future liability to the Trustees. Any additional security required pursuant to this subsection shall be deposited with the Trustees who are authorized to pay out of such security any sums found by the Trustees to be due for unpaid Art. XX Fringe Benefit Contributions, liquidated damages, interest, attorneys' fees, or other costs of collection.

## Art. XXII. Sec. 2. - Damages, Interest and Fees

a). Liquidated Damages - Time is of the essence for the payment of Art. XX Fringe Benefit Contributions. The parties recognize and acknowledge that the regular and prompt payment of Art. XX Fringe Benefit Contributions by Signatory Employers is essential, and that it would be extremely difficult, if not impractical, to fix the actual expense and damages which will result from a failure of a Signatory Employer to make the required Art. XX Fringe Benefit Contributions in full within the time provided, and without becoming delinquent.

· 37

Therefore, the parties agree that if the required Art. XX Fringe Benefit Contributions shall become delinquent, the amount of damage resulting from any such delinquency shall be, by way of liquidated damages, and not as a penalty, a sum equivalent to 10% of the total Art. XX Fringe Benefit Contributions required pursuant to this Trade Agreement, for each failure to pay in full within the time provided in Art. XX, Sec. 1(g), for each pay period for which payments are required to be made; *unless* a lawsuit is commenced to recover such contributions, in which case the liquidated damages shall be 20% of the required contributions. The liquidated damages, so fixed and computed, shall be added to and become a part of the Signatory Employer's required Art. XX Fringe Benefit Contribution due to any of the Trustees.

Notwithstanding the foregoing, no signatory employer shall be assessed liquidated if a delinquency is cured within 29 days from the date which contributions were due.

b). Interest - If the required Art. XX Fringe Benefit Contributions of a Signatory Employer become delinquent, in addition to the amount assessed as liquidated damages, interest shall be added to the obligation of the delinquent Signatory Employer, calculated monthly at the annual rate of the prime rate plus 2.0%, which shall be calculated based upon the sum of all Art. XX Fringe Benefit Contributions due for the period for which the Signatory Employer is delinquent, starting with the first day of delinquency. Notwithstanding the foregoing, no signatory employer will be charged interest if a delinquency is cured within 8 days from the date from which contribution are due.

c). Attorneys' Fees and Cost of Collection - If the required Art. XX Fringe Benefit Contributions become delinquent, in addition to the amount due as liquidated damages and interest as provided for in the preceding subsections (a) and (b), there shall be added to the obligation of the delinquent Signatory Employer, all reasonable expenses incurred by the Trustees in the collection of any delinquency, liquidated damages and interest, including but not limited to (i) reasonable attorneys' fees; (ii) accountant's fees; (iii) cost of attachment and execution; (iv) bond; (v) receivers; and (vi) court costs.

d). All liquidated damages, interest, and any other costs and assessments due and received from a delinquent Signatory Employer shall be paid to and received by the Trustees.

Art. XXII. Sec. 3. - Trust Fund Hearing

a). Signatory Employer Request - Should a Signatory Employer, after an audit held by the Trustees, be subject to an assessment of additional Art. XX Fringe Benefit Contributions, the Signatory Employer shall be entitled, on request, to a hearing before the Trustees or a properly appointed subcommittee thereof. At such hearing, the Signatory Employer shall be given an opportunity to present all available facts, and shall be subject to open examination thereon, so that the Signatory Employer may establish an actual lower direct labor cost such that a readjustment of the basis for the calculation of the Signatory Employer's Fringe Benefit Contributions due to the Trustees is warranted. At such hearing, the Trustees shall consider the recommendation of the Funds' auditors and any proof that the Signatory Employer may offer. If the Signatory Employer's right to a readjustment is proven, the Trustees shall remit any excess Art. XX Fringe Benefit Contributions to the Signatory Employer. The decision of the Trustees, after such hearing, shall be final and binding.

b). Failure to Request Hearing — If, after an audit and a final assessment of further contributions due, the Signatory Employer fails, within twenty (20) days after written notice thereof given by the Trustees, to request in writing a hearing before them as provided in the preceding sub-section (a), the Signatory Employer shall be deemed conclusively to have consented thereto, with no further recourse.

# CONDITIONS

**Art. XXIII. Sec. 1** — In the event that the Union enters into a contract, or contracts, or enters into renewals or modifications of a contract, or contracts, with any employers performing the work covered by this Trade Agreement which contain new or revised economic terms or other conditions effective on or after May 31, 2000, which economic terms or other conditions are more favorable to such employers than the terms contained in this Trade Agreement, the Union shall immediately notify the Association of such more favorable terms, and the Association and all its members shall be entitled to and may have the full benefit of any and all such more favorable terms, upon notification to the Union. The Union shall also provide written notice to the Association if it offers to any contractor that is not a member of the Association the terms set forth in the market recovery agreement referenced in Article I, Sec. 4(J) and Article V, Section 2(d), or the terms set forth in Article XVI, Article XXVII, Sec. 4(c) and/or Art. XXVII, Sec. 5 of the Association Trade Agreement. This section does not apply to any agreements entered into by Union on behalf of Local Union No. 1456.

**Art. XXIII. Sec. 2.** - JOURNEYPERSONS and apprentices shall not work for employers who are not in contractual relations with the Union or any other council or local union affiliated with the I.U.P.A.T., it being understood that JOURNEYPERSONS and apprentices may work directly for the City and State of New York, and/or the Federal Government. Contractual relations as used in this section shall mean a written agreement containing substantially all of the provisions of this Trade Agreement.

# JURISDICTIONAL DISPUTES

**Art. XXIV.** - All jurisdictional disputes will be handled by the Union and the respective craft representative.

# NATIONAL LABOR RELATIONS ACT

**Art. XXV. Sec. 1.** - Without recognizing the applicability of the National Labor Relations Act to the New York City Painting Industry or to the Building and Construction Industry, the parties agree that they will abide by the provisions of said Act, and by any amendments thereto of general application or specifically applicable to the Building and Construction Industry, or any other applicable statute. Any and all provisions of this Trade Agreement which may be in conflict with said Act or amendments thereto or other applicable statute, shall be deemed to be modified and amended accordingly so as to conform to and comply with said Act or any amendments thereto or other applicable statute.

# SAVINGS CLAUSE

**Art. XXVI. Sec. 1.** - In the event there is a change in the state or federal laws which affect any of the terms of this Trade Agreement, the terms of this Trade Agreement shall be automatically modified or stricken in accordance with the change of the state or federal law as of the effective date or said change. The modification or changes in the state or federal law shall not affect the validity of the balance of this Trade Agreement, which is not in conflict with said change. Further, any provision of this Trade Agreement which provides for union security or employment in a manner and to an extent prohibited by any law or the determination of any governmental board or agency, shall be and hereby is of no force or effect during the term of any such prohibition. It is understood and agreed, however, that if any of the provisions which are hereby declared to be of no force, or any restrictions imposed by law are determined either by Act of Congress or other legislative enactment or by a decision of the court of highest recourse to be legal or permissible, then such provision shall immediately become and remain effective during the remainder of the term of this Trade Agreement. In the event that there shall be changes in applicable laws concerning the expansion or enlargement of union security, they shall automatically be incorporated into the terms and conditions of this Trade Agreement and become effective during the remainder of its term. In the event that any provision of this Trade Agreement shall be

39

declared to be in violation of law, the remaining provisions of this Trade Agreement shall continue in full force and effect.

**Art. XXVI. Sec. 2.** - The use of any terms in this Trade Agreement that may connote a masculine gender is intended to include all persons, whether male or female, and such usage is not intended to indicate any bias or discrimination in connection with membership in the Union or employment by any Employer.

# WALL COVERERS' PRICE LIST & GENERAL REGULATIONS

**Art. XXVII. Sec. 1.** - Wages and Benefits.

a). The Wage and Benefit package will be adjusted each year commencing May 1, 2005 as follows:

  i.    Effective May 1, 2005, an increase of 0.75 cents per hour to be allocated to wages and an increase of $1.25 per hour to fringe benefits.

  ii.   Effective May 1, 2006, an increase of 0.50 cents per hour to be allocated to wages and an increase of $1.00 per hour to fringe benefits.

  iii.  Effective May 1, 2007, an increase of $1.00 per hour to be allocated to wages and an increase of $1.00 per hour to fringe benefits.

  iv.   Effective May 1, 2008, an increase of 0.50 cents per hour to be allocated to wages and an increase of $1.00 per hour to fringe benefits.

  v.    Effective May 1, 2009, an increase of $1.00 per hour to be allocated to wages and an increase of $1.00 per hour to fringe benefits.

  vi.   Effective May 1, 2010, an increase of 0.50 cents per hour to be allocated to wages and an increase of $1.00 per hour to fringe benefits.

b). The amount of the cost-of-living adjustment shall be determined and re-determined on the basis of the official New York City Consumer Price Index for Urban Wage Earners and Clerical Workers (CPI-W) published by the U.S. Department of Labor Bureau of Labor Statistics (1967=100) and referred to herein as the Index.

c). Cost of living increases shall be determined as demonstrated in the example cited in Art. III, Sec. 8(C), above.

d). All jobs having paperhanging work shall be registered with the Union on the same form required for registering painting jobs.

e). All wall coverers' work shall be done by the piece according to this Price List, except making samples of treatments for use by the Employer, repairing, stripping of wall covering, preparatory work normally done by the JOURNEYPERSONS, which shall be charged for at the following hourly rates:

| | | |
|---|---|---|
| i.   | May 1, 2005 to April 30, 2006 | $34.98 |
| ii.  | May 1, 2006 to April 30, 2007 | $35.33 |
| iii. | May 1, 2007 to April 30, 2008 | $36.04 |
| iv.  | May 1, 2008 to April 30, 2009 | $36.40 |
| v.   | May 1, 2009 to April 30, 2010 | $37.13 |

40

vi.    May 1, 2010 to April 30, 2011                    $37.50

**Art. XXVII. Sec. 2. – General Wall Coverers' Regulations**

a). Pay and Work Rules

1.) No Employer nor any JOURNEYPERSON or apprentice may change the rates quoted herein.

2.) No Employer nor any JOURNEYPERSON or apprentice is allowed to establish a price for hanging any material not specified in this price list.

3.) Wall coverers must be paid individually and weekly for the performance of work covered by this Trade Agreement. Wall coverers must submit time sheets either immediately upon completion of a job or weekly, whichever comes first.

4.) Where a dispute exists, no wages may be withheld unless a complaint is filed with the Joint Trade Committee and is brought to the attention of District Council No. 9. Only the amount in dispute shall be withheld and must be placed in escrow with the Joint Trade Committee, pending settlement. Such settlement shall be completed within a period of seven (7) days from the filing of the complaint.

5.) A wall covering Sub-Committee of the Joint Trade Committee shall include a representative of the wall coverers craft and a representative of the Association of Master Painters and Decorators of New York, Inc. This Sub-Committee shall adjust, dispose of and settle all grievances, complaints and any other problems of the wall covering industry, and determine prices of new material, within forty-eight (48) hours after receipt of said grievance or complaint. If the Sub-Committee cannot resolve the matter within that time period, it shall refer the matter to the Joint Trade Board.

6.)

    a). Wall coverers and apprentices are prohibited from subcontracting or lumping work. Wall coverers and apprentices shall not advertise to contract work. Employers are prohibited from subcontracting work to wall coverers and apprentices.

    b). All hiring of wall coverers must be done by the employer, but only through the Union in accordance with Art. II.

    c). No wall coverer other than a Union Business Representative is allowed to send other wall coverers to any jobs. In the event that a member of the Union sends another wall coverer to a job, the Union must take disciplinary action against the offending party.

7.) In the Bronx, Brooklyn, Manhattan and Staten Island, all materials, such as pasteboards, pails, wall covering glue, tacks, ladders, scaffolds, and table legs, shall be furnished and delivered to the job by the Employer.

8.) Wall coverers kept waiting for materials, ladders, scaffold, pasteboards, etc., or sent on work that is not ready, shall receive the prevailing hourly wages. Wall coverers shall contact the shop before leaving from the job.

9.) Wall coverers shall be responsible for their workmanship to guarantee a satisfactory job. The Union will take joint responsibility with the Employer for adjusting problems relative to repairs or defective work, even if the responsible wall coverer is no longer employed by the Employer.

41

10.) Wall coverers are not responsible for goods hung over old wallpaper, varnished, waxed, or enameled surfaces.

11.)
    a). Failures caused by lack of lining shall not be the responsibility of the wall coverers, where such lining is willfully omitted by the Employer.

    b). Failures caused by lack of lining shall not be the responsibility of the Employer, where the wall coverer willfully omits such lining.

12.) The standard workweek shall be as set forth in Art. IV, Sec. 1(A), Sec. 1(B) and Sec. 2(A).

13.) The Apprentice Ratio shall be that set forth in Art. VII, Sec. 5 of this Trade Agreement.

14.) On all quantity discount-sized jobs as defined in Art. XXVII, Sec. 4, a Job Steward shall be placed. Such placement shall be made in conformity with Art. IX.

15.) JOURNEYPERSONS and apprentices shall submit time sheets to the Employer weekly, indicating names of men, including apprentices, working on a job, and the dates worked.

16.) The pay scale for registered wall coverer apprentices shall be based on a percentage of the applicable painter hourly rate as set forth in Art. III, Sec. 1. The apprentice percentage rate of pay shall be as provided for in Art. VII, Sec. 1. Apprentice hours worked and the percentage rate as provided in Art. VII, Sec. 1 are to be shown on all time sheets submitted for payment.

17.) The Union shall appoint Shop Stewards in all shops having a wall coverers annual payroll over $80,000 in the preceding calendar year.

18.) Wall coverer Stewards shall be placed on all jobs of out-of-town employers doing work in the jurisdiction of the Union.

19.) An agreement has been reached as to limiting weights of materials. A Joint Committee shall survey the problem and determine maximum weights.

20.) Adhesive containers shall not exceed four (4) gallons.

21.) Foremen shall receive pay in addition to their regular earnings depending upon the number of JOURNEYPERSONS on a job, including the foreman, in accordance with the following schedule:

| | |
|---|---|
| 8 to 13 journeypersons | 1 hour |
| 14 to 19 journeypersons | 2 hours |
| 20 to 24 journeypersons | 3 hours |
| 25 or more journeypersons | 7 hours |

22.) Wall coverers shall not deliver bulk materials from the sidewalk to a job site.

23.) A JOURNEYPERSON who distributes a business card with his name on it shall be deemed to be advertising to do contract work. In such cases, the Union must take disciplinary action against said JOURNEYPERSON, and the distribution of these business cards must cease.

24.) Prices quoted herein are based on rolls eighteen (18) inches wide and eight (8) yards in length.

42

25.) Square yards measured are to be computed by multiplying the greatest length and width of any irregular shaped surface.

b). Special / Extra Charges

1.) On all work, the actual amount of goods required to cover a room, etc., shall be charged.

2.) On all plain goods, 10% additional quantity shall be charged for shrinkage, waste or trimming above square measure.

3.) On all figured goods, the actual amounts of goods required to be cut shall be charged.

4.) Lining paper shall be charged in each instance in the same quantity as finished goods hung thereupon.

5.) For goods hung in a cove, 50% over the actual amount of the goods required shall be charged.

6.) For materials hung with insoluble cements, 50% over the actual amount of the goods required shall be charged.

7.) For goods hung on a ceiling with a cove, $0.63 (sixty-three cents) extra per yard over the actual amount of the goods required shall be charged for the entire ceiling.

8.) For goods hung on sand-finished walls or ceilings, or on muslin, $1.11 per roll, $0.33 (thirty-three cents) per square yard over the actual amount of the goods required shall be charged.

9.) For goods cut to finish for ornamental work, 20% over the actual amount of the goods required shall be charged.

10.) The lower part of a wall, if it is decorated differently from the upper part and is less than five feet high, shall be known as Dado.

11.) Where three (3) papers are used on walls in one room, they shall be known as Frieze, Wall and Dado. Where two (2) papers are used on walls in one room, the shortest of the two shall be Frieze or Dado. The other shall be wall price.

12.) Goods required to be hung horizontally are to be charged the same price as Frieze or Dado.

13.) Definition of panels: A panel is a surface on a ceiling or a wall surrounded by a molding whose area does not exceed 100 square feet. A ceiling or wall which is cut up into panels, a number of which is smaller than 100 square feet, shall be classified as paneled ceiling or wall.

14.) For square, round or decorative arches, sinks, washbasins, doors per side, electric and telephone box doors (and in the bathrooms when area behind sink or commode is being papered), and freestanding water coolers, as per yearly price list.

15.) The charge for hanging wallpaper or other material in rooms where more than one wall has beams or coves, and where ceiling and wall joins, shall be as specified in column 2 of the wall coverers' price list, provided that the beams are papered. In rooms where beams are on one wall, column 2 of the price list will apply to one wall only.

43

16.) The charge for hanging wallpaper or other material on columns only, is to be specified in column 3 of the wall coverers' price list. Window columns only, when not attached to wall areas being covered, will be specified in column 3 on wall coverers' price list.

17.) Horizontal Face boards up to twenty-four (24) inches in width shall be paid the piece rate plus 50% on material hung. Graphics shall be paid on the basis of piece rate for material hung plus the hourly rate for lay out time.

18.) Where shelves, moldings, casings, brackets, switch plates, etc., are covered, the wall coverers' hourly rate shall be charged in addition to material used.

19.) Any wall length four (4) feet or less in height shall be charged the same as in the 2nd column.

20.) Heights of seventeen (17) feet or more shall be paid for at 15% above wall coverers' price list. This shall not apply where there is a completely decked working platform.

21.) Dressing booths or coupon booths under forty (40) square feet; floor area; and where counters, seats or mirrors are attached to walls, shall be charged as indicated in the 3rd column of the wall coverers' price list.

22.) All items listed under cloth and vinyl returns one (1) inch or less, as per yearly price list.

## Art. XXVII. Sec. 3. - Wall Coverers' Price List

a). All Wall coverers overtime shall be paid on the basis of Wall coverers piece rate plus 50% of that piece rate.

b). Wall coverers' Price List;

### WALLCOVERER'S PRICE LIST - May 1, 2005 – April 30, 2006

| | #1 | #2 | #3 |
| --- | --- | --- | --- |
| | Wall Space | Ceilings, Gable Walls walls w/stairs, walls w/coves, Beams, Friezes, Mailrooms Dadoes, Panels | Ceilings only, Bathrooms, Toilets, Closets, Kitchens, Pantries, Columns, Spiral Stairways |
| **Wallpaper** | | | |
| 1. Lining Paper p/roll...................................................................5.69 | | 6.29 | 7.06 |
| 2. Wallpaper costing to $5.00 p/roll retail excluding hand prints.........................10.62 | | 11.75 | 13.51 |
| 3. Wallpaper costing $5.01 to 14.00 p/roll including all grass cloths, silver & gold coated grass cloths. Wallpaper costing $14.00 or over p/roll retail, including Flocks, Tech Metal, Foil Timbertone.................................. 14.24 | | 15.05 | 18.49 |
| 4. Japanese Gold or Wood in Sheets, Sectional Papers, Posters, Blueprints etc. up to 9 sq. ft. | | | |
|     Lapped...................................................................3.68 | | 4.86 | 5.67 |
|     Butted.....................................................................5.70 | | 6.60 | 7.43 |
| 5. Scenery Papers or Landscape to 44" in width per strip...........................27.18 | | | |
| 6. Section Scenic regardless of size p/strip..............................................13.80 | | | |
| 7. Plain Paper filler p/strip on same wall as scenic...................................13.80 | | | |
| 8. Hand Painted or Water Color Scenics up to 44" in width costing in excess of $60.00 p/strip retail...............................................41.51 | | | |
| **Wood Veneer on Canvas** | | | |
| 1. Plain Work, Panel, Stairways, Columns, Ceilings, Dadoes, wall w/beams p/ square foot..............................................................1.47 | | | |
| 2. Stiles, Casings, Door frames, Arches and around panels, with or without | | | |

44

moldings any width under 12" p/running foot.................................1.47

**Blancharized Vinylite, Suede Backed Vinyl, Rigi-Wall and Similar Type Materials**
1. Walls, Ceilings, Panels, Dadoes, Stairways, Columns, p/square foot..................1.31
2. Stiles, Casings, Door frames, Arch and Secret doors and around panels, with
   or without moldings, any width under 12" p/running foot.................................1.31

**Cork**

| | | |
|---|---|---|
| Per square foot.................................1.18 (up to 1/8" light wt.) | 1.62 (over 1/8" heavy wt.) | |

**Photo Murals**

Per Square foot.................................................1.38

**Striated or Sculpted Plastic**

| Per roll.................................38.67 | 41.51 | 44.71 |
|---|---|---|

**Borders**
A. All borders, styles, and extensions are to be charged by the yard. Friezes over 9" in width are to be charged proportionately.
B. Nursery and scenery borders in sheets, 50% extra. When laid out in panels, double price.
C. Forming panels of striped paper by using strips of the wallpaper at top and bottom, each cap $1.12 and 0.89 cents per miter.
D. Cutting out border to be charged at paperhangers' hourly rate. No extra charge for straight cuts.
E. Borders, etc., hung in coves, 50% extra.
F. From 1" to 9" per running yard

| | | | |
|---|---|---|---|
| 1. Paper.................................1.12 | 1.27 | 1.72 |
| 2. Printed Vinyl.................................3.63 | 3.95 | 4.45 |
| 3. Solid Vinyl, Felt or Hand prints.................................2.94 | 3.35 | 3.85 |

**Stiles**

From 1" to 9" per running yard

| | |
|---|---|
| 1. Paper.................................2.11 | |
| 2. Vinyl, Felts or Hand prints.................................4.55 | |

**Cloth and Vinyl**

| | | |
|---|---|---|
| 1. All Fabrics, Textiles, natural or synthetic, regardless of backing, or unbacked. Tufted Materials, Fabric backed Cork, p/square yard.................................6.68 | 7.30 | 7.87 |
| 2. Woven Paper per square yard.................................5.23 | 5.78 | 6.32 |
| 3. Cloth backed Foil per roll.................................17.55 | 20.30 | 22.88 |
| 4. Oil Painting, Hand Painted Canvas per square foot.................................1.72 | 2.13 | 2.52 |
| 5. Stencil Decorated Glass or Sanded Canvas per square foot.................................91 | 1.08 | 1.12 |
| 6. Sheepskin or Natural Leather per square yard.................................7.74 | 8.48 | 11.45 |
| 7. Unfinished Canvas for Painting only per square yard.................................4.14 | 4.85 | 5.26 |
| 8. Vinyl, Canvas up to 13 oz. per square yard.................................4.58 | 5.23 | 5.78 |
| Patterned Goods per roll.................................18.28 | 21.02 | 23.09 |
| 9. Vinyl over 13 oz. to 24.5 oz. and all hand printed vinyl, paper or cloth backed, regardless of weight per square yard.................................5.23 | 5.78 | 6.60 |
| Patterned Goods per roll.................................21.02 | 23.09 | 26.44 |
| 10. Vinyl over 25.5 oz., Flocked or Metal faced Vinyl, Flock on Foil, paper or fabric backed, regardless of weight, per square yard.................................5.78 | 6.60 | 7.86 |
| Patterned Goods per roll.................................23.09 | 26.44 | 30.96 |

**Curon**

Per square foot.................................................97

**Fiberglass**

| | | |
|---|---|---|
| Per square yard.................................5.23 | 5.78 | 6.60 |
| Undercover Paper, Polyester Lining p/square yard.................................4.14 | 4.85 | 5.26 |

**Fabric Track Systems**
1. Installation track batting and fabric p/linear ft.
2. Installation of fabric only.
3. Panel under 16 square foot to be charged at higher rate.

To be determined
by joint pricing
Committee.

---

All Wallcoverers Overtime shall be paid on the basis of Piece Rate plus 50% of the Piece Rate.

All Benefits will be paid on Full Gross Pay.

**Stamps**

45

Divide $28.00 into Full Gross Pay for stamp hours.
Up to .24 = 0          From .25 to .74 = ½ Hour          .75 and over = 1 Hour

| Quick References | #1 | #2 | #3 |
|---|---|---|---|
| **Vinyl** | | | |
| Vinyls, Canvas up to 13 oz. p/square yard............................ 4.58 | | 5.23 | 5.78 |
| Patterned Goods per Roll.................................................... 18.28 | | 21.02 | 23.09 |
| Vinyls over 13 oz. to 24.5 oz. and all hand printed vinyl, paper or cloth | | | |
| backed, regardless of weight per square yard......................... 5.23 | | 5.78 | 6.60 |
| Patterned Goods per Roll.................................................... 21.02 | | 23.09 | 26.44 |
| **Fabric** | | | |
| All fabric textiles, natural or synthetic, regardless of backing or unbacked, | | | |
| Tufted Materials, Fabric backed Cork, p/square yard................ 6.68 | | 7.30 | 7.87 |
| **Hourly Rate**....................................................... 34.98 | | | |
| **Returns** to 24 ½ oz........................................ .41 | | | |
| Over 24 ½ oz............................................ .71 | | | |

Square, round or decorative arches, sinks, washbasins, doors per side, electric
and telephone box doors (and in bathrooms when area behind sink or
commode is being papered) and free standing water cooler.................8.34

### WALLCOVERER'S PRICE LIST - May 1, 2006 ~ April 30, 2007

| | #1 Wall Space | #2 Ceilings, Gable Walls walls w/stairs, walls w/coves, Beams, Friezes, Mailrooms Dadoes, Panels | #3 Ceiling only, Bathrooms, Toilets, Closets, Kitchens, Pantries, Columns, Spiral Stairways |
|---|---|---|---|
| **Wallpaper** | | | |
| 1. Lining Paper p/roll........................................... 5.74 | | 6.35 | 7.13 |
| 2. Wallpaper costing to $5.00 p/roll retail excluding hand prints........... 10.73 | | 11.87 | 13.65 |
| 3. Wallpaper costing $5.01 to 14.00 p/roll including all grass cloths, silver & gold coated grass cloths. Wallpaper costing $14.00 or over p/roll retail, including Flocks, Tech Metal, Foil Timbertone........... 14.38 | | 15.20 | 18.67 |
| 4. Japanese Gold or Wood in Sheets, Sectional Papers, Posters, Blueprints etc. up to 9 sq. ft. | | | |
| Lapped........................................... 3.72 | | 4.91 | 5.73 |
| Butted........................................... 5.76 | | 6.67 | 7.50 |
| 5. Scenery Papers or Landscape to 44" in width per strip........... 27.45 | | | |
| 6. Section Scenic regardless of size p/strip........... 13.94 | | | |
| 7. Plain Paper filler p/strip on same wall as scenic........... 13.94 | | | |
| 8. Hand Painted or Water Color Scenics up to 44" in width costing in excess of $60.00 p/strip retail........... 41.93 | | | |
| **Wood Veneer on Canvas** | | | |
| 1. Plain Work, Panel, Stairways, Columns, Ceilings, Dadoes, wall w/beams p/ square foot........... 1.48 | | | |
| 2. Stiles, Casings, Door frames, Arches and around panels, with or without moldings any width under 12" p/running foot........... 1.48 | | | |
| **Blancharized Vinylite, Suede Backed Vinyl, Rigi-Wall and Similar Type Materials** | | | |
| 1. Walls, Ceilings, Panels, Dadoes, Stairways, Columns, p/square foot........... 1.32 | | | |
| 2. Stiles, Casings, Door frames, Arch and Secret doors and around panels, with or without moldings, any width under 12" p/running foot........... 1.32 | | | |
| **Cork** | | | |
| Per square foot........... 1.19 (up to 1/8" light wt.) | | 1.64 (over 1/8" heavy wt.) | |
| **Photo Murals** | | | |
| Per Square foot........... 1.39 | | | |

46

**Striated or Sculpted Plastic**

| | | | |
|---|---|---|---|
| Per roll................................................................39.06 | 41.93 | 45.16 |

**Borders**
A.  All borders, styles, and extensions are to be charged by the yard. Friezes over 9" in width are to be charged proportionately.
B.  Nursery and scenery borders in sheets, 50% extra. When laid out in panels, double price.
C.  Forming panels of striped paper by using strips of the wallpaper at top and bottom, each cap $1.13 and 0.90 cents per miter.
D.  Cutting out border to be charged at paperhangers' hourly rate. No extra charge for straight cuts.
E.  Borders, etc., hung in coves, 50% extra.
F.  From 1" to 9" per running yard.

| | | | |
|---|---|---|---|
| 1. Paper...........................................................1.13 | 1.28 | 1.74 |
| 2. Printed Vinyl..............................................3.67 | 3.99 | 4.49 |
| 3. Solid Vinyl, Felt or Hand prints..................2.97 | 3.38 | 3.89 |

**Stiles**

From 1" to 9" per running yard
| | |
|---|---|
| 1. Paper............................................................2.12 | |
| 2. Vinyl, Felts or Hand prints...........................4.60 | |

**Cloth and Vinyl**
| | | | |
|---|---|---|---|
| 1.  All Fabrics, Textiles, natural or synthetic, regardless of backing, or unbacked. Tufted | | |
|      Materials, Fabric backed Cork, p/square yard...........6.75 | 7.37 | 7.95 |
| 2.  Woven  Paper per square yard................................5.28 | 5.84 | 6.38 |
| 3.  Cloth backed Foil per roll...................................17.73 | 20.50 | 23.11 |
| 4.  Oil Painting, Hand Painted Canvas per square foot....1.74 | 2.15 | 2.55 |
| 5.  Stencil Decorated Glass or Sanded Canvas per square foot....92 | 1.09 | 1.13 |
| 6.  Sheepskin or Natural Leather per square yard...........7.82 | 8.56 | 11.56 |
| 7.  Unfinished Canvas for Painting only per square yard....4.18 | 4.90 | 5.31 |
| 8.  Vinyl, Canvas up to 13 oz. per square yard..............4.63 | 5.28 | 5.84 |
|      Patterned Goods per roll....................................18.46 | 21.23 | 23.32 |
| 9.  Vinyl over 13 oz. to 24.5 oz. and all hand printed vinyl, paper or cloth backed, regardless of | | |
|      weight per square yard.......................................5.28 | 5.84 | 6.67 |
|      Patterned Goods per roll....................................21.23 | 23.32 | 26.70 |
| 10. Vinyl over 25.5 oz., Flocked or Metal faced Vinyl, Flock on Foil, paper or fabric | | |
|      backed, regardless of weight, per square yard...........5.84 | 6.67 | 7.94 |
|      Patterned Goods per roll....................................23.32 | 26.70 | 31.27 |

**Curon**

| | |
|---|---|
| Per square foot................................................98 | |

**Fiberglass**
| | | | |
|---|---|---|---|
| Per square yard..............................................5.28 | 5.84 | 6.67 |
| Undercover Paper, Polyester Lining p/square yard......4.18 | 4.90 | 5.31 |

**Fabric Track Systems**
| | |
|---|---|
| 1.  Installation track batting and fabric p/linear ft. | To be determined |
| 2.  Installation of fabric only. | by joint pricing |
| 3.  Panel under 16 square foot to be charged at higher rate. | Committee. |

---

**All Wallcoverers Overtime shall be paid on the basis of Piece Rate plus 50% of the Piece Rate.**

**All Benefits will be paid on Full Gross Pay.**

**Stamps**

Divide $28.00 into Full Gross Pay for stamp hours.
Up to .24 = 0          From .25 to .74 = ½ Hour          .75 and over = 1 Hour

| Quick References | #1 | #2 | #3 |
|---|---|---|---|
| **Vinyl** | | | |
| Vinyls, Canvas up to 13 oz. p/square yard.................4.63 | 5.28 | 5.84 |
| Patterned Goods per Roll......................................18.46 | 21.23 | 23.32 |
| Vinyls over 13 oz. to 24.5 oz. and all hand printed vinyl, paper or cloth | | | |
| backed, regardless of weight per square yard.............5.28 | 5.84 | 6.67 |
| Patterned Goods per Roll......................................21.23 | 23.32 | 26.70 |
| **Fabric** | | | |
| All fabric textiles, natural or synthetic, regardless of backing or unbacked, | | | |

47

| Tufted Materials, Fabric backed Cork, p/square yard...................6.75 | 7.37 | 7.95 |
|---|---|---|

Hourly Rate...................35.33

Returns to 24 ½ oz...................41
    Over 24 ½ oz...................72

Square, round or decorative arches, sinks, washbasins, doors per side, electric and telephone box doors (and in bathrooms when area behind sink or commode is being papered) and free standing water cooler...................8.42

## WALLCOVERER'S PRICE LIST - May 1, 2007 – April 30, 2008

| | #1<br><br>Wall<br>Space | #2<br>Ceilings,<br>Gable Walls<br>walls w/stairs,<br>walls w/coves,<br>Beams, Friezes,<br>Mailrooms<br>Dadoes, Panels | #3<br>Ceiling only,<br>Bathrooms, Toilets,<br>Closets, Kitchens,<br>Pantries,<br>Columns,<br>Spiral Stairways |
|---|---|---|---|
| **Wallpaper** | | | |
| 1.  Lining Paper p/roll...................5.85 | | 6.48 | 7.27 |
| 2.  Wallpaper costing to $5.00 p/roll retail excluding hand prints.......10.94 | | 12.11 | 13.92 |
| 3.  Wallpaper costing $5.01 to 14.00 p/roll including all grass cloths, silver & gold coated grass cloths. Wallpaper costing $14.00 or over p/roll retail, including Flocks, Tech Metal, Foil Timbertone...................14.67 | | 15.50 | 19.04 |
| 4.  Japanese Gold or Wood in Sheets, Sectional Papers, Posters, Blueprints etc. up to 9 sq. ft. | | | |
|     Lapped...................3.79 | | | |
|     Butted...................5.88 | | 5.01 | 5.84 |
| 5.  Scenery Papers or Landscape to 44" in width per strip...................28.00 | | 6.80 | 7.65 |
| 6.  Section Scenic regardless of size p/strip...................14.22 | | | |
| 7.  Plain Paper filler p/strip on same wall as scenic...................14.22 | | | |
| 8.  Hand Painted or Water Color Scenics up to 44" in width costing in excess of $60.00 p/strip retail...................42.77 | | | |

**Wood Veneer on Canvis**
1.  Plain Work, Panel, Stairways, Columns, Ceilings, Dadoes, wall w/beams p/ square foot...................1.51
2.  Stiles, Casings, Door frames, Arches and around panels, with or without moldings any width under 12" p/running foot...................1.51

**Blancharized Vinylite, Suede Backed Vinyl, Rigi-Wall and Similar Type Materials**
1.  Walls, Ceilings, Panels, Dadoes, Stairways, Columns, p/square foot...................1.35
2.  Stiles, Casings, Door frames, Arch and Secret doors and around panels, with or without moldings, any width under 12" p/running foot...................1.35

**Cork**
|     Per square foot...................1.21 (up to 1/8" light wt.) | 1.67 (over 1/8" heavy wt.) |
|---|---|

**Photo Murals**
    Per Square foot...................1.42

**Striated or Sculpted Plastic**
|     Per roll...................39.83 | 42.77 | 46.06 |
|---|---|---|

**Borders**
A.  All borders, styles, and extensions are to be charged by the yard. Friezes over 9" in width are to be charged proportionately.
B.  Nursery and scenery borders in sheets, 50% extra. When laid out in panels, double price.
C.  Forming panels of striped paper by using strips of the wallpaper at top and bottom, each cap $1.15 and 0.92 cents per miter.
D.  Cutting out border to be charged at paperhangers' hourly rate. No extra charge for straight cuts.
E.  Borders, etc., hung in coves, 50% extra.
F.  From 1" to 9" per running yard.

|     1. Paper...................1.15 | 1.30 | 1.77 |
|---|---|---|
|     2. Printed Vinyl...................3.74 | 4.07 | 4.58 |
|     3. Solid Vinyl, Felt or Hand prints...................3.03 | 3.45 | 3.97 |

48

**Stiles**

    From 1" to 9" per running yard
        1. Paper...................................................2.16
        2. Vinyl, Felts or Hand prints........................4.69

**Cloth and Vinyl**

| | | #1 | #2 | #3 |
|---|---|---|---|---|
| 1. | All Fabrics, Textiles, natural or synthetic, regardless of backing, or unbacked. Tufted Materials, Fabric backed Cork, p/square yard............6.89 | | 7.52 | 8.11 |
| 2. | Woven Paper per square yard............5.39 | | 5.96 | 6.51 |
| 3. | Cloth backed Foil per roll............18.08 | | 20.91 | 23.57 |
| 4. | Oil Painting, Hand Painted Canvas per square foot:............1.77 | | 2.19 | 2.60 |
| 5. | Stencil Decorated Glass or Sanded Canvas per square foot............94 | | 1.11 | 1.15 |
| 6. | Sheepskin or Natural Leather per square yard............7.98 | | 8.73 | 11.79 |
| 7. | Unfinished Canvas for Painting only per square yard............4.26 | | 5.00 | 5.42 |
| 8. | Vinyl, Canvas up to 13 oz. per square yard............4.72 | | 5.39 | 5.96 |
| | Patterned Goods per roll............18.83 | | 21.65 | 23.79 |
| 9. | Vinyl over 13 oz. to 24.5 oz. and all hand printed vinyl, paper or cloth backed, regardless of weight per square yard............5.39 | | 5.96 | 6.80 |
| | Patterned Goods per roll............21.65 | | 23.79 | 27.23 |
| 10. | Vinyl over 25.5 oz., Flocked or Metal faced Vinyl, Flock on Foil, paper or fabric backed, regardless of weight, per square yard............5.96 | | 6.80 | 8.10 |
| | Patterned Goods per roll............23.79 | | 27.23 | 31.90 |

**Curon**

    Per square foot..................................................1.00

**Fiberglass**

| | #1 | #2 | #3 |
|---|---|---|---|
| Per square yard............5.39 | | 5.96 | 6.80 |
| Undercover Paper, Polyester Lining p/square yard............4.26 | | 5.00 | 5.42 |

**Fabric Track Systems**

| | | |
|---|---|---|
| 1. | Installation track batting and fabric p/linear ft. | To be determined |
| 2. | Installation of fabric only. | by joint pricing |
| 3. | Panel under 16 square foot to be charged at higher rate. | Committee. |

---

**All Wallcoverers Overtime shall be paid on the basis of Piece Rate plus 50% of the Piece Rate.**

**All Benefits will be paid on Full Gross Pay.**

**Stamps**

    **Divide $28.00 Into Full Gross Pay for stamp hours.**
    Up to .24 = 0      From .25 to .74 = ½ Hour    .75 and over = 1 Hour

| Quick References | #1 | #2 | #3 |
|---|---|---|---|
| **Vinyl** | | | |
| Vinyls, Canvas up to 13 oz. p/square yard............4.72 | 5.39 | 5.96 |
| Patterned Goods per Roll............18.83 | 21.65 | 23.79 |
| Vinyls over 13 oz. to 24.5 oz. and all hand printed vinyl, paper or cloth backed, regardless of weight per square yard............5.39 | 5.96 | 6.80 |
| Patterned Goods per Roll............21.65 | 23.79 | 27.23 |
| **Fabric** | | | |
| All fabric textiles, natural or synthetic, regardless of backing or unbacked, Tufted Materials, Fabric backed Cork, p/square yard............6.89 | 7.52 | 8.11 |

Hourly Rate............36.04

Returns to 24 ½ oz............42
    Over 24 ½ oz............73

Square, round or decorative arches, sinks, washbasins, doors per side, electric and telephone box doors (and in bathrooms when area behind sink or commode is being papered) and free standing water cooler............8.59

49

## WALLCOVERER'S PRICE LIST - May 1, 2008 – April 30, 2009

| | #1 Wall Space | #2 Ceilings, Gable Walls walls w/stairs, walls w/coves, Beams, Friezes, Mailrooms Dadoes, Panels | #3 Ceiling only, Bathrooms, Toilets, Closets, Kitchens, Pantries, Columns, Spiral Stairways |
|---|---|---|---|

### Wallpaper

| | | | |
|---|---|---|---|
| 1. Lining Paper p/roll..........................................................5.91 | | 6.54 | 7.34 |
| 2. Wallpaper costing to $5.00 p/roll retail excluding hand prints......11.05 | | 12.23 | 14.06 |
| 3. Wallpaper costing $5.01 to 14.00 p/roll including all grass cloths, silver & gold coated grass cloths. Wallpaper costing $14.00 or over p/roll retail, including Flocks, Tech Metal, Foil Timbertone.............14.82 | | 15.66 | 19.23 |
| 4. Japanese Gold or Wood in Sheets, Sectional Papers, Posters, Blueprints etc. up to 9 sq. ft. | | | |
|    Lapped...............................................................3.83 | | 5.06 | 5.90 |
|    Butted................................................................5.94 | | 6.87 | 7.73 |
| 5. Scenery Papers or Landscape to 44" in width per strip...........28.28 | | | |
| 6. Section Scenic regardless of size p/strip........................14.36 | | | |
| 7. Plain Paper filler p/strip on same wall as scenic................14.36 | | | |
| 8. Hand Painted or Water Color Scenics up to 44" in width costing in excess of $60.00 p/strip retail.................................43.20 | | | |

### Wood Veneer on Canvas

| | | | |
|---|---|---|---|
| 1. Plain Work, Panel, Stairways, Columns, Ceilings, Dadoes, wall w/beams p/ square foot....................................................1.53 | | | |
| 2. Stiles, Casings, Door frames, Arches and around panels, with or without moldings any width under 12" p/running foot....................1.53 | | | |

### Blancharized Vinylite, Suede Backed Vinyl, Rigi-Wall and Similar Type Materials

| | | | |
|---|---|---|---|
| 1. Walls, Ceilings, Panels, Dadoes, Stairways, Columns, p/square foot....1.36 | | | |
| 2. Stiles, Casings, Door frames, Arch and Secret doors and around panels, with or without moldings, any width under 12" p/running foot.........1.36 | | | |

### Cork

Per square foot.....................................................1.22 (up to 1/8" light wt.)     1.69 (over 1/8" heavy wt.)

### Photo Murals

Per Square foot......................................................1.43

### Striated or Sculpted Plastic

| Per roll.............................................................40.23 | | 43.20 | 46.52 |
|---|---|---|---|

### Borders

A. All borders, styles, and extensions are to be charged by the yard. Friezes over 9" in width are to be charged proportionately.
B. Nursery and scenery borders in sheets, 50% extra. When laid out in panels, double price.
C. Forming panels of striped paper by using strips of the wallpaper at top and bottom, each cap $1.16 and 0.93 cents per miter.
D. Cutting out border to be charged at paperhangers' hourly rate. No extra charge for straight cuts.
E. Borders, etc., hung in coves, 50% extra.
F. From 1" to 9" per running yard.

| | | | |
|---|---|---|---|
| 1. Paper.............................................................1.16 | | 1.31 | 1.79 |
| 2. Printed Vinyl.....................................................3.78 | | 4.11 | 4.63 |
| 3. Solid Vinyl, Felt or Hand prints..................................3.06 | | 3.48 | 4.01 |

### Stiles

From 1" to 9" per running yard

| | | | |
|---|---|---|---|
| 1. Paper.............................................................2.18 | | | |
| 2. Vinyl, Felts or Hand prints.......................................4.74 | | | |

### Cloth and Vinyl

| | | | |
|---|---|---|---|
| 1. All Fabrics, Textiles, natural or synthetic, regardless of backing, or unbacked. Tufted Materials, Fabric backed Cork, p/square yard......................6.96 | | 7.60 | 8.19 |
| 2. Woven Paper per square yard.......................................5.44 | | 6.02 | 6.58 |
| 3. Cloth backed Foil per roll........................................18.26 | | 21.12 | 23.81 |
| 4. Oil Painting, Hand Painted Canvas per square foot.................1.79 | | 2.21 | 2.63 |

50

| | | #1 | #2 | #3 |
|---|---|---|---|---|
| 5. | Stencil Decorated Glass or Sanded Canvas per square foot....................... .95 | | 1.12 | 1.16 |
| 6. | Sheepskin or Natural Leather per square yard.............................. 8.06 | | 8.82 | 11.91 |
| 7. | Unfinished Canvas for Painting only per square yard......................... 4.30 | | 5.05 | 5.47 |
| 8. | Vinyl, Canvas up to 13 oz. per square yard................................ 4.77 | | 5.44 | 6.02 |
| | Patterned Goods per roll.................................... 19.02 | | 21.87 | 24.03 |
| 9. | Vinyl over 13 oz. to 24.5 oz. and all hand printed vinyl, paper or cloth backed, regardless of weight per square yard.................................. 5.44 | | 6.02 | 6.87 |
| | Patterned Goods per roll................................... 21.87 | | 24.03 | 27.50 |
| 10. | Vinyl over 25.5 oz., Flocked or Metal faced Vinyl, Flock on Foil, paper or fabric backed, regardless of weight, per square yard....................... 6.02 | | 6.87 | 8.18 |
| | Patterned Goods per roll................................... 24.03 | | 27.50 | 32.22 |

**Curon**

Per square foot................................................................1.01

**Fiberglass**

| | #1 | #2 | #3 |
|---|---|---|---|
| Per square yard.............................................5.44 | | 6.02 | 6.87 |
| Undercover Paper, Polyester Lining p/square yard.........4.30 | | 5.05 | 5.47 |

**Fabric Track Systems**
1. Installation track batting and fabric p/linear ft.
2. Installation of fabric only.
3. Panel under 16 square foot to be charged at higher rate.

To be determined
by joint pricing
Committee.

All Wallcoverers Overtime shall be paid on the basis of Piece Rate plus 50% of the Piece Rate.

All Benefits will be paid on Full Gross Pay.

**Stamps**

Divide $28.00 into Full Gross Pay for stamp hours.
Up to .24 = 0     From .25 to .74 = ½ Hour     .75 and over = 1 Hour

| Quick References | #1 | #2 | #3 |
|---|---|---|---|
| **Vinyl** | | | |
| Vinyls, Canvas up to 13 oz. p/square yard................ 4.77 | | 5.44 | 6.02 |
| Patterned Goods per Roll.................................. 19.02 | | 21.87 | 24.03 |
| Vinyls over 13 oz. to 24.5 oz. and all hand printed vinyl, paper or cloth backed, regardless of weight per square yard............ 5.44 | | 6.02 | 6.87 |
| Patterned Goods per Roll................................. 21.87 | | 24.03 | 27.50 |
| **Fabric** | | | |
| All fabric textiles, natural or synthetic, regardless of backing or unbacked, Tufted Materials, Fabric backed Cork, p/square yard................ 6.96 | | 7.60 | 8.19 |
| Hourly Rate................................................ 36.40 | | | |
| Returns to 24 ½ oz......................................... .42 | | | |
| Over 24 ½ oz.......................................... .74 | | | |

Square, round or decorative arches, sinks, washbasins, doors per side, electric
and telephone box doors (and in bathrooms when area behind sink or
commode is being papered) and free standing water cooler....................8.68

## WALLCOVERER'S PRICE LIST - May 1, 2009 – April 30, 2010

| | #1 | #2 | #3 |
|---|---|---|---|
| | Wall Space | Ceilings, Gable Walls walls w/stairs, walls w/coves, Beams, Friezes, Mailrooms Dadoes, Panels | Ceiling only, Bathrooms, Toilets, Closets, Kitchens, Pantries, Columns, Spiral Stairways |
| **Wallpaper** | | | |
| 1. Lining Paper p/roll......................................... 6.03 | | 6.67 | 7.49 |
| 2. Wallpaper costing to $5.00 p/roll retail excluding hand prints....... 11.27 | | 12.47 | 14.34 |

51

3. Wallpaper costing $5.01 to 14.00 p/roll including all grass cloths, silver
   & gold coated grass cloths. Wallpaper costing $14.00 or over p/roll retail,
   including Flocks, Tech Metal, Foil Timbertone.................................15.12

| | | |
|---|---|---|
| | 15.92 | 19.61 |

4. Japanese Gold or Wood in Sheets, Sectional Papers, Posters,
   Blueprints etc. up to 9 sq. ft.
   Lapped.................................................3.91
   Butted..................................................

| | | |
|---|---|---|
| | 5.16 | 6.02 |

5. Scenery Papers or Landscape to 44" in width per strip................6.06

| | | |
|---|---|---|
| | 7.01 | 7.88 |

6. Section Scenic regardless of size p/strip.................................28.85
7. Plain Paper filler p/strip on same wall as scenic......................14.65
8. Hand Painted or Water Color Scenics up to 44" in width costing in
   excess of $60.00 p/strip retail.............................................44.06

## Wood Veneer on Canvas

1. Plain Work, Panel, Stairways, Columns, Ceilings, Dadoes, wall w/beams
   p/ square foot..............................................................1.56
2. Stiles, Casings, Door frames, Arches and around panels, with or without
   moldings any width under 12" p/running foot...........................1.56

## Blancharized Vinylite, Suede Backed Vinyl, Rigi-Wall and Similar Type Materials

1. Walls, Ceilings, Panels, Dadoes, Stairways, Columns, p/square foot....1.39
2. Stiles, Casings, Door frames, Arch and Secret doors and around panels, with
   or without moldings, any width under 12" p/running foot...............1.39

## Cork

Per square foot..............................................................1.24 (up to
1/8" light wt.)

| | |
|---|---|
| | 1.72 (over 1/8" heavy wt.) |

## Photo Murals

Per Square foot.................................................................1.46

## Striated or Sculpted Plastic

Per roll..........................................................................41.03

| | | |
|---|---|---|
| | 44.06 | 47.45 |

## Borders

A. All borders, styles, and extensions are to be charged by the yard. Friezes over 9" in width are to be charged proportionately.
B. Nursery and scenery borders in sheets, 50% extra. When laid out in panels, double price.
C. Forming panels of striped paper by using strips of the wallpaper at top and bottom, each cap $1.18 and 0.95 cents per miter.
D. Cutting out border to be charged at paperhangers' hourly rate. No extra charge for straight cuts.
E. Borders, etc., hung in coves, 50% extra.
F. From 1" to 9" per running yard.
   1. Paper........................................................1.18

| | | |
|---|---|---|
| | 1.33 | 1.83 |

   2. Printed Vinyl................................................3.86

| | | |
|---|---|---|
| | 4.19 | 4.72 |

   3. Solid Vinyl, Felt or Hand prints............................3.12

| | | |
|---|---|---|
| | 3.55 | 4.09 |

## Stiles

From 1" to 9" per running yard.
   1. Paper........................................................2.22
   2. Vinyl, Felts or Hand prints................................4.83

## Cloth and Vinyl

1. All Fabrics, Textiles, natural or synthetic, regardless of backing, or unbacked. Tufted
   Materials, Fabric backed Cork, p/square yard.............................7.10

| | | |
|---|---|---|
| | 7.75 | 8.35 |

2. Woven Paper per square yard................................................5.55

| | | |
|---|---|---|
| | 6.14 | 6.71 |

3. Cloth backed Foil per roll..................................................18.63

| | | |
|---|---|---|
| | 21.54 | 24.29 |

4. Oil Painting, Hand Painted Canvas per square foot........................1.83

| | | |
|---|---|---|
| | 2.25 | 2.68 |

5. Stencil Decorated Glass or Sanded Canvas per square foot.................97

| | | |
|---|---|---|
| | 1.14 | 1.18 |

6. Sheepskin or Natural Leather per square yard.............................8.22

| | | |
|---|---|---|
| | 9.00 | 12.15 |

7. Unfinished Canvas for Painting only per square yard......................4.39

| | | |
|---|---|---|
| | 5.15 | 5.58 |

8. Vinyl, Canvas up to 13 oz. per square yard...............................4.87
   Patterned Goods per roll....................................................19.40

| | | |
|---|---|---|
| | 5.55 | 6.14 |
| | 22.31 | 24.51 |

9. Vinyl over 13 oz. to 24.5 oz. and all hand printed vinyl, paper or cloth backed, regardless of
   weight per square yard.....................................................5.55
   Patterned Goods per roll....................................................22.31

| | | |
|---|---|---|
| | 6.14 | 7.01 |
| | 24.51 | 28.05 |

10. Vinyl over 25.5 oz., Flocked or Metal faced Vinyl, Flock on Foil, paper or fabric
    backed, regardless of weight, per square yard............................6.14
    Patterned Goods per roll...................................................24.51

| | | |
|---|---|---|
| | 7.01 | 8.34 |
| | 28.05 | 32.86 |

**Curon**

Per square foot.................................................................1.03

**Fiberglass**

| | | | |
|---|---|---|---|
| Per square yard.................................................................5.55 | 6.14 | 7.01 |
| Undercover Paper, Polyester Lining p/square yard.................4.39 | 5.15 | 5.58 |

**Fabric Track Systems**
1. Installation track batting and fabric p/linear ft.
2. Installation of fabric only.
3. Panel under 16 square foot to be charged at higher rate.

To be determined
by joint pricing
Committee.

---

**All Wallcoverers Overtime shall be paid on the basis of Piece Rate plus 50% of the Piece Rate.**

**All Benefits will be paid on Full Gross Pay.**

**Stamps**

Divide $28.00 into Full Gross Pay for stamp hours.
Up to .24 = 0          From .25 to .74 = ½ Hour          .75 and over = 1 Hour

---

| Quick References | #1 | #2 | #3 |
|---|---|---|---|
| **Vinyl** | | | |
| Vinyls, Canvas up to 13 oz. p/square yard............................. 4.87 | 5.55 | 6.14 |
| Patterned Goods per Roll................................................19.40 | 22.31 | 24.51 |
| Vinyls over 13 oz. to 24.5 oz. and all hand printed vinyl, paper or cloth | | | |
| backed, regardless of weight per square yard............................. 5.55 | 6.14 | 7.01 |
| Patterned Goods per Roll..............................................22.31 | 24.51 | 28.05 |
| **Fabric** | | | |
| All fabric textiles, natural or synthetic, regardless of backing or unbacked, | | | |
| Tufted Materials, Fabric backed Cork, p/square yard............... 7.10 | 7.75 | 8.35 |

Hourly Rate...............................................................37.13

Returns to 24 ½ oz.........................................................43
Over 24 ½ oz...........................................................75

Square, round or decorative arches, sinks, washbasins, doors per side, electric
and telephone box doors (and in bathrooms when area behind sink or
commode is being papered) and free standing water cooler....................8.85

---

## WALLCOVERER'S PRICE LIST - May 1, 2010 – April 30, 2011

| | #1 | #2 | #3 |
|---|---|---|---|
| | Wall Space | Ceilings, Gable Walls walls w/stairs, walls w/coves, Beams, Friezes, Mailrooms Dadoes, Panels | Ceiling only, Bathrooms, Toilets, Closets, Kitchens, Pantries, Columns, Spiral Stairways |
| **Wallpaper** | | | |
| 1. Lining Paper p/roll.................................... 6.09 | 6.73 | 7.56 |
| 2. Wallpaper costing to $5.00 p/roll retail excluding hand prints...........11.38 | 12.59 | 14.48 |
| 3. Wallpaper costing $5.01 to 14.00 p/roll including all grass cloths, silver & gold coated grass cloths. Wallpaper costing $14.00 or over p/roll retail, including Flocks, Tech Metal, Foil Timbertone..................15.27 | 16.08 | 19.81 |
| 4. Japanese Gold or Wood in Sheets, Sectional Papers, Posters, Blueprints etc. up to 9 sq. ft. | | | |
| Lapped.......................................3.95 | 5.21 | 6.08 |
| Butted........................................6.12 | 7.08 | 7.96 |
| 5. Scenery Papers or Landscape to 44" in width per strip................29.14 | | |
| 6. Section Scenic regardless of size p/strip.............................14.80 | | |
| 7. Plain Paper filler p/strip on same wall as scenic.....................14.80 | | |

53

8. Hand Painted or Water Color Scenics up to 44" in width costing in
   excess of $60.00 p/strip retail...................................................44.50

**Wood Veneer on Canvas**
1. Plain Work, Panel, Stairways, Columns, Ceilings, Dadoes, wall w/beams
   p/ square foot...................................................1.58
2. Stiles, Casings, Door frames, Arches and around panels, with or without
   moldings any width under 12" p/running foot...................................................1.58

**Blancharized Vinylite, Suede Backed Vinyl, Rigi-Wall and Similar Type Materials**
1. Walls, Ceilings, Panels, Dadoes, Stairways, Columns, p/square foot...................1.40
2. Stiles, Casings, Door frames, Arch and Secret doors and around panels, with
   or without moldings, any width under 12" p/running foot...........................1.40

**Cork**

| | | |
|---|---|---|
| Per square foot...................................................1.25 (up to | 1.74 (over 1/8" | |
| 1/8" light wt.) | heavy wt.) | |

**Photo Murals**
Per Square foot...................................................1.47

**Striated or Sculpted Plastic**

| | | |
|---|---|---|
| Per roll...................................................41.44 | 44.50 | 47.92 |

**Borders**
A. All borders, styles, and extensions are to be charged by the yard. Friezes over 9" in width are to be charged proportionally.
B. Nursery and scenery borders in sheets, 50% extra. When laid out in panels, double price.
C. Forming panels of striped paper by using strips of the wallpaper at top and bottom, each cap $1.19 and 0.96 cents per miter.
D. Cutting out border to be charged at paperhangers' hourly rate. No extra charge for straight cuts.
E. Borders, etc., hung in coves, 50% extra.
F. From 1" to 9" per running yard.

| | | |
|---|---|---|
| 1. Paper...................................................1.19 | 1.34 | 1.85 |
| 2. Printed Vinyl...................................................3.90 | 4.23 | 4.77 |
| 3. Solid Vinyl, Felt or Hand prints...................................3.15 | 3.59 | 4.13 |

**Stiles**
From 1" to 9" per running yard
1. Paper...................................................2.24
2. Vinyl, Felts or Hand prints...................................4.88

**Cloth and Vinyl**
1. All Fabrics, Textiles, natural or synthetic, regardless of backing, or unbacked. Tufted
   Materials, Fabric backed Cork, p/square yard.

| | | |
|---|---|---|
| 2. Woven  Paper per square yard...................................................7.17 | 7.83 | 8.43 |
| 3. Cloth backed Foil per roll...................................................5.61 | 6.20 | 6.78 |
| 4. Oil Painting, Hand Painted Canvas per square foot...................18.82 | 21.76 | 24.53 |
| 5. Stencil Decorated Glass or Sanded Canvas per square foot...............1.85 | 2.27 | 2.71 |
| 6. Sheepskin or Natural Leather per square yard........................98 | 1.15 | 1.19 |
| 7. Unfinished Canvas for Painting only per square yard...................8.30 | 9.09 | 12.27 |
| 8. Vinyl, Canvas up to 13 oz. per square yard...........................4.43 | 5.20 | 5.64 |
| Patterned Goods per roll...................................................4.92 | 5.61 | 6.20 |
| 9. Vinyl over 13 oz. to 24.5 oz. and all hand printed vinyl, paper or cloth backed, regardless of | 19.59 | 22.53 | 24.76 |
| weight per square yard...................................................5.61 | 6.20 | 7.08 |
| Patterned Goods per roll...................................................22.53 | 24.76 | 28.33 |
| 10. Vinyl over 25.5 oz., Flocked or Metal faced Vinyl, Flock on Foil, paper or fabric | 6.20 | 7.08 | 8.42 |
| backed, regardless of weight, per square yard...................................................24.76 | 28.33 | 33.19 |
| Patterned Goods per roll...................................................24.76 | | |

**Curon**
Per square foot...................................................1.04

**Fiberglass**

| | | |
|---|---|---|
| Per square yard...................................................5.60 | 6.20 | 7.08 |
| Undercover Paper, Polyester Lining p/square yard...................4.43 | 5.20 | 5.64 |

**Fabric Track Systems**
1. Installation track batting and fabric p/linear ft.
2. Installation of fabric only.
3. Panel under 16 square foot to be charged at higher rate.

To be determined
by joint pricing
Committee.

54

All Wallcoverers Overtime shall be paid on the basis of Piece Rate plus 50% of the Piece Rate.

All Benefits will be paid on Full Gross Pay.

Stamps

Divide $28.00 into Full Gross Pay for stamp hours.
Up to .24 = 0        From .25 to .74 = ½ Hour        .75 and over = 1 Hour

| Quick References | #1 | #2 | #3 |
|---|---|---|---|
| **Vinyl** | | | |
| Vinyls, Canvas up to 13 oz. p/square yard | 4.92 | 5.61 | 6.20 |
| Patterned Goods per Roll | 19.59 | 22.53 | 24.76 |
| Vinyls over 13 oz. to 24.5 oz. and all hand printed vinyl, paper or cloth | | | |
| backed, regardless of weight per square yard | 5.61 | 6.20 | 7.08 |
| Patterned Goods per Roll | 22.53 | 24.76 | 28.33 |
| **Fabric** | | | |
| All fabric textiles, natural or synthetic, regardless of backing or unbacked, | | | |
| Tufted Materials, Fabric backed Cork, p/square yard | 7.17 | 7.83 | 8.43 |
| Hourly Rate | 37.50 | | |
| Returns to 24 ½ oz. | .43 | | |
| Over 24 ½ oz. | .76 | | |

Square, round or decorative arches, sinks, washbasins, doors per side, electric
and telephone box doors (and in bathrooms when area behind sink or
commode is being papered) and free standing water cooler ......8.94

## Art. XXVII. Sec. 4. - Quantity Discounts

a). All jobs having the quantities listed in this section must be registered with Union five (5) days before starting. Wall coverers working on Quantity Discount jobs are to be limited to earning an amount not in excess of $800.00 per job, except the head wall coverer, who is not to be limited as to the amount of work or earning. On all Quantity Discount jobs requiring over 4,000 square yards of cloth and/or material, the Association member may employ an assistant head wall coverer who is not to be limited as to the amount of work or earnings on said job. It is understood that on all multiple jobs a wall coverer Job Steward will be placed by District Council No. 9.

b). Wall covering jobs requiring over 800 square yards of cloth and/or material shall comprise a multiple discount job. Lining paper shall not be subject to discount.

c). The discount on piece rates for Independent employers that applies for jobs requiring over 800 square yards of cloth and/or material shall be 5% on piece rates.

## Art. XXVII. Sec. 5. - National Pension and Fringes

a). Each Employer will contribute to the I.U.P.A.T. Union and Industry National Pension Fund, in accordance with the rules of that fund, sums of money for the period from May 1, 2005 to April 30, 2011.

b). Each Employer contribution to the Insurance Fund and Painting Industry Annuity Fund on behalf of wall coverers shall be from May 1, 2005 to April 30, 2011.

c). Stamp Hours are to be calculated by dividing gross wages by $28.00.

55

| | 5/1/05 - 4/30/2006 | 5/1/06 - 4/30/2007 | 5/1/07 - 4/30/2008 | 5/1/08 - 4/30/2009 | 5/1/09 - 4/30/2010 | 5/1/10 - 4/30/2011 |
|---|---|---|---|---|---|---|
| Health & Welfare | 5.94 | 6.93 | 7.92 | 7.92 | 7.92 | 7.92 |
| Pension | 6.42 | 6.42 | 6.42 | 6.42 | 6.42 | 6.42 |
| Annuity | 6.40 | 6.40 | 6.40 | 6.90 | 6.90 | 6.90 |
| Vacation | 2.81 | 2.81 | 2.81 | 3.30 | 4.29 | 5.29 |
| DC 9-JAATF | 0.35 | 0.35 | 0.35 | 0.35 | 0.35 | 0.35 |
| IUPAT-FTI | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 |
| IUPAT-LMCF | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 |
| IUPAT-PAT | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 |
| I.P.F. | 0.18 | 0.19 | 0.20 | 0.21 | 0.22 | 0.22 |

DUES CHECK OFF: As per District Council No. 9 By-Laws.

d). For the duration of this Trade Agreement and any renewals or extensions thereof, each Employer agrees to make payments to the I.U.P.A.T. Union and Industry National Pension Fund for each wall coverer covered by this Trade Agreement as follows:

i.  For the purpose of this Article, each hour paid for, including hours attributable to show-up time, and any other hours for which pay is received by the wall coverer in accordance with this Trade Agreement, shall be counted as hours for which contributions are payable.

ii. Contributions shall be paid on behalf of any wall coverer starting with his/her first day of employment.

iii. The payments to the Pension Fund required above shall be made to the I.U.P.A.T. Union and Industry National Pension Fund, which was established under an Agreement and Declaration of Trust, dated April 1, 1967. The Employer hereby agree to be bound by the Agreement and Declaration of Trust as though they had actually signed the same.

e). The Employer hereby irrevocably designates as its representative on the Board of Trustees such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors. The Employer further agree to be bound by all actions taken by the Trustees pursuant to the April 1, 1967 Agreement and Declaration of Trust.

## DURATION OF AGREEMENT

Art. XXVIII. - The term of this Trade Agreement shall be for the period commencing May 1, 2005 and ending April 30, 2011.

Negotiations for a new Trade Agreement shall commence not later than January 2, 2011. All interested parties shall present their proposals, if any, at that time.

During the life of this Trade Agreement, neither party shall make any rules or by-laws conflicting with its provisions.

*56*

# PAINTERS AND DECORATORS MASTER AGREEMENT

## July 1, 2004 - June 30, 2007

### Painters Local Union #159

### Las Vegas, Nevada

**WITNESSETH:** That for and consideration of harmonious relations between the parties referred to and the public, the maintenance and stability of the conditions of employment and other mutually beneficial relations, and for the purpose of preventing strikes and lockouts by facilitating just and peaceful adjustments of disputes and grievances that may arise from time to time, and for the purpose of protecting and safeguarding the health and safety of the parties concerned, the parties hereto have agreed that the understanding hereinafter set forth shall be binding on all signatory members of the parties thereto, individually and collectively.

## ARTICLE 1
## RECOGNITION

1. This agreement is made and entered into the 1st of July 2004, by and between the **INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, LOCAL UNION #159** which is affiliated with IUPAT DISTRICT COUNCIL 15, Las Vegas, Nevada, and the **PAINTING AND DECORATING CONTRACTORS OF AMERICA, SOUTHERN NEVADA CHAPTER**, Las Vegas, Nevada, for and on behalf of its present and future signatory members, as well as firms who have executed written authorizations for the Chapter to represent them in Labor Relation matters of which are related to this Agreement and any independent employers who may affix their signature to this agreement.

2. It is agreed that this agreement shall constitute the complete agreement between the parties signatory hereto, and any other agreed to revisions and/or amendments not herein included are null and void.
   a) The employer recognizes the Union as the sole collective bargaining agency between itself and the employees

2

covered under the scope of this Agreement.
   b) The Union recognizes the Southern Nevada Chapter of the P.D.C.A. as the collective bargaining agency between itself and the employers covered under the scope of this Agreement.
   c) Any and all Collective Bargaining Agreements (excluding agreements with the Nevada Test Site either directly or indirectly) entered into between Local #159 and Painting and Decorating Contractors of Southern Nevada will first be signatory to this Downtown Agreement.
   d) The parties to this Agreement hereby understand that Painters Local Union No. 159 will be fully affiliated with IUPAT District Council 15 effective July 1, 2004. It is also understood that effective July 1, 2004 the employer recognizes District Council 15 as the sole collective bargaining agency between the employers and the employees covered under the scope of this Agreement.

3. The Parties signatory to this agreement hereby recognizes, acknowledges, and agrees that Painters Local Union #159, Las Vegas, Nevada, is within the meaning of Section 9(a) of the National Labor Relations Act, the exclusive representative for the purpose of collective bargaining of all the Employer's employees wherever such employees may be employed, in all of the wage classifications and/or the work jurisdiction described in this agreement.

4. It is hereby agreed to by the Independent Employer(s) signatory to this Agreement, that the Southern Nevada PDCA chapter shall appoint all employer committee member(s), to any of the committees referred to in this Agreement if needed.

## ARTICLE 2
## WORK JURISDICTION

1. This Agreement shall cover jurisdiction over
   a) Painters: Work will include, but not be limited to: (1) preparation of any surface that is to receive any coating. This is to include, but not be limited to caulking, puttying, spackling, bond, fiberglass applications and repairs, sealers and primers. The application and removal of all types of coatings and coating systems in relation to all painting, decorating, protective coatings,

3

coating and staining of concrete floors and toppings, waterproofing, masonry restoration, fireproofing, fire retarding, metal polishing, refinishing, sealing, lining, fiber-glassing, E-Glass fiberglass, GRG, GFRC, plaster cast, carbon fiber, encapsulating, insulating, metalizing, flame spray, Exterior Insulating Finishing Systems, the application of Venetian Plasters and/or Polymers; (2)each and all such applications, and similar or substitute applications, on all surfaces, interior and exterior, to include, but not be limited to: residences; buildings; structures; industrial, power, chemical and manufacturing plants; bridges; tanks; vats; pipes; stacks; light and high tension poles; parking, traffic and air strip lines; trucks; automobile and railroad cars; ships; aircraft; and all machinery and equipment; (3) any and all material used in preparation, application or removal of any paint, coatings or applications, including, but not limited to: the handling and use of thinners, dryers, sealers, binders, pigments, primers, extenders, air and vapor barriers, emulsions, waxes, stains, mastics, plastics, enamels, acrylics, epoxies, epoxy injection and T-Lock welding, alkylids, sheet rubber, foams, seamless and tile-like coatings, etc.; (4) all preparation for and removal of any and all materials for finishes, such as deep cleaning, patching, all levels of finishing, taping/finishing, skim coating, pointing, caulking, high pressure water, chemical and abrasive blasting, environmental blasting, wet/dry vacuum work, chemical stripping, scraping, air tooling, bleaching, steam cleaning, asbestos and lead abatement/removal; (5) the inspection of all coatings and/or coating systems during their applications will be performed by members of this International Union.

b) Wall Covering work will include, but not limited to: (1) all material applied to walls or ceilings with adhesive, staples, tacks, by stretching or adhered by any other method, including all papers, vinyls, flexible woods, fabrics, borders, metals, upholstered wall systems, the fabric covered panels made of plastic/wood or pre-finished products of micro fiberglass, etc., acrovin and various plastic wall coverings such as wainscoat, caps, corner moldings and accessories; (2) any and all

4

preparation of walls and ceilings such as scraping or any methodology for removal of existing materials, including patching, leveling, skim coating and priming. Drywall Finishing work will include, but not be limited

c) to: (1) the preparation or leveling of any surface or substrate which is to receive a coating, finish and/or wall covering; this will include, but not be limited to, all levels of finishing and/or spackling of all surfaces, including gypsum wallboard taping and finishing, fire taping and all fire-stopping systems, glaze coatings, skim coating or any other finishing system, spotting of nails, finishing of corner beads/flex beads. Patching and sanding is within the system of preparing surfaces for finishes. (2) all stucco and dryvit systems will be performed by members of this International Union.

d) Paint Makers will include, but not be limited to all workers engaged in the mixing, testing, preparing and/or manufacturing of paint, coating, caulking, putty, sealants, etc. and handling of lead, color, oil, lacquer, varnish, synthetic resin, acrylic paints and coatings, etc., including any and all materials for the same.

e) Sign and Display: Sign and Display Painters' work shall include, but not be limited to: (1) the making and installation of all signs and servicing of same, designing, lettering and pictorial work of any kind, including vinyl signs and vinyl substrates and the preparing for the finishing of same, be it by hand brush, roller, spray, mechanical or computer-aided and by any other method or process pertaining to same; (2) they shall have control of all branches, methods and processes of screen process work; tube bending and display work such as creating, designing, building and finishing of all display matter and its related operations used for advertising purposes, including all art work and lettering whether it is done by hand, mechanical or computer aided or by any other method or process pertaining to same; (3) the construction, erection and maintenance of all billboards and all communication advertising will be done by members of this International Union.

f) Scenic Artists and Designers: Scenic Artists' and Designers' work will include, but not be limited to:

5

models, sketches, carpenter drawings, painting for theatrical productions, motion picture settings and all the various effects; the painting of properties and decorations which may be used to decorate stage, motion picture and TV settings, mural paintings, display creations, costumes and the art of make-up and all its various effects.

g) Metal Polishers: Metal Polishers' work will include, but not be limited to: new construction and existing sites consisting of metal polishing, both the initial and continuing maintenance which shall include, but not be limited to, coloring, lacquering, spraying, application of vinyl coatings, cleaning, polishing and finishing of ornamental and architectural iron, bronze, brass, nickel, aluminum, stainless steel and all metal specialty work.

h) All Tools, Equipment and Material: (1) the handling, assembling, disassembling, operation, maintenance, storage and transporting of all tools, equipment and material used or that may be used by members of this International Union in performing their trade or work; (2) the loading and unloading of any and all materials, tools and equipment will be done by any members and units coming under the International Union's jurisdiction; (3) tools, material and equipment, as used herein, shall include, but not be limited to, brushes, rollers, spray painting equipment, coating applicators, all miscellaneous hand and power driven tools, all operated abrasive, shot, bead, water and related blasting equipment, containment systems, ventilation/dehumidification systems, vacuum recovery units, wet and dry vacuum systems and any and all related safety equipment, ladders, scaffolding, lifts and all other dedicated rigging, including the handling, erection and dismantling of same, the operation and maintenance of all types of compressors.

i) Related Work: Members of this International Union shall also have jurisdiction of: (1) all processes and procedures for decontamination of all contaminated areas; (2) all clean-up of any type debris caused by or during the preparation and/or application of any work

6

described in this Section.

j) Technological Improvements, Advancements, New or Substitute Systems or Processes and/or New or Substitute Materials: The jurisdiction of this International Union shall include and extend to any and all new or substitute systems or processes, new or substitute materials and technological improvements or advancements in any existing or new system, process or material that is referred to or incorporated in any of the provisions in the General Constitution or any collective bargaining agreement to which the International or any of its subordinate bodies is a party.

k) Jurisdictional Disputes

l) The parties hereto agree that, where a jurisdictional problem develops involving Unions not signatory to this agreement, the representatives of the Unions involved will meet with the representatives of the Contractor to resolve the particular problem. Any resolution resulting from such aforementioned meeting between the Unions and the Contractor shall be put into effect immediately.

m) Jurisdictional disputes that cannot be resolved at the local level shall be referred to the International Unions for the purpose of setting the said dispute under the dispute resolution process adopted by the General Presidents of the National Building trades known commonly as "The Plan".

## ARTICLE 3
## AREA JURISDICTION

1. The area Jurisdiction, covered by this agreement shall include: Clark County, Lincoln County, Nye County, Esmeralda County, in the State of Nevada and any other area jurisdiction awarded to Painters Local Union #159, by the International Union of Painters and Allied Trades.

## ARTICLE 4
## 50-50 CLAUSE

1. It being understood that the principle place of business and the employment of the employer is in the area jurisdiction as stated, but that such employer on occasion undertakes

7

## ARTICLE 5
## HIRING PROCEDURES

1. The Union shall be the sole and exclusive source of referrals of applicants for employment. All employees covered by this Agreement shall be dispatched by the Union.

   a) The employers retain the right to reject, for any lawful reason, any job applicant referred by the Union.

   b) All persons shall be retained on the job except for the following reasons: willful neglect of duty, incompetence, or conditions beyond the control of the employer.

   c) The Employer hereby agrees that when a worker is laid-off or terminated, that the employer shall fax a termination slip to the Union dispatch office and shall furnish the Union with information relative to reason for lay-off or termination and eligibility for rehire.

2. The Union shall establish and maintain separate, open and non-discriminatory employment lists for workmen desiring employment on work covered by this agreement, and such workmen shall be entitled to registration and dispatch free of charge, subject to the provisions of this section.

3. The Employer shall first fax the dispatch office of the Union for the workmen they may from time to time need, and the Union shall furnish to the employer the required number of workmen of the classification needed and requested by the employer strictly in accordance with the procedure established.

4. The dispatching office will fill the Employer's request for workmen of the type specified from among those entered on said lists by use of a written referral. The following order of preference and the selection of workmen for referral for jobs shall be on a non-discriminatory basis. The Employer will be able to select workman on the list by name at a ratio of 3 to 1. Work call shall be at 8 a.m. on regular workdays.

5. Apprentices shall be hired and transferred in accordance with the Apprenticeship Standards and provisions of the Painters and Decorators Joint Apprenticeship Council of Las Vegas, Nevada, and as established by the signatory parties.

6. When the Employer has notified the Union in writing that a worker is not eligible for rehire, the Employer shall not be forced into hiring, but may do so should the Employer elect to at a future date. Applicants who are not eligible for rehire

9

---

painting work in other cities and areas, on which occasions such employer employs such additional employees, residents of such other city or area as the needs of the work require; now therefore, be it resolved:

a) The contractor or the employer party to this agreement, when engaged in work outside the geographical jurisdiction of the Union party to this agreement, shall employ not less than fifty percent (50%) of the workers employed on such work from the residents of the area where the work is performed or from among persons who are employed the greater percentage of their time in such area.

b) The Employer party hereto shall, when engaged in work outside the geographic jurisdiction of the Union party to the agreement, comply with all of the lawful clauses of the collective bargaining agreement in effect in said other geographic jurisdiction and executed by the employers of the industry and the affiliated Local Unions in that jurisdiction, including but not limited to, the wages, hours, working conditions, fringe benefits, and procedure for settlement of grievances set forth therein; provided however, that as to employees employed by such employer from within the geographic jurisdiction of the Union party to this agreement and who are brought into an outside jurisdiction, such employee shall be entitled to receive the wages and conditions effective in either the home or outside jurisdiction whichever are more favorable to such jurisdiction, and fringe benefit contributions on behalf of such employees shall be made solely to their home funds in accordance with their governing documents. This provision is enforceable by the District Council or Local Union in whose jurisdiction the work is being performed, both through the procedure for settlement of grievances set forth in its applicable collective bargaining agreement and through the courts, and is also enforceable by the Union party to this agreement, both through the procedure for settlement of grievances set forth in this agreement and through the courts.

8

shall not be entitled to show-up time or any other form of compensation.

7. If the registration list is exhausted or registrants refuse referral and the Union is unable to refer applicants for employment to the employer, within forty-eight (48) hours from the time of receiving the employer's request (Saturdays, Sundays and holidays excluded), the employer may procure employees from any other available source. If employees are so hired, the employer shall immediately refer to the Union those employees for dispatch, and shall replace such temporary employees as soon as registered applicants for employment are available under the referral procedure.
In order to be entitled to registration and dispatching as a journeyman, the applicant must be able to demonstrate that he has worked at the trade for a minimum of three years, and must have successfully completed standard examinations conducted by the Local Union.

8. Should an Employee be hired contrary to the provisions of the Hiring Procedure, The Union Representative shall request that the Employer dismiss the employee so hired. If the Employer refuses to dismiss the employee, the matter shall be referred to the Joint Committee.

9. The Union and the employers shall cooperate to the end that a copy of hiring and referral procedures set forth and as contained herein shall be posted on the bulletin board in the office of the Local Union and in the offices or shops of the employers who are parties to this Agreement.

10. The Union representatives have the right at all times to interview employers, or to see, or to be advised, on any applicant or journeyman as to hours worked, time cards, sign in sheets and or charts, rate of pay, travel time and subsistence paid, and any or all deductions covered by such payment. Further, the Business Representative shall be authorized as a matter of convenience for the Union and its members or applicants to present to a signatory employer, during the life of this Agreement, an authorization for any necessary deductions from an employee's earnings for the purpose of bringing an employee's account with the Union up to date after said employee has properly signed or endorsed such "holdout" notice.

# ARTICLE 6
## HOURS OF WORK & OVERTIME

1. The regular workday shall consist of eight (8) or ten (10) hours of work depending on the work week, between 5:00 a.m. and 4:30 p.m. with one half (1/2) hour for lunch to be given no later than five (5) hours after the beginning of the shift. Following the regular midday lunch break, no employee shall be required to work more than six hours without an additional thirty-minute lunch break. If more than six hours work is required, the employer agrees to provide no less than thirty minute lunch period without loss of time to the employee.
The employer shall allow one paid fifteen (15) minute break for every four (4) hour period or portion thereof worked. The break will be an unorganized break in the area which work is being performed.

2. The regular workweek shall consist of five (5) eight (8) hour workdays, Monday through Friday or four (4) consecutive ten (10) hour workdays between Monday and Friday.

3. A five day eight (8) hour week – the first three (3) hours worked outside a regular five (5) day eight (8) hours constituted day shift, Monday through Friday, shall be paid at the rate of 1 and 1/2 times the straight time rate. All hours worked beyond eleven (11) hours shall be paid at two (2X) times the straight time rate. The first eight (8) hours worked on a Saturday day shift shall be paid at the rate of one and one-half (1-1/2X) times the straight time rate all other hours worked beyond the eight (8) hours shall be paid at double (2X) the straight time rate.

4. When working a four-ten (4-10) hour shift; All hours worked beyond ten hours shall be paid at double (2X) the straight time rate. The first eight (8) hours worked on the fifth (5th) or sixth (6th) day shall be paid at one and one half (1-1/2) the straight time rate all other hours at double (2X) the straight time rate.

5. If at the discretion of the Contractor a second shift is required to maintain the scheduling by the customer or the contractor, the workweek and hours per shift shall be consistent with that of the day shift and shall be inclusive of a meal period and the pay shall be at the straight time rate.

6. Hours worked on Sunday and recognized holidays shall be

paid at the rate of two times (2X) the straight time hourly rate.

7. The contractor must register such starting time with the Joint Committee and Local Union, setting forth the hours that he chooses to work and once such decision is made, such hours would apply on each and every job being performed by said contractor. It has never been the intention of this section to allow the employer to start the project and then transfer employees to another job site since this could be in violation of overtime as provided for in this agreement.

8. Any work beginning after 9:00 pm Sunday that ends on Monday shall be considered Monday work. This shall apply only if the shift hours worked for the week are consistent with the hours worked on Sunday. Any hours worked prior to 9:00 pm Sunday would be considered Sunday work and shall be paid at two times (2x) the regular straight time rate of pay.

9. In recognition of the fact that the scope of work as defined in this agreement is increasingly more tourist oriented in the Las Vegas and Laughlin area, the parties have agreed to special work hours for Hotel Guest Room remodel type work. To cover specific job requirements such as rooms that must be ready for occupancy on Fridays, the agreement is as follows:

When the working schedule requires remodeling of guest rooms be started on Monday and be completed so they may be occupied on Friday and provided the Union is advised and agrees prior to the start of such project, the employer, may work a shift consisting of four (4) consecutive days Monday through Thursday and may work a shift of ten (10) hours at the straight time hourly rate.

It is further understood that the employer may schedule the hours of the shift to coincide with Hotel operations. All hours outside of the special shift will be paid at the double time rate.

10. No member of the Local Union shall report to any shop earlier than fifteen minutes, or to any job earlier than fifteen minutes before the starting time.

11. Employees who report for work at the time they are instructed to by the employer (or employer's agent) and who are not placed to work, shall be paid two hours show-up time. No show-up time is required if employees are not put

12

---

to work because of inclement weather or an act of God.

12. The parties to the agreement recognize that in the course of doing work in the construction industry certain unpredictable weather related situations can occur that can have severe economic impact on the employer and loss of income to the employee. To deal with this type of situation, the parties to this agreement agree to the following:

If work covered by this agreement is unable to be performed due to inclement weather during the regular work week, the employer may, if the employees are willing, schedule the employees to work on Saturday and/or Sunday of the same week at the straight time rate of pay during the regular hours.

It is understood the situation must be the nature spelled out in the memorandum of understanding, which will by made part of this agreement and further provided the Union is notified and agrees, prior to the start of such Saturday and/or Sunday work. The employees affected by such inclement weather will be those offered the Saturday and/or Sunday work but will be under no obligation to accept this work and no disciplinary measures will be taken against those who refuse to work such shift. If work is performed prior to the union approval, the regular overtime rates will apply.

13. Workmen referred to the employers job site who arrive in an unfit condition for work, without proper tools or referrals, or who are not ready to go to work or who are not otherwise qualified, or who are workmen that the requesting contractor has notified the Union in writing of ineligibility for rehire, shall not be entitled to show-up time, travel or subsistence, or any other form of compensation by the contractor.

## ARTICLE 7
## HOLIDAYS

1. The following days are recognized holidays:

| New Year's Day | Independence Day | Thanksgiving & the day after |
| President's Day | Labor Day | Christmas Day |
| Memorial Day | Veteran's Day | |

13

2. If any of the above holidays fall on Sunday, the Monday immediately following shall be observed.

3. Work performed on any of the above Holidays or the day observed as the Holiday shall be paid for at double the regular straight-time rate of the classification involved.

4. No work shall be performed on Labor Day.

## ARTICLE 8
## PENSION

If, during the life of this agreement, a majority of the members covered by this agreement elect by secret ballot to enter into a 401k) or Annuity plan, the parties signatory to this agreement shall meet for the purpose of creating a jointly trusted plan, with contributions being allocated from wages. Additionally, if the members elect to create a 401h) plan as a portion of the 401k)/Annuity plan, the Employers Agree.

1. Commencing with the 1st day of July, 2004 and for the duration of the Agreement, and any renewals or extension hereof, the Employer Agrees to make payments to the IUPAT Union and Industry Pension Fund for each employee covered by this Agreement, as follows:

a) For each hour or portion thereof, for which an employee received pay, the employer shall make a contribution to the above named Pension Fund in accordance with the following; Effective July 1, 2004 a contribution of twenty-five cents ($0.25) per hour bringing the total Pension Contribution rate to three dollars and fifty cents ($3.50) per hour to be paid on all hours worked as agreed upon. Effective July 1, 2005 a contribution of twenty-five cents ($0.25) per hour bringing the total Pension Contribution rate to three dollars and seventy-five cents ($3.75) per hour to be paid on all hours worked as agreed upon. Effective July 1, 2006 a contribution of twenty-five cents ($0.25) per hour bringing the total Pension Contribution rate to four dollars ($4.00) per hour to be paid on all hours worked as agreed upon.

b) For the purpose of this Article, each hour paid for, including hours attributable to show-up time, and other hours for which pay is received by the employee in accordance with the Agreement, shall be counted as hours for which contributions are payable.

14

c) Contributions shall be paid on behalf of any employee starting with the employee's first day of employment in a job classification covered by this Agreement. This includes all indentured apprentices and members of the International Union of Painters and Allied Trades, Local #159.

d) The payments to the Pension Fund required above shall be made to the IUPAT Union and Industry Pension Fund, which was established under an Agreement and Declaration of Trust, dated April 1, 1967. The Employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust, as amended from time to time, as though he actually signed the same.

2. The Employer hereby irrevocably designates as its representatives on the Board of Trustees such trustees as are now serving, or who will in the future serve, as employer trustees, together with their successors. The Employer further agrees to be bound by all actions taken by the trustees pursuant to the said Agreement and Declaration of Trust, as amended from time to time.

3. All contributions shall be made at such time and in such manner as the trustees require; and the trustees may at any time conduct an audit in accordance with Article V Section 6 of the said Agreement and Declaration of Trust.

4. If an Employer fails to make contributions to the Pension Fund within five days after the date required by the trustees, the Joint Committee shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provisions hereof to the contrary notwithstanding, and the Employer shall be liable for all costs of collection of the payments due together with attorney's fees, and such penalties as may be assessed by the trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure of any "nostrike" clause which may be provided or set forth elsewhere in this Agreement.

5. The Pension and Annuity Plan adopted by the trustees shall at all times conform with the requirements of the Internal Revenue Code so as to enable the Employer at all times to treat contributions to the IUPAT Union and Industry Pension Fund as a deduction for income tax purposes.

15

# ARTICLE 9
## APPRENTICE

1. Commencing with the 1st day of July, 2004 and for the duration of this Agreement, and any renewals or extensions thereof, the Employer, as defined in the National Trust Indenture executed by and between the International Union of Painters and Allied Trades and employer associations in the industry, agrees to make payment to the Painters Joint Apprenticeship Committee for each employee covered by this Agreement as follows:

a) For each hour, for which an employee receives pay, the Employer shall make a contribution of forty cents ($0.40).

b) For the purpose of this Article, each hour paid for, including hours attributable to show-up time and other hours for which pay is received by the employee in accordance with this Agreement, shall be counted as hours for which contributions are payable.

c) Contributions shall be paid on behalf of any employee starting with the employee's first day of employment in a job classification covered by this Agreement. This includes all indentured apprentices and journeymen of Painters Local Union #159.

d) The payments to the Apprenticeship Fund required above shall be made to the Painters Joint Apprenticeship Committee which was established under an Agreement and Declaration of Trust, dated May 1, 1966. The Employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust, as though he had actually signed the same.

e) From the funds collected in the above manner, the trustees of the Painters Joint Apprenticeship shall hold in trust the sum of five cents ($0.05) per hour, for each hour or portion thereof for which an employee receives pay, and remit said sum to the National Painting and Decorating and Dry Wall Apprenticeship and Manpower Training Fund at such regular periods of time and in the manner and form as shall be determined by the trustees of the National Fund from time to time.

f) The payments to the Apprenticeship Fund required in paragraph (e) above shall be made to the National

16

Painting and Decorating and Dry Wall Apprenticeship and Manpower Training Fund which was established under an Agreement and Declaration of Trust dated February 1, 1971. The Employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust as though he had actually signed the same.

2. The employer hereby irrevocably designates as its representatives on the Board of Trustees of the National Painting and Decorating and Dry Wall Apprenticeship and Manpower Training Fund, such trustees as are now serving or who will in the future serve, as employer Trustees, together with their successors, as provided for in the aforesaid Trust Indenture.

3. The Union hereby irrevocably designates as its representatives on the Board of Trustees of the National Painting and Decorating and Dry Wall Apprenticeship and Manpower Training Fund, such trustees as are now serving, or who will in the future serve, as Union trustees, together with their successors, as provided for in the aforesaid Trust Indenture. The parties hereto further agree to be bound by all actions taken by the trustees of the National Fund pursuant to the said Agreement and Declaration of Trust.

4. All contributions shall be made at such time and in such manner as the trustees require and the trustees shall have the authority to have an independent certified public accountant audit the payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the Apprenticeship Fund.

5. If an Employer fails to make contributions to the Painters Joint Apprenticeship Committee within five (5) days after the date required by the trustees, such failure shall be deemed a violation of this Agreement, and the Joint Committee shall have the right to take what ever steps are necessary to secure compliance with this Agreement, and other provisions hereof to the contrary notwithstanding, and the Employer shall be liable for all costs for collecting the payments due together with attorney's fees and such penalties as may be assessed by the trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no strike' clause which may be provided or set forth elsewhere in this Agreement.

17

6. The Apprenticeship Plan adopted by the trustees of said Apprenticeship Funds shall at all time conform with the requirements of the Internal Revenue Code so as to enable the Employer at all times to treat contributions to the Apprenticeship Funds as a deduction for income tax purposes.

7. When an employer has hired three (3) Journeymen he shall employ one (1) Apprentice, and may employ Apprentices on a three (3) Journeymen to one (1) Apprentice ratio after the first Apprentice has been hired.

8. Shops with less than three journeymen may be granted an apprentice if in the opinion of the Joint Committee, it would be beneficial to all parties concerned.

9. All apprentices may change shops at least every six months in order to provide them with more rounded education of the trade. However, if an employer and his apprentice petition the J.A.C. with proof that said apprentice is receiving a proper training program, the J.A.C. may allow the apprentice to stay with the shop an additional six months. At the end of each six-month period an additional six months may be applied for. No apprentice will be engaged as a foreman or in any supervisory position.

10. The Joint Apprenticeship Committee shall have the right to take an apprentice from his employer if it is proven to the Committee that said apprentice is not benefiting from his job or is being misused.
All Apprentices shall be required to fill out and maintain in their possession an Employment activity book. A representative of the company shall sign this weekly. This is to insure that the education and training of the Apprentice continues. 2Upon evaluation of this record by the Apprenticeship Committee he may be removed from the employment with the contractor. It is the intention of this section not to cause loss of work but to insure that the apprentice is being trained in the craft.

11. The Joint Apprenticeship Committee shall be notified by the employer and the apprentice in writing of all hiring, releasing, and termination of apprentices.

12. The Joint Apprenticeship Committee, in coordination with the Painters and Decorators Joint Committee, shall be the governing body in all apprentice matters.

18

## APPRENTICE WAGES

13. Apprentice wages shall be as follows:

Percentage of Journeymen wage rate

| | | | |
|---|---|---|---|
| 40%-45% | = 500 Hours Worked | 65%-75% | = 3000 Hours Worked |
| 45%-50% | = 1000 Hours Worked | 75%-85% | = 4000 Hours Worked |
| 50%-55% | = 1500 Hours Worked | 85%-95% | = 5000 Hours Worked |
| 55%-65% | = 2000 Hours Worked | 95%-100% | = 6000 Hours Worked |

14. No Vacation money will be withheld from wages of an apprentice until the 75% level has been reached.

## ARTICLE 10
## HEALTH & WELFARE

1. Each employer signatory to this Agreement shall pay to the Employees Painters Trust (or designated health and welfare trust) the sum of Five dollars and eight cents ($5.08) or the sum in effect per hour worked by each employee from July 1, 2004 for Health & Welfare, Dental and Vision Plans.

2. Effective July 1, 2004 and for the duration of this Agreement, the contractor, after 30 days notice, agrees to contribute one half (1/2) of any increases required by the Employee Painters Trust (or designated health and welfare trust) to maintain the present benefits for health and welfare, dental or vision plans, with a maximum contractor contribution of twenty-five cents for each year of the agreement. (7-1-04: $0.25, 7-1-05: $0.25, 7-1-06: $0.25)

3. The Plans in effect are hereby made a part hereof and all signatories to this Agreement are bound by the terms of said Trust Agreement, which are incorporated herein by reference as though fully set forth herein.

4. If an employer fails to make contributions to the employee's Painters Trust Fund within five (5) days after the date required by the Trustees, the Joint Committee shall have the right to take whatever action or steps necessary to secure compliance with the Agreement and other provisions hereof to the contrary notwithstanding. The employer is liable for payment under this Article and if the Union so desires, it shall not be subject to, or covered by any grievance or

19

arbitration procedure, or any "no strike" clauses which may be provided or set forth elsewhere in this Agreement. All legal fees will be paid by the employer.

5. The Union reserves the right to refuse employees to any contractor or employer not keeping their welfare contributions current.

6. In order that workmen who are otherwise eligible for welfare benefits shall be fully protected, it is mutually agreed that any employer who fails to make payment for the welfare benefits as provided herein shall personally be responsible to the employees herein covered for the benefits which would have occurred by such welfare coverage.

7. In the event that there is a change in the designated health and welfare trust, the parties bound to this agreement hereby agree to take the steps necessary to jointly administer that fund.

## ARTICLE 11
## VACATION FUND

1. Effective July 1, 2004 the employer will forward one dollar and fifty cents ($1.50) per hour, on behalf of each employee who earns seventy-five percent (75%) or more of the journeyman straight time rate of pay, to the IBEW Plus Credit Union at 1900 South Jones Blvd. Las Vegas, Nevada 89146 (or designated financial institution).

2. This contribution to the Vacation Fund by the contributing employer will be paid at the same time and on the same forms as the welfare contributions. All rules pertaining to the payment of welfare monies will apply to the payment of vacation contributions.

3. The Vacation Fund contribution is a part of the hourly wage rate and is not to be construed as a fringe benefit. It shall be treated as such in the computation of payroll deductions.

4. Contributions shall be paid monthly and shall be recorded on forms supplied by the International Union of Painters and Allied Trades Union and Industry National Pension Fund Office.

Contributions covering hours worked during any month are due and payable on the first of the following month and will be considered delinquent if not paid by the thirtieth of the month. Employers failing to submit monthly reports as

20

provided for above shall be assessed liquidated damages equal to five percent (5%) of the amount due on a monthly basis. Damages assessed shall be applied to the respective funds.

If contribution reports and payment are not received by the 30th of the month, the Joint Committee will suspend or revoke the employer's Shop Card for violation of this agreement and reserves the right to request the Local Union to remove any employees as covered by this agreement.

## ARTICLE 12
## ADMINISTRATIVE FEES CHECK - OFF

1. Every Employer signatory to this Agreement hereby agrees to check-off from the wages of any employee employed by such Employer during the term of this Agreement, administrative dues in the amount specified in the Union's bylaws and to remit said amount to the Union in the following manner.

   a) The Union will notify the Employer in writing of the amount of administrative dues specified in the bylaws, and will submit to the Employer a copy of the bylaws or the applicable bylaw provisions.

   b) For each payroll period, the Employer will deduct from the wages of each employee the amount specified in the bylaws based on the number of hours worked during said payroll period, and will accumulate said deductions to the end of the month.

   c) On or before the 30th day of each month, the Employer will remit to the Union the entire amount of administrative dues due and owing as to each employee for the month previous, together with a list of employees covered hereby and the number of hours worked by each during the applicable period.

2. When a signatory Employer performs a job within the jurisdiction of a union affiliated with the IUPAT other than the Union signatory hereto and the bylaws of that other union contain a provision for administrative dues or business representatives "assessment", the Employer shall check off from the wages of employees covered by this Agreement and employed on that job administrative dues or business representative "assessment" in the amount stated in that other union's bylaws, and shall remit said amount to

21

contribute twenty-three cents ($.23) per hour, but not less than twenty dollars ($20.00) per month. These contributions are to be paid monthly in the same manner as all other benefits. Effective July 1, 2005, all signatory employers shall contribute twenty-four cents ($.24) per hour. Effective July 1, 2006, all signatory employers shall contribute twenty-five cents ($.25) per hour.

## ARTICLE 14
## FRINGE BENEFIT CONTRIBUTIONS ADMINISTRATION

1. Contributions shall be made monthly and shall be recorded on forms supplied by the International Union of Painters and Allied Trades Union and Industry National Pension Fund office (computer attachments accepted) and mail in one envelope with separate checks for each fund to the Joint Committee office for disbursement.
In order to eliminate confusion relative to the processing of benefit contributions, the Employer will send a monthly remittance report and individual benefit contribution checks as follows, to the Joint Committee, who in turn will process and remit to:

1. IUPAT Pension Fund
2. The Painters Trust Health and Welfare
3. IBEW Plus Credit Union/Vacation Funds
4. Painters Local 159 Dues Check Off
5. Painters Local 159 Organizing Fund
6. Health & Safety/Upgrade Training Award Program
7. Labor Management Cooperation Initiative LMCI
8. Industry Promotion Fund
9. Joint Committee Fund
10. Joint Committee Industry Promotion Fund
11. Painters JATC – Apprenticeship

2. Contributions covering hours worked during any month are due and payable on the first of the following month and will be considered delinquent if not paid by the 30th of the month. Employers failing to submit monthly reports as provided for above shall be assessed liquidated damages equal to five percent (5%) of the amount due on a monthly basis. Damages assessed shall be applied to the respective funds.
3. If contribution reports and payment are not received by the 30th of the month for the preceding month, the Local Union may suspend or revoke the employer's Shop Card for

23

that other union. In that event, that other union shall be acting as agent of the signatory union for the purpose of policing and administering this Agreement. In performing this check-off, the procedure specified in Section 1(ac) will be followed, except that it shall be the responsibility of said other Union to notify the Employer in writing of the amount of administrative dues or business representative "assessment" specified in its bylaws, and to submit to the Employer a copy of the bylaws or the applicable bylaw provision. When the signatory Employer performs a job within the jurisdiction of a Union affiliated with the IUPAT other than the Union signatory hereto, and the bylaws of that other Union contain no provision for administrative dues or business representative "assessment", the Employer shall continue to be bound by Section 1.

3. The obligations of the Employer under Sections 1 and 2 shall apply only as to employees who have voluntarily signed a valid dues deduction authorization card.
It is mutually agreed and understood that in the event a majority of the members of the Union covered by this Agreement elect, through means of a special called meeting and secret ballot, to enter into Union Administrative Dues Check-Off the employer shall within 30 days after written notice from the Union, deduct from the employee wages, the amount voted on. Prior to making this deduction the Union shall forward signed authorization from the employee as provided for under Nevada Revised Statute 608.110.

## ARTICLE 13
## INDUSTRY PROMOTION FUND

1. The effective date of the Industry Promotion Fund contributions was July 1, 1973, and it is agreed between the Painting and Decorating Contractors of America, Southern Nevada Chapter, and the International Union of Painters and Allied Trades, Local Union #159, that all Chapter Signatory members shall contribute, as provided for in Section 2 of this Section, to the Painting and Decorating Contractors of America, Southern Nevada Chapter.
It is further agreed, that this fund is not to be used for any anti-labor activities.
2. Effective July 1, 2004, all signatory employers shall

22

violation of this agreement and reserves the right to remove all employees as covered by this agreement.

4. The Individual Employer further and additionally agrees to pay all reasonable costs and attorney's fees necessary and incurred to collect any amount due hereunder in the event of the default in performance by the Employer hereunder, including collection of sums due hereunder by demand or suit on the surety bond.

## ARTICLE 15
## BONDING - SHOP CARDSUBCONTRACTING

1. On or after July 1, 2004 all employers signatory to this agreement shall provide and be covered by a surety bond for no less than thirty thousand dollars ($30,000) for the purpose of protecting the Trust Funds as provided for in this agreement. The Joint Committee will review all applications and issue Shop Cards. The Committee shall have the authority, based upon past work and financial responsibilities, to require higher bond limits.

2. Further, should an employer fail to comply with the monthly remittance reporting provision of this agreement, then such employer may be required to submit the fringe benefit report to the Local Union on a weekly basis, including his check to cover such report. This weekly report shall be due no later than the following Wednesday after the regular Friday payday.

3. The employer agrees that should work, as herein defined be contracted or assigned to a subcontractor, provisions shall be made to require compliance by the subcontractor with all the terms of this agreement.

4. A subcontractor shall be defined as any person, firm, partnership, corporation, or other entity that is properly licensed in accordance with State Law, or the appropriate State Agency, to perform work covered under the scope of this Agreement.

5. The Individual Employer will give written notice to the Union of any subcontract involving the performance of work covered by this Agreement prior to commencement of work by the subcontractor, and shall specify the name and address of the subcontractor, the name and address of the work and the start date of the work. If thereafter the

24

subcontractor becomes delinquent in the payment of any wages, trust fund contributions, or other fringe benefit payments, the Union shall give written notice of the delinquency to the individual Employer and to the subcontractor. The notice shall specify the name(s) and amounts, if known, of the delinquency. When the notice of delinquency is received, the Individual Employer shall pay the amount of the subcontractor's delinquency which has occurred on the Individual Employer's specific job.

It is expressly understood that this Article shall apply to all present and subsequently acquired operations of the Employer and to all accretions to the bargaining unit, including, but not limited to, newly established or acquired operations.

6. Therefore, any employer becoming signatory to the Agreement by taking out a Shop Card hereby agrees to be bound by all provisions and amendments of the said Trust Agreements, decision of the Board of Directors of the Joint Committee, and decisions of the Board of Trustees of the various trust funds.

7. The signing of the short form Shop Card application refers to this Agreement and is binding for all parties involved.

8. On and after the date of signing of this Agreement, every employer, although, a party hereto, must be registered through an authorized representative of Painters Local Union #159. The following information shall be required when registering.

a) Firm name, address and telephone number.
b) Name of owner or owners.
c) Average number of workmen employed.
d) A State Contractor's license number.
e) Federal Withholding and Social Security account number.
f) Nevada unemployment insurance account number.
g) City and/or County license number.
h) Proof of workers Compensation insurance
i) Proof of Surety Bond

9. Such registration shall call for issuance of serially numbered Shop Cards. Said Cards shall be issued for the terms of the Agreement.

10. The Joint Committee shall be vested with the authority to issue Shop Cards; however, a Shop Card will not be issued

25

to any employer until after the employer has met the qualifications as set forth in this Agreement.

11. The Shop Card is issued by the Joint Committee to indicate that the person to whom it is issued is a party to this Agreement and that he has signed a copy thereof. The holder of a Shop Card shall notify Painters Local Union #159 within ten (10) business days of any changes in ownership and/or officers of the corporation of license holder.

12. It is agreed that it is unfair for any person to be bound by the terms of this Agreement unless other parties thereto observe it likewise. It is recognized that it would constitute unfair competition for one employer to observe reasonable working conditions agreed upon while his competitors ignore such conditions. Therefore, no Shop Card will be issued to any license holder unless he employs one or more Journeymen.

13. The official Shop Card and all identification cards issued by the Joint Committee are the property of the Joint Committee. They are not transferable and must be returned upon demand to the Joint Committee or an authorized representative of the Joint Committee.

## ARTICLE 16
## PRESERVATION OF WORK CLAUSE

1. To protect and preserve, for the employees covered by this Agreement, all work they have performed and all work covered by this Agreement, and to prevent any devise or subterfuge to avoid the protection and preservation of such work, it is agreed as follows: If the Employer performs on-site construction work of the type covered by this agreement, under its own name or the name of another, as a corporation, company, partnership, or other business entity, including a joint venture, wherein the Employer, through its officers, directors, partners, owners, or stockholders, exercises directly or indirectly (through family members or otherwise), management, control, or majority ownership, the terms and conditions of this agreement shall be applicable to all such work.

2. All charges of violation of Section 1 of this Article shall be considered as a dispute and shall be processed in accordance with the provisions of this agreement on the

26

---

handling of grievances and the final and binding resolution of disputes. As a remedy for violations of this Article, the Joint Trade Board or Arbitrator shall be able, at the request of the Union, to require an Employer to pay (1) the effected employees covered by this agreement, including registered applicants for employment, the equivalent of wages those employees have lost because of the violations, and (2) into the affected Joint Trust Funds to which this agreement requires contributions, any delinquent contributions that resulted from the violations. The Joint Trade Board or Arbitrator shall be able also to provide any other appropriate remedies, whether provided by law or this agreement. The Union shall enforce a decision of the Joint Trade Board or Arbitrator under this article only through arbitral, judicial, or governmental, for example, the National Labor Relations Board channels.

3. If, after an employer has violated this Article, the Union and/or the Trustees of one or more Joint Trust Funds to which this agreement requires contributions institute legal action to enforce and award by an Arbitrator or the Joint Trade Board remedying such violation, or defend an action that seeks to vacate such award, the Employer shall pay any accountants' and/or attorneys' fees incurred by the Union and/or the Joint Trust Funds, plus costs of the litigation, that have resulted from such legal action. This section does not affect other remedies, whether provided by law or this Article, that may be available to the Union and/or the Joint Trust Funds.

## ARTICLE 17
## TRAINING

The Joint Committee shall be responsible for the management and disbursement of all Safety and Training Funds (at present this amount is five cents ($0.05) per hour worked) remitted to them under the J.C.I.P. Fund. This fund is to offset the costs of any and all Safety classes or courses and for Journeyman craft training along with materials and equipment. This fund will also be used for the purpose of training trainers.

a) The Local Unions Safety and Training Committee along with the Apprenticeship Committee will be responsible for the formulation and scheduling of such classes along

27

with the selection of Instructors. These funds at the discretion of the Joint Committee may be used for the Testing, Evaluating, Certifying, Tracking or Indexing Journeyman Painter, Drywall Finisher and Paperhanger members of Local 159.

b) The Joint Committee at their discretion may combine the J.C.I.P. Safety and Training Fund with any other Training funds that the Union and Contractors may be involved with if at their discretion it would benefit the members of Local 159.

c) The parties signatory to this Agreement have agreed, that in the interest of promoting the industry through increased participation in Health and Safety and Upgrade Training, to create a Health and Safety/Upgrade Training Award Program to be funded by a thirteen cent ($.13) Employer contribution effective July 1, 2004. The parties signatory to this Agreement shall meet for the purpose of creating a jointly trusted/jointly managed program, which will be then be attached to this Agreement. If this program does not increase participation in Health and Safety and Upgrade training by the end of this agreement, the program will be dissolved and the contribution will then revert to a contribution to the Health and Welfare Trust, if necessary.

## ARTICLE 18
## WORKING RULES

1. Workmen shall report to work with the usual tools of the trade.
a) Painters shall supply duster, putty knife, broad knife, hammer, nail set, screwdriver, 5 in 1 tool, and wrenches.
b) Paperhangers shall supply a straight edge, 2' level and usual paperhanger's hand tools, with the contractor supplying all other tools and equipment. It is agreed by the signatory employers that they will furnish the necessary tables or boards, including such tools as rollers for pastes and adhesives, razor blades, towels, sponges, adhesives, wallpaper and wall coverings for a finished job.

28

c) Drywall Finishers (Tapers) shall be required to furnish mud pans, various size knives, stomper, sanding pole, screwdriver, hammer and tin snips. The employer shall furnish all other tools of the craft.

2. Piecework, contracting or subcontracting to journeymen and apprentices shall not be permitted.

3. The employer shall furnish fresh cool drinking water on all jobs. The Employer agrees to put sufficient ice into the containers to keep water cool on a daily basis.

4. No employer signatory to this agreement shall require or utilize any employees car, truck or any other vehicle to transport materials, tools or equipment of any type in excess of twenty five pounds in the performance of work while said employee is employed by him unless by mutual agreement a rental agreement is entered into with a payment to be no less than twenty ($20.00) dollars per day per vehicle and/or trailer.

5. Employees shall not be permitted to rent, lease, or allow use of his own tools or spray equipment. Use of stilts is prohibited.

6. The preparation of material and equipment and the cleaning up and removal of same is to be performed within the eight hours. Employees will be allowed sufficient time for the cleaning of tools so as not to run past quitting time.

7. Workmen referred to the employers job site who arrive in an unfit condition for work, without proper tools or referrals, or who are not ready to go to work or who are not otherwise qualified, or who are workmen that the requesting contractor has notified the Union in writing of ineligibility for rehire, shall not be entitled to show-up time, travel or subsistence, or any other form of compensation by the contractor.

8. Employees covered by this agreement shall have the right to respect any legal primary picket line validly established by any bona fide labor organization, and the Union party to this agreement has the right to withdraw employees covered by this agreement whenever the employer party to the agreement is involved in a legitimate primary labor dispute with any bona fide labor organization.

9. Employers shall furnish all paste machines and no employee shall be required to agree to furnish said equipment.

10. It is required that all journeymen and apprentices shall

29

furnish and wear clean white overalls, or clean white pants and shirts; such uniforms to be changed at least once a day.

11. The Working Card is supplied by the Building and Construction Trades Council of Clark, Lincoln, Nye and Esmeralda Counties, Nevada, or by Painters Local Union #159 and issued to members in good standing with Painters Local Union #159.

12. It is agreed that any and all work not covered by this Agreement contracted for by an employer be performed by an employee affiliated with and in good standing with the Building and Construction Trades Council of Clark, Lincoln, Nye, and Esmeralda Counties, Nevada, or any other jurisdiction that is awarded to Painters Local Union #159.

13. Disabled Workers
   a) Disabled members shall be permitted to solicit work on an hourly basis. A worker that is injured and is injured to such a degree that he is unable, because of physical disability, or other infirmity, may be employed at below the established minimum wage rate, by mutual agreement between both parties to this agreement. The worker may be asked to work for the hourly wage, less the percentage of disability, he/she sustained.
   b) No employer shall employ more than one disabled worker to each five employees.
   c) The Joint Committee shall by medical documentation, determine the basis of a workers disability status.

## ARTICLE 19
## TRAVEL TIME & SUBSISTANCE

1. Travel Time – the established city limits of Henderson and Boulder City shall be travel "free zone".
   Laughlin (Remodel) – travel time down first day of work, back last day of work. No subsistence.
   Laughlin ( New Work) – travel time down first day of work, back last day of work. Subsistence $35 per day.
   Mesquite – no travel, no subsistence
   State Line – no travel, no subsistence

   a) On all other job sites, travel time shall commence fifteen (15) miles from Las Vegas Boulevard and Fremont Streets and shall be paid as follows:

30

0 to 15 miles = "free-zone"
0 to 5 miles beyond "free-zone" 15 minutes per day.
5 to 10 miles beyond "free-zone" 30 minutes per day.
10 to 15 miles beyond "free-zone" = 45 minutes per day.
15 to 25 miles beyond "free-zone" = 1 hour per day

   b) Any job beyond the twenty-five (25) mile radius will pay at the hourly rate or fraction thereof.
   c) All employees residing within 25 perimeter miles of Laughlin, Nevada while employed at said site will not be eligible to receive any travel or subsistence pay.

2. Travel time is not to be construed as working time.
3. When an employee is hired or is currently working on a job site where travel time is paid and the employer, or a representative of the employer, fails to properly notify said employee not to report to the job site, then travel time shall be paid even though no work is performed by the employee.
4. If the construction job is classified as a subsistence job, the employee shall receive travel time to the job site on the first day of hire and travel time at the end of the job or termination. Power plant or industrial plant projects are excluded from this provision and shall be paid pursuant to paragraph (a) of this Section.
5. On jobs where subsistence is paid, the employer shall furnish a suitable change room and lunch area which shall be adequately heated in the winter and cooled in the summer.
6. Travel time on subsistence jobs will be determined by the amount of time actually spent driving from Las Vegas Boulevard and Fremont Streets, to the job site at the legal rate of speed.
7. Any dispute involving travel pay shall be resolved by the Joint Committee.
8. Subsistence - All jobs located 45 miles or more beyond the established "free-zone" shall pay subsistence. If food and lodging are not available at the job site, in addition to subsistence, the employee shall receive travel time as provided for in this agreement to the nearest location that food and lodging are available beyond a "free-zone" of fifteen (15) miles from the job site.
9. Subsistence shall be paid at the rate of sixty-five ($65.00)

31

## ARTICLE 20
## STEWARDS

1. There are to be stewards designated on all jobs. The steward is to receive grievances or disputes from employee members of his craft and shall immediately report them to his business representative, who shall immediately attempt to adjust the grievance or dispute with the Employer or his representative.

2. The steward shall be a working employee selected by the Union who shall in addition to his regularly assigned work, be permitted to perform during working hours such of his steward's duties as cannot be performed otherwise. The Union agrees that such duties shall be performed as expeditiously as possible, and the Employer agrees to allow the steward a reasonable amount of time for the performance of his duties, including, in addition to his normal duties, obtaining information on safety and sanitation. The Employer shall make available to such designated steward the names and locations of jobs in progress and the number and names of bargaining unit employees employed on such jobs.

3. The Union shall notify the Employer or his representative, in writing, of the appointment of the steward. The Employer or his representative can lay off or discharge the steward for cause only, and the Employer shall notify the Union, in writing, of his intent to do so one (1) full working day prior to such layoff or discharge on projects within fifty (50) miles of the hiring hall, and give two (2) working days notice on projects located over fifty (50) miles from the hiring hall.

4. It is recognized by the Employer that the employee selected as the steward shall remain on the job whenever overtime is worked and as long as there is work he is qualified to perform. The steward shall not be discharged or laid off for the performance of his Union duties. The Steward (who must be capable of performing the work) shall be the last employee to be laid off or terminated (other than for cause) excluding supervision.

33

dollars per day for all days required to be out of town, however, if an employee "shows-up" on the job site on a scheduled workday and no work is provided, the employee shall receive full subsistence pay. If the employer provides rooms for workers subsistence shall be paid at the rate of thirty-five ($35.00) dollars per day. There shall be no more than two employees per room and no more than one employee per bed.

10. If, for personal reasons, an employee voluntarily leaves the job site and fails to complete the shift, the amount of subsistence shall be prorated on an eight hour basis.

11. If a worker is required to furnish his own transportation to any job site that is off the pavement or any first class country road (a maintained bladed road) the employer shall furnish transportation from pavement or first class county road to the job site and back.

12. Employees shall not accept transportation to or from job site in the employer's vehicle unless it is satisfactorily enclosed against the elements. Vehicles shall be provided with seats or benches. Employees are expressly forbidden to ride in the beds of trucks that contain gasoline, solvents, or an excessive amount of materials.

13. Any employee reporting to the job site in transportation furnished by the employer and who is arrested or detained by an authorized agent, State, County, City or Federal, for reasons of faulty equipment improperly registered vehicle, etc., shall be paid his prevailing wage while detained. This paragraph does not apply if such arrest or detainment is caused by negligence of said employee.

14. Any time lost by an employee in a legal court or hearing, if requested to appear by his employer, or employer's agent, shall be reimbursed at the prevailing basic wage rate. This paragraph shall not apply if negligence is on the part of the employee.

15. When an employee is requested to report to a job site in an area where free parking is not available on the job site or within two blocks of the site, the employer shall reimburse the employee for the cost of parking while working at said job site payable the next pay period.

32

## ARTICLE 21
## PAYMENT OF WAGES

1. All wages shall be due and payable either in lawful currency enclosed in an envelope showing the employer's and employee's names, hours worked, deductions made, and the amount due; or by negotiable check payable on demand at par, together with a receipt showing the employer's and employee's names, hours worked, deductions made and amount due. The said check and said envelope shall conform with all provisions pertaining to the payment of employees as required by Federal and State laws. Any charges or penalties due to invalid payroll checks shall be reimbursed to the employee(s) affected upon demand. This shall include only charges or penalties incurred by the employee(s) that can be directly attributable to the bounced check(s).

2. Wages earned shall be due and payable Friday, on the job, no later than normal quitting time, and shall include all wages earned up to and including all hours worked on Sunday. When the regularly scheduled payday falls on a recognized holiday, wages earned shall be due and payable the day preceding the holiday.

3. The employee shall not be required to go to any shop or office outside of the job site to pick up his Friday paycheck unless he/she is on company time.

4. Employers bound to the provisions of this Collective Bargaining Agreement whose home office is in a different jurisdiction, shall have the ability to meet payroll when it is due.

5. Should any employee fail to work, quit early, or fail to be on the job site for the Friday pay, said employee shall not be entitled to any waiting time as provided for under this Agreement. Paychecks that are due and payable on Friday, in violation of Section 7 shall be submitted to the Local Union office the following Monday morning prior to 8:00 a.m. If the employer fails to present the weekly pay as provided for in this Section, the employer shall pay all waiting time as per Section 7.

6. Employees laid off or discharged must be paid in full on the job at the time of dismissal.

7. Upon failure of the employer to pay the employees at the

stipulated quitting time, all waiting time shall accrue at the rate of straight time of the employees current wage classification rate, not to exceed eight (8) hours in a twenty-four (24) hour period on a seven-day (7) basis. Members must report to the Union Representative all claims for waiting time not later than 4:30 p.m. of the following working day after said wages are due and payable.

8. Delay occasioned by accidents beyond the control of the employer shall not be construed as a violation of Section 2.

9. In the event of controversy regarding the merits of the period of waiting time, the employer shall place the said compensation involved in escrow with the local Joint Committee and said compensation shall be held by the Joint Committee pending decision of the Joint Committee empowered to rule on said matter.

10. The refunding of wages earned (commonly referred to as a "kickback") by a member of the Local Union, or the acceptance of said refund by the employer as defined herein, shall constitute a distinct and separate violation of this agreement and shall necessitate such action as is hereinafter stipulated under the section covering violations.

11. This agreement shall be in addition to any right accruing under the Nevada Revised Statutes pertaining to Labor Law which makes "kickback" punishable by fine and/or imprisonment.

12. All employees, either discharged or terminated for normal cause, shall be given a termination slip with their final check. The termination slip shall state the reason, such as normal reduction in force, job ending, work unsatisfactory, etc. The termination slip shall also state whether or not the employee is eligible for rehire. One copy shall be retained by the employer, one copy shall be given to the employee, and one copy shall be sent to the Union.

## ARTICLE 22
## NEW COMMERCIAL & INDUSTRIAL WORK

### 3 Year Contract

### Negotiated Contract - Downtown Construction

### Wage Package 3 Years

1. Journeyman wages and benefit contributions shall be as follows:

|  | 7/1/04 | 7/1/05 | 7/1/06 |
|---|---|---|---|
| Wage | $27.58 | $28.98 | $30.39 |
| H & W | $5.08 | $5.08 | $5.08 |
| Pension | $3.50 | $3.75 | $4.00 |
| Apprentice | $0.40 | $0.40 | $0.40 |
| JC | $0.04 | $0.04 | $0.04 |
| JCIP | $0.05 | $0.05 | $0.05 |
| IP | $0.23 | $0.24 | $0.25 |
| LMCF | $0.05 | $0.05 | $0.05 |
| H&S/U TAW | $0.13 | $0.13 | $0.13 |
| Total Package | $37.06 | $38.72 | $40.39 |
| Package Increase | $2.15 | $1.66 | $1.67 |

Deductions from wage

|  | 7/1/04 | 7/1/05 | 7/1/06 |
|---|---|---|---|
| Organizing | -$0.40 | -$0.40 | -$0.40 |
| Vacation | -$1.50 | -$1.50 | -$1.50 |
| Dues Ck Off | -3.00% | -3.00% | -3.00% |

|  | 7/1/04 | 7/1/05 | 7/1/06 |
|---|---|---|---|
| Brush & Roller | $27.58 | $28.98 | $30.39 |
| Spray Painter | $27.58 | $28.98 | $30.39 |
| Structural Steel Painter | $27.98 | $29.38 | $30.79 |
| Paperhanger | $27.58 | $28.98 | $30.39 |
| Sandblaster | $27.58 | $28.98 | $30.39 |

36

| | 7/1/04 | 7/1/05 | 7/1/06 |
|---|---|---|---|
| Structural Steel Sandblaster | $27.98 | $29.38 | $30.79 |
| Pot Tender | $27.58 | $28.98 | $30.39 |
| Nozzleman | $27.58 | $28.98 | $30.39 |
| Tapers | $27.58 | $28.98 | $30.39 |
| Marbleizing | $27.58 | $28.98 | $30.39 |
| Metal Leafing | $27.58 | $28.98 | $30.39 |
| Sign Painter | $27.58 | $28.98 | $30.39 |
| Steeplejack | $29.38 | $30.78 | $32.19 |
| Acid Staining | $27.58 | $28.98 | $30.39 |
| Graining | $27.58 | $28.98 | $30.39 |
| Buffing | $27.58 | $28.98 | $30.39 |
| Buffing Steel | $27.98 | $29.38 | $30.79 |
| Special Coating | $28.58 | $29.98 | $31.39 |

2. SPECIALTY PREMIUM PAY

a) High Pay - work over forty (40) feet, up to and including one hundred (100) feet in height shall be paid at the rate of fifty cents ($0.50) per hour above the base classification. All work over one hundred (100) feet shall be paid at the rate of one dollar and seventy-five cents ($1.75) per hour above the base classification.

b) High time shall be paid in addition to all other premiums involved.

c) Swing Stage - Boatswain Chair. All work from suspended scaffolds, swing stage, boatswain chair, rigging suspended from a mechanical device shall be paid at the rate of thirty-five cents ($0.35) per hour above the base rate and in addition to all other premiums involved.

d) Down Hole - Down hole time shall pay in the same increments as high pay.

e) Hazard Pay - Employees required to work inside tunnels, tubes or piping not covered in paragraph (d) such as work involved at water treatment plants and mining operations shall receive a premium of thirty-five cents ($0.35) per hour above the base classification. Hazard pay shall be paid in addition to all other premiums involved.

f) Employees working with or applying creosote, coal or hot tar epoxies shall be furnished uniforms or clothing described by OSHA.

If a worker is entitled to receive premium pay at any time

37

during his shift he shall receive the premium for the entire shift.

3. Structural Steel

a) For a definition of structural steel, see Exhibit A, Steel Construction Manual of the American Institute of Steel Construction; page 307, Section 2 classification.

b) On erected structural steel, a premium of thirty five cents ($0.35) per hour over brush painters' rate will be paid from the ground up.

c) If painted on the ground (not erected), brush painter's rate will be paid. If steel is sprayable, the spray rate premium will be paid.

d) Service Station, as such, is not classified as structural steel.

e) Upright or horizontal storage tanks set in concrete or similar base, such as tanks used by oil company bulk plants will not be considered to be structural steel.

f) All tanks mounted on structural steel supports, such as typical water towers of all designs, shall be considered structural steel and the steel premium rate shall apply.

4. ALLOCATION OF WAGES

a) The Union reserves the right to allocate any or all of the negotiated wage increases to Welfare, Vacation, Pension, Dues Check Off, Apprenticeship or Organizing.

b) In the event the Union wants to increase the amount of contribution to any of the above mentioned Funds, the employer shall, within thirty days following written notice from the Union, divert the amount of such increase from the hourly wage rate then being paid and add the amount so diverted to the Fund as per instruction in the Union letter.

Any negotiated increase for Vacation and/or Dues Check Off must be included in wages for tax purposes (vacation to be deducted after taxes).

## ARTICLE 23
## FOREMAN - GENERAL FOREMAN

1. Foremen and General Foremen of the crafts shall be from the crafts will be chosen at the discretion of the employer, however, there will be at least one foreman on each job that has five or more journeymen.

38

A foreman may work with the tools of the trade unless he is required to supervise more than ten employees at any given time. When a foreman is assigned the responsibility of supervising more than ten employees, he shall not be allowed to work with the tools of the trade, except for the purpose of instruction or for incidental assistance to a journeyman or an apprentice. In case more than three foremen are employed on the same shift on a single job, there shall be designated a general foreman. Foremen and General Foremen shall not work with the tools of the trade when working overtime. Foremen shall receive a minimum of nine percent (9%) differential above the highest paid journeyman under his supervision.

General Foreman: A foreman designated to supervise other foremen shall be classified as a general foreman. When a general foreman is required under paragraph A of this Article, he shall receive a minimum of nine percent (9%) differential above the highest paid foreman under his supervision.

## ARTICLE 24
## PAINTERS JOINT COMMITTEE

1. PURPOSE AND BUSINESS

a) To promote, protect, foster and advance the rights and interests of those engaged in the business and profession of painting, paperhanging and decorating in the community, whether as a journeyman, apprentice, or contractor; to improve the conditions under which the industry is carried on; to develop fair and just competitive methods, to perfect methods and rules for the peaceful and just settlement of disputes and misunderstandings in the profession and in the industry; and the profession as against unfair actions and discriminations; to collect and disseminate pertinent and constructive data and information relating to the industry and useful in the profession.

b) To promote greater harmony and unity of purpose in the industry as between employer and employee, and as between both and the public; to establish equitable standards of business relations between the painting and decorating craft and the community served; to

39

advocate and encourage trade education and improvement, to establish and enforce rules and principles of conduct and codes of ethics for the government of its members and associates in the Industry; to investigate, arbitrate, compromise, adjust and determine all organizations and local contractor associations in the Industry, as shall be authorized from time to time by contracts or other existing agreements as between the Union and the Association; to sit as a board of arbitration under the terms and conditions of any such contracts or agreement; to receive complaints, hear evidence, make findings, and order and render and enforce decisions hereon; to make and enforce rulings there under and in accordance therewith, and with the findings of said board; and otherwise to perform and carry out all terms and conditions, intents and purposes of any such contract or agreement.

c) The foregoing clauses shall be constructed both as objects and powers, but no recital expression or declaration of specific or special powers or purposes herein enumerated shall be deemed to be exclusive; but it is hereby expressly declared that all other lawful purposes and powers not inconsistent with the Area Painters Agreement.

2. MEMBERSHIP AND ALTERNATE MEMBERS

a) The affairs and management of the Joint Committee shall be under the control of six (6) members and six (6) alternate members. Three (3) of the regular and three (3) of the alternate members shall be journeymen members of, and selected by Painters Local Union #159, of the International Union of Painters and Allied Trades, and the remaining three (3) regular and three (3) alternate members shall be as follows: Three (3) of the regular and three (3) of the alternate members shall be contractors who are members selected by the P.D.C.A., this shall constitute the Employer's side of the committee. Alternate members of the committee shall be entitled to vote only in the event the regular member for whom he is an alternate is absent. The Joint Committee shall elect from among their members, a president and a secretary. The president and secretary will have one vote each. The committee shall not vote upon any subject

40

unless at least two (2) journeymen members and at least two (2) contractor members are present and voting, and shall not vote upon matters of importance unless all six (6) members, or their respective alternates are present. Voting and meeting shall be subject to such further restrictions as shall be fixed from time to time by the Bylaws, or by agreement between Local #159 and contractors.

OFFICERS AND DUTIES

3.

a) The President shall be the executive officer of the Joint Committee and shall preside at all meetings of the Joint Committee and shall be a member exofficio of all committees. He shall, at such times as he shall deem proper, communicate to the Joint Committee such subject, and make such suggestions as may, in his opinion, tend to promote the welfare and increase the usefulness of the Joint Committee and shall perform such other duties as are necessarily incidental to the office, or as may be prescribed by the Joint Committee. He shall appoint a Committee. He shall sign all instruments which have first been approved by the Joint Committee.

b) The secretary shall perform the duties of the President in the event of his death or absence, and in the event of permanent termination of the services of the President from any cause, for the balance of his term in office, the Secretary shall be automatically designated as "Acting President". He shall act as assistant to the President with such duties as the Chairman may designate or assign.

c) The Secretary shall give notice of and attend all meetings and keep a record of the proceedings. He shall conduct all correspondence and carry into execution all orders, votes and resolutions requiring communications. He shall have charge of all documents, records and papers, and shall keep them safely. At the discretion of the Joint Committee, he shall prepare an annual report of the transactions and conditions of the Joint Committee.

d) A treasurer may be elected or appointed by the Joint Committee who shall keep an accurate record of all monies received and expended for the Joint Committee

41

and shall make all disbursements authorized and approved by the Joint Committee. Funds shall be drawn only on the signature of the Treasurer and President and all bills must be approved by the endorsement thereon of the President. He shall have charge of the property and other cash funds set up by the Joint Committee for the transaction of current business and regularly occurring expenses. The funds, books, and vouchers in his hands shall at all times be subject to verification by the Joint Committee. At the expiration of his term of office, the Treasurer shall deliver to his successor, all books, monies and other property of the Committee, or in the absence of a treasurer-elect, shall make delivery to the Chairman.

e) The said officers' hall perform such other duties as shall from time to time be imposed or required by the Joint Committee, or as may be prescribed by the Bylaws or within the jurisdictions the specific office.

f) The officers shall be empowered to employ such additional persons as may be necessary to the functioning of the Joint Committee subject to the approval of the expenditure by the Joint Committee.

g) The President of the Joint committee shall preside at all meetings. In the absence of the President, the Secretary shall act; otherwise the Joint Committee may elect a President from their own number.

h) The Joint Committee shall hold regular monthly meetings at a place as designated at 4:00 p.m. on the second Thursday of each month, for the transaction of such business and reports as may properly come before the committee. The Committee shall meet at such other times as may be necessary at the call of the President, or by any three (3) Committee members.

i) Failure of any member of the Committee to attend a meeting hereof shall be explained in writing by such absentee, said communication to be delivered to the Secretary prior to the convening of the meeting. Also when a member of the Committee is unable to attend a meeting, he shall, as soon as possible, and prior to the holding of said meeting, advise his Alternate of the matter. Those members present shall determine in each instance the excuse for such absence and three

consecutive inexcusable absences shall automatically vacate said membership.

j) The Painters Local Union #159 of Las Vegas, Nevada of the International Union of Painters and Allied Trades, and the Chapter of Painting and Decorating Contractors of Southern Nevada, shall fill all vacancies of officers from their respective representatives on the Committee for the unexpired term thereof that may occur by reason of death, resignation or otherwise.

k) The Joint Committee shall elect from its membership an auditing committee each year to audit the books of the Joint Committee.
It shall be the duty of the Joint Committee to keep a complete record of all its meetings and acts; to supervise all acts of the officers, committees and employees of the Joint Committee; to act as a board of investigation and/or discipline, or to appoint a committee for such a purpose and impose fines or other penalties.
Notice of special meetings shall be mailed to each Joint Committee member not less than two (2) days prior to the meeting date and shall state the purpose, time and place of the meeting.

4. ELECTION AND TERM OF OFFICE
a) In the election of officers, if the President should be an Employer, then the secretary must be a journeyman or vice versa. At each annual election, the office of President and Secretary must alternate, (i.e., if the President is an employer during the term of office then at the succeeding annual election, the President must be a journeyman and the Secretary must be an Employer or vice versa.)

b) All officers of the Joint Committee shall be elected from official delegates to the Joint Committee.

c) Elections shall take place at the first regular Joint Committee in July of each year and such officers shall serve for a term of one year, except as otherwise provided for under the terms of this Agreement.

5. PROCEDURE
a) Robert's Rules of Order shall be the mode of procedure in the conducting of the meetings of the Joint Committee, governing all parliamentary action.
b) The order of business at all meetings of the Board of

changes in wage scales, hours of work or working conditions.

c) Contractors who are accused of violation of this agreement are subject to trials by the Joint Committee, with such Joint Committee having power to levy penalties in the way of monetary fines or recommending cancellation of said employer's agreement to Local Union #159. In the event the Joint Committee is required to use court action, to secure compliance with this agreement or to collect fines due, such Employer being sued shall pay, in addition to a court award, court costs and attorney fees incurred by the Joint Committee.

d) The Committee shall not have any authority in questions pertaining to renewal or negotiations of a new contract.

e) If a decision cannot be reached by the Joint Committee, either because of a tie vote with the committee, or if the Joint Committee fails to make a decision on the grievance or the interpretation of the Contract shall be submitted to arbitration in the following manner:

1) Within five days the Joint Committee shall meet and decide upon an arbitrator. The arbitrator shall be selected from seven (7) names which have been submitted to the Joint Committee by the Board of Appeals in the State of Nevada.

2) The arbitrator that is selected shall be notified and shall hear the case within twenty (20) days and make a decision in writing within twenty (20) days to all three (3) parties concerned.

3) The decision of the arbitrator shall be final and binding.

4) The costs of the arbitrator shall be borne by the Joint Committee totally.

5) If any of the above procedures are not complied with within the time limits, the Joint Committee shall be free to take whatever economic action they deem necessary in order to resolve this dispute.

7. CHARGES AND TRIALS

a) All charges of contract violation shall be filed with the Secretary of the Joint Committee in triplicate. Such charges shall set forth the section of the agreement

45

Directors or Committees shall be as follows:

1) Call to order,
2) Roll Call,
3) Reading of minutes,
4) Reports of Officers, Chairman, Secretary, Treasurer (if elected or appointed)
5) Correspondence,
6) Reports of committees;
7) Unfinished business from previous minutes, from officers reports, from committee reports, from floor,
8) New business proposed by correspondence, proposed by committee, proposed by officers,
9) Elections and Appointments, and
10) Adjournment.

c) The order of business may be altered by the Chairman or by vote of the members of the committee for any current meeting only.

6. POWER AND DUTIES

a) The Committee is hereby vested with power to adjust all disputes and grievance that may arise out of the application or interpretation of this agreement and shall be empowered to interpret and make such rules and regulations as may be necessary to give force and affect the intent, purpose and meaning of this Agreement. The Committee is empowered to have access to all records pertaining to any case where violations of this Agreement are involved. The Committee shall have the power to require all parties to testify under oath, and such parties may be required to subscribe to a written statement of their testimony under oath. All decisions of the Joint Committee shall be final and binding upon both parties to this Agreement.

b) The parties hereto and any party executing a counter part hereof hereby agrees that any disputes and grievances that may arise under this Agreement or any question of interpretation of any clause of this Agreement shall establish such rules for procedure hereunder as it shall from time to time determine. The Joint Committee is not authorized to arbitrate disputes arising out of negotiations for a new contract of any

44

which was violated. The time and place of such violation shall be set forth in addition to a description of the violation.

b) Upon receipt of such charges, the Secretary of the Joint Committee shall notify the party being charged, of such charge, with a copy of such original charge enclosed. The Secretary shall advise the accused of a time and place of a Joint Committee hearing. Such hearing shall be not less than five (5) days nor more than ten (10) days after notification. The Secretary shall at the time notify all Joint Committee members of the date of such hearing.

c) The Joint Committee shall conduct a hearing on the charges, and if the accused is an employee, the Joint Committee shall refer the charges, along with the Joint Committee findings to Local Union #159. Local #159 shall process the charges and reach a conclusion within thirty (30) days after receipt of such charges. Local Union #159 shall within five days after concluding the matter, notify the Joint Committee of the action taken by the Local Union.

All fines collected by the Joint Committee shall go into the general fund of such committee. Any monies recovered by the Joint Committee shall be disbursed to either the appropriate benefit trust fund, the Local Union for dues check-off, organizing trust fund, or costs for attorney or accounting fees incurred by the Local Union, or the affected member if monies recovered are for lost wages.

8. PREVAILING WAGE

The parties that are bound to the provisions of this CBA recognize that maintaining the prevailing wage rate at a high level is in the best interest of the industry.

a) The parties that are bound to the provisions of this Collective Bargaining Agreement recognize and understand that it is mandatory in the State of Nevada that the Employer(s) complete and submit prevailing wage surveys on a yearly basis. The survey is to include hours worked in each classification, wages and benefits paid for each classification, whether or not a CBA is in existence, and the signatures of the person who prepares the survey, and either the Employer or the

46

Employer's authorized representative.

b) The Employer shall have the choice whether or not to voluntarily submit the survey, or to allow the Joint Committee to act as the Employer's representative for the exclusive purpose of submitting the prevailing wage survey.

c) Should the Employer elect to allow the Joint Committee to act as the Employer's representative, the Employer must supply the Joint Committee with the necessary information relative to public and private jobs, including the project and hours worked in each classification. The Employer must also grant the Joint Committee limited power of attorney for the exclusive purpose of preparing and submitting the prevailing wage surveys in accordance with the provisions of NAC 338.020 subsection 4.

d) In any event a copy of all surveys must be turned into both the Southern Nevada PDCA and the Local Union.

ARTICLE 25
SAFETY

1. All approved safety rules and regulations as set down and adopted by the State Industrial Insurance System, Public Service Commission, State Public Health Service and other agencies of the Federal, County or City governments having jurisdiction over the parties with respect to safety and sanitation matters shall be observed by the employer and his employees.

2. Each employer signatory to this agreement shall designate an employee or an authorized representative to be in charge of Safety and shall be answerable to the State Industrial Insurance System and OSHA. When said person has been appointed, his name shall be reported to the Union office and the Union office shall be notified of any change. There shall be at least one safety meeting held per week at either the job site, or by the way of a "tailgate" meeting or at employer's primary place of business. Safety meetings shall be mandatory to all Union employees and shall be held on company time.

3. The Local Union shall be notified concerning all reported accidents by being sent a copy of the S.I.I.S. report when it

47

is filed. In the case of a fatality, the Union shall be notified immediately by telephone. The employer further agrees that the Union Representative shall have full access to all areas where such accident occurred.

4. Labor and Management are aware of the problem of alcohol and substance abuse in our industry today, therefore the employer may institute a fair and consistent drug policy. In case of accident on the job that requires medical treatment, a drug test shall be given, this testing shall not be selective but given to all workers requiring medical aid.

5. All Personnel Protection Equipment shall be furnished without cost or deposit to the employee.

## ARTICLE 26
## GENERAL SAVINGS CLAUSE

1. If any Article or Section of this Agreement should be held invalid by operation of law or by any tribunal of competent jurisdiction, or if compliance with or enforcement of any Article or Section should be restrained by such tribunal pending a final determination as to its validity, the remainder of the Agreement or the application of such Article or Section to persons or circumstances other than those as to which compliance with or enforcement of has been restrained, shall not be affected thereby.

2. In the event that any Article or Section is held invalid or enforcement of or compliance with any Article or Section has been restrained, as above set forth, the affected parties shall meet at the request of the Union, for the purpose of arriving at a mutually satisfactory replacement for such Article or Section during the period of invalidity or restraint. If the parties do not agree on a mutually satisfactory replacement within sixty (60) days after beginning of other period of invalidity or restraint, either party shall be permitted all legal or economic recourse in support of its demands notwithstanding any provision in this Agreement to the contrary.

48

# INDUSTRIAL REPAINT AGREEMENT

1-B.

a) Work covered under this Section shall include industrial projects such as wastewater treatment, power substations, water reservoirs, water/fuel/chemical tanks, water/power/gas pipe lines/vaults.

b) Work covered by state or federal prevailing wage laws are not covered by this Section.

## HOURS OF WORK—OVERTIME

2-B.

a) WORKDAY - The regular workday shall consist of eight (8) or ten (10) hours of work depending on the work week, between 5:00 a.m. and 4:30 p.m.

b) WORKWEEK – The regular workweek shall consist of five (5) eight (8) hour workdays, Monday through Friday or four (4) ten (10) hour workdays between Monday and Friday.

c) A five day eight (8) hour week – the first three (3) hours worked outside a regular five (5) day eight (8) hours constituted day shift, Monday through Friday, shall be paid at the rate of 1 and 1/2 times the straight time rate. All hours worked beyond eleven (11) hours shall be paid at two (2X) times the straight time rate. The first eight (8) hours worked on a Saturday day shift shall be paid at the rate of one and one-half (1 1/2X) times the straight time rate all other hours worked beyond the eight (8) hours shall be paid at double (2X) the straight time rate.

When working a four-ten (4-10) shift; All hours worked beyond ten hours shall be paid at double (2X) the straight time rate. The first eight (8) hours worked on the fifth (5th) or sixth (6th) day shall be paid at one and one half (1 1/2X) the straight time rate all other hours at double (2X) the straight time rate.

Any work beginning after 9:00 pm Sunday that ends on Monday shall be considered Monday work. This shall apply only if the shift hours worked for the week are

49

consistent with the hours worked on Sunday. Any hours worked prior to 9:00 pm Sunday would be considered Sunday work and shall be paid at two times (2x) the regular straight time rate of pay.

d) In those instances where an employee fails to work forty (40) hours during the regular work week (Monday through Friday) due to inclement weather, or circumstances beyond the control of the employer, the employer may, if the employee is willing, schedule the employee to work on Saturday of the same week and in such event, the pay for such work, not exceeding eight hours, shall be computed at the straight time rate of pay.

The contractor must register such starting time with the Joint Committee and Local Union, setting forth the hours that he chooses to work and once such decision is made, such hours would apply on each and every job being performed by said contractor. It has never been the intention of this section to allow the employer to start the project and then transfer employees to another job site since this could be in violation of overtime as provided for in this agreement.

## SHIFT WORK

3-B.

On Industrial repaint work as defined herein, where the contractor is unable to perform the work involved during the day shift, a swing shift and/or graveyard shift may be established as follows:

If at the discretion of the Contractor a second shift is required to maintain the scheduling by the customer or the contractor, the workweek and hours per shift shall be consistent with that of the day shift and shall be inclusive of a meal period and the pay shall be at the straight time rate. If there is a third (graveyard) shift required, the workweek and hours per shift shall be consistent with that of the day shift except that workers shall be paid eight (8) hours for seven (7) hours worked and shall be inclusive of a meal period and the pay shall be at the straight time rate.

Swing Shift - shall include the hours worked between

50

---

The employee shall receive the straight time hourly rate of pay plus twenty percent (20%).

Graveyard Shift - shall include the hours worked between 12:00 midnight and 8:30 a.m. Monday through Friday. The employee shall receive the straight time hourly rate of pay, plus thirty percent (30%).

## WAGE SCHEDULE
## INDUSTRIAL REPAINT

4-B.

Effective July 1, 2004 the following basic wage rates shall be in force.

|  | 7/1/04 | 7/1/05 | 7/1/06 |
|---|---|---|---|
| Wage | $27.58 | $28.98 | $30.39 |
| H & W | $5.08 | $5.08 | $5.08 |
| Pension | $3.50 | $3.75 | $4.00 |
| Apprentice | $0.40 | $0.40 | $0.40 |
| JC | $0.04 | $0.04 | $0.04 |
| JCIP | $0.05 | $0.05 | $0.05 |
| IP | $0.23 | $0.24 | $0.25 |
| LMCF | $0.05 | $0.05 | $0.05 |
| H&S/U TAW | $0.13 | $0.13 | $0.13 |
| Total Package | $37.06 | $38.72 | $40.39 |
| Package Increase | $2.15 | $1.66 | $1.67 |

Deductions from wage

| Organizing | -$0.40 | -$0.40 | -$0.40 |
|---|---|---|---|
| Dues Ck Off | -3.00% | -3.00% | -3.00% |

b) FOREMAN - A foreman shall receive 9% per hour differential above the highest paid journeyman under his supervision.

c) Any special premiums such as high pay, swing stage, etc. as outlined in Section 24 shall be in addition to the hourly wage rates as prescribed in this section.

51

d) There shall be no deduction for Vacation Pay under the Industrial Repaint Addendum.

e) TRAVEL TIME – Boulder City and Henderson shall be included as a "free zone" area for work covered under the Industrial Repaint addendum.

## USE OF TOOLS

5-B.

There shall be no restrictions placed on the use of the tools to perform work covered under the Industrial Repaint addendum.

## MASTER AGREEMENT

e.g.,

a) All language contained in the Master Agreement that pertains to payment of wages, fringe benefits, rules or regulations that govern the Master Agreement that is not contained herein shall also govern this addendum.

**FOR THE P.D.C.A.**        **FOR THE UNION**

Thomas Pfundstein        John Smith

Bill B. Shoning        Michael Dunham

## DURATION CLAUSE

This Agreement shall be in full force and effect from 7/1/2004 to and including 6/30/2007 and shall continue from year to year thereafter unless written notice of desire to cancel or terminate the Agreement is served by either party upon the other not less than sixty (60) and not more than ninety (90) days prior to 6/30/2007 or June 30 of any

52

subsequent contract year.

2. Where no such cancellation or termination notice is served and parties desire to continue said Agreement, but also desire to negotiate changes or revisions in this Agreement, either party may serve upon the other a written notice not less than sixty (60) and not more than ninety (90) days prior to 6/30/2007 or June 30 of any subsequent contract year, advising terms or conditions of such Agreement. The respective parties shall be permitted all legal or economic recourse to support their requests for revisions if the parties fail to agree thereon. Nothing herein shall preclude the parties from making revisions or changes in this Agreement, by mutual consent, at any time during its term.

IN WITNESS WHEREOF the parties hereto have set their hands and seals, this 1st day of July, 2004 to be effective as of 7/01/2004 except as to those provisions where it has been otherwise agreed between the parties.

**For the Union:**

IUPAT District Council 15
Local Union No. 159

Dated: 9/27/06

John Smith
Print Name

Signature

Title

**For the Company:**

NA-TPC-INC.
In Painting Co.
Company Name

Dated: 09/27/06

David Aguman
Print Name

Signature

Vice President
Title

53

RECEIVED
OCT 05 2006
G.S.T.

# COLLECTIVE BARGAINING AGREEMENTS

Between

## DISTRICT COUNCIL 711
State of New Jersey
International Union of Painters and
Allied Trades



And

Garden State Council, Inc.

And the

Drywall and Interior Systems Contractors
Association, Inc. of New Jersey

And the

New Jersey Glass and Metal Contractors Association

# TABLE OF CONTENTS

| Article | Page |
|---|---|
| 1 Recognition | 1 |
| 2 Jurisdiction | 3 |
| 3 Union Security | 9 |
| 4 Administration Dues | 10 |
| 5 Exclusive Hiring Hall | 10 |
| 6 Wage & Schedule | 13 |
| 7 Hours & Overtime | 18 |
| 8 Contractual Relations & Obligations | 20 |
| 9 Working Conditions | 22 |
| 10 Fringe Benefit Fund | 23 |
| 11 Cooperation & Advancement Funds | 26 |
| 12 Political Action Fund | 27 |
| 13 Safety | 28 |
| 14 Union Representative & Shop Stewards | 28 |
| 15 Subcontracting | 29 |
| 16 Preservation of Work Clause | 29 |
| 17 Joint Trade Board | 30 |
| 18 Successor Clause | 33 |
| 19 General Savings Clause | 34 |
| 20 Duration Clause | 35 |
| Schedule A, new construction of all kinds | 38 |
| Schedule A 6.2 | 39 |
| Schedule A, Paperhanger | 40 |
| Schedule B, Repaint, Paperhanger | 41 |
| Schedule B | 42 |
| Schedule B 6.2 | 43 |
| Schedule C 6.1 | 44 |
| Schedule C 6.2 | 45 |
| Schedule D Industrial | 46 |
| Schedule D 6.2 Industrial | 47 |
| Schedule D 6.1 Industrial Repaint | 48 |
| Schedule D 6.2 Industrial Repaint | 49 |
| Schedule E Bridge | 50 |

COLLECTIVE BARGAINING
AGREEMENT

Between

DISTRICT COUNCIL 711
State of New Jersey
International Union of Painters and
Allied Trades



And

Garden State Council, Inc.

## AGREEMENT

This agreement is between District Council 711, International Union of Painters and Allied Trades, hereinafter referred to as the "Union" and the Garden State Council Inc., hereinafter referred to as the "Council".

## ARTICLE 1
## MUTUAL RECOGNITION AND RELATIONSHIP

1.1   The Council hereby recognizes Painters District Council 711 as the sole and exclusive bargaining agent for all employees doing work covered in the work jurisdiction defined in Article 2.2

1.2   The Union recognizes the Council as the exclusive bargaining agent for all contractor employers.

1.3   (A)      The terms of employment, wages, hours of work and working conditions shall be maintained on a consistent basis for all employers and employees.

(B)      The parties agree that any employer who has entered into this agreement has the option to adopt or work under any other agreements, or terms or provisions thereof, which the Union has entered into with any other employer performing such work.

1.4   The terms of this agreement shall be binding upon the assigns and successors of the respective parties.

1.5   The employer agrees to register all jobs by mail/phone/fax to the Union main or local office in the area where the job is performed prior to starting any job. The original form shall be retained by the employer. Failure to comply is a violation of this agreement and is subject to an automatic $500.00 fine which must be paid to the Joint Trade Board before continuing work on said job.

1.6   All employers shall report to the Union the loss of any contract to a non-signatory contractor.

1.7   Any employer engaged in work outside the geographical jurisdiction of the Union shall:

1

(A)    Employ not less than 50% of the employed on such work from the residents of the area where the work is performed or from among the persons who are employed the greater percentage of their time in such area; any others shall be employed from the contractor's home area.

(B)    Comply with lawful clauses of the collective bargaining agreement in effect in the other jurisdiction including, but not limited to, wages, hours of work, working conditions, fringe benefits and procedure for settlement of grievances; provided, however, employees brought into an outside jurisdiction by employers shall be entitled to receive wages, fringe benefits, and conditions effective in either the home or outside jurisdiction, whichever are more favorable to such employees.

1.8    An employer shall not engage in work covered by the agreement through the use or device of another business or corporation which such an employer owns or controls through the use or device or a joint venture with another employer or contractor without first consulting with the Union to establish to the Union's satisfaction that the use of such device is not for the purpose of taking advantage of lower wages or conditions in effect in the area where said device is sought to be used. If the Union is not satisfied, it may resort to all legal or economic recourse, including cancellation of this agreement with said employer, not withstanding any other provision of this agreement.

1.9    An employer from another territorial jurisdiction who has work to be performed in the territory of District Council 711, shall employ persons from the registration list in the ratio of one (1) person from said list to one (1) person from other sources.

1.10.  Employees covered by this agreement have the right to respect any legal picket line validly established by a bona fide labor organization; the Union has the right to withdraw employees subject to this agreement if the employer is involved in a legitimate primary labor dispute with a bona fide labor organization.

(A)    It shall be violation of this agreement, and it shall not be cause for discharge or disciplinary action, if any employee refuses to perform any service which his or her

2

employer undertakes to perform for an employer or person whose employees are on strike, and which service, but for such strike, would be performed by the employees of the employer or persons on strike.

1.11  (A)    It is stipulated and agreed that the below named officer is the authorized representative of the Union:

Patrick J. Brennan, Business Manager

(B)    It is stipulated and agreed that the below named officer is the authorized representative of the Council:

Clement V. Sommers, Executive Director

(C)    In the event that either representative is no longer authorized by their respective organization, that party shall provide the other party with the name and address of the new authorized representative by registered letter, return receipt requested.

**ARTICLE 2**
**JURISDITION**

2.1    The territorial jurisdiction of the Union includes the State of New Jersey.

2.2    The Union shall have jurisdiction over:

All workers engaged in: painting, decorating and coating applications and wall covering; all levels of drywall and wall finishing, and all labor, material, tools or equipment for preparatory work or surface treatment, including mold remediation, work in relation to painting, hardwood finishers, grainers, varnishers, enamellers, gilders, drywall and wall finishing; glazing; architectural metal and glass work; flooring and decorative floor covering work; paint and coating manufacturing; sign, convention and display work; show decorators; scenic artists and designers; metal polishers; civil service, public and professional employees; book-binding, maintenance work; chemical, clerical and warehouse workers; any and all units, as well as all apprenticeable crafts, that have historically been part of the International Union of Painters and Allied Trades; and any and all work as may be obtained

3

and maintained through organizing and collective bargaining. Such work shall include, but not limited to:

(A)    **Painters:** Work will include, but not limited to: (1) preparation, application and removal of all types of coatings and coating systems in relation to all painting, decorating, protective coatings, coating and staining of concrete floors and toppings, waterproofing, masonry restoration, fireproofing, fire retarding, metal polishing, refinishing, sealing, lining, fiberglassing, E-Glass fiberglass, carbon fiber, encapsulating, insulating, metalizing, flame spray, the application of Exterior Insulating Finishing Systems; (2) each and all such applications, and similar or substitute applications, on all surfaces, interior and exterior, to include, but not be limited to: residences; buildings; structures; industrial, power, chemical and manufacturing plants; bridges; tanks; vats; pipes; stacks; light and high tension poles; parking, traffic and air strip lines; trucks; automobile and railroad cars; ships; aircraft; and all machinery and equipment; (3) any and all material used in preparation, application or removal of any paint, coatings or applications, including, but not limited to; the handling and use of thinners, dyers, sealers, binders, pigments, and primers, extenders, air and vapor barriers, emulsions, waxes, stains, mastics, plastics, enamels, acrylics, alkyds, epoxies, epoxy injections and t-lock welding, sheet rubber, foams, seamless and tile-like coatings, etc.; (4) all preparation for and removal of any and all materials for finishes, such as deep cleaning, patching, all levels of finishing, taping/finishing, skim coating, pointing, caulking, high pressure water, chemical and abrasive blasting, environmental blasting, wet/dry vacuum work, chemical stripping, scraping, air tooling, bleaching, steam cleaning, asbestos and lead abatement/removal; (5) the inspection of all coating systems during their applications will be performed by members of this International Union.

(B)    **Wall Covering** work will include, but not limited to: (1) all material applied to walls or ceilings with adhesive, staples, tacks, by stretching or adhered by any other method, including all papers, vinyl's, flexible woods, fabrics, borders, metals, upholstered wall systems, the fabric covered panels made of plastic/wood or pre-finished products of micro fiberglass, etc., acrovin and various plastic wall coverings such as wainscot, caps, corner molding and accessories; (2)

4

any and all preparation of walls and ceilings such as scraping or any methodology for removal of existing materials, including patching, leveling, skim coating and priming.

(c) **Drywall Finishing** work will include, but not be limited to: (1) the preparation or leveling of any surface or substrate which is to receive a coating, finish and/or wall covering; this will include, but not be limited to, all levels of finishing and/or spackling of all surfaces, including gypsum wallboard taping and finishing, fire taping and all fire stopping systems, glaze coatings, skim coating or any other finishing system, spotting of nails/screws, finishing of corner beads/flex beads. Patching and sanding is within the system of preparing for finishes. (2) All stucco and dryvit systems will be performed by members of this International Union.

(D) **Glaziers, Architectural Metal and Glass Workers:** General Glazing will include, but not be limited to: (1) the installation, setting, cutting, preparing, fabricating, distributing, handling or removal of the following: Glass and Glass substitutes used in place of glass, pre-glazed windows, retrofit windows systems, mirrors, curtainwall systems, window wall systems, suspended glass system, louvers, skylights, entranceways including automatic doors, patio doors, store front, column covers, panels and panel systems, glass hand rails, decorative metal as part of the glazing system, and the sealing of all architectural metal and glass systems for weatherproofing and structural reasons. Art glass, prism glass, beveled glass, leaded glass, automotive glass, protective glass, plate glass, window glass, wire glass, ribbed glass, ground glass, colored glass, figured glass, vitrolite glass, carrara glass, all types of opaque glass, glass chalk boards, structural glass, tempered and laminated glass, Thiokol, neoprene, all types of insulating glass units, all plastics or other similar materials when used in place of glass to be set or glazed in its final resting place with or without putty, vinyl, molding, rubber, lead, sealants, silicone and all types of mastics in wood, iron, aluminum, sheet metal or vinyl sash, doors, frames, stone wall cases, show cases, book cases, sideboards, partitions and fixtures; (2) the installation of the above systems materials when in the shop or on the jobsite, temporary or permanent, on or for any building in the course of repair, remodel, alteration, retrofit or construction; (3) the installation and welding of all extruded, rolled or fabricated materials including, but not limited to, all metals, plastics and

5

vinyl's, or any materials that replace same, metal and vinyl tubes, mullions, metal facing materials, corrugated flat metals, aluminum panels, muntins, facia, trim moldings, porcelain panels, architectural porcelain, plastic panels, unitized panels, showcase doors, all handrails and relative materials, including those in any or all types of building related to store front, door/window construction and curtain wall systems; (4) the installation of automatic door entrances, door(s) and window (s) frame assemblers such as patio sliding or fixed doors, vented or fixed windows, shower doors, bathtub enclosures, storm sash where the glass becomes an integral part of the finished product, including the maintenance of all of the above; (5) bevellers, silverers, scratch polishers, abrasive blasters, flat glass wheel cutting, mitre cutters, gravers, hole drilling, machine operations belt machines and all machines used in the processing of glass, automatic beveling, silvering, grinding, polishing, unpacking and racking of glass, packing glass, glass cleaners in shops, mirror cleaning, assembling, framing and fabrication and assembling of all insulated and non-insulated units, fabrication and mounting of mirrors and the operations of all machines and equipment for these operations; (6) the selecting, cutting, preparing, designing, art painting, and installing of fused glass, thick facet glass in concrete and cementing of art glass, and the assembly and installing or removal of all art glass, engraving, drafting, etching, embossing, designing, abrasive blasting, chipping, glass bending, glass mosaic workers, cutters of all flat and bent glass; glass shade workers, and glaziers in lead or other metals; the fabrication and distribution of all glass and glass-related products; (7) any and all transportation, handling, unloading and loading of tools, equipment and materials will be performed by members of this International Union.

(E)    **Paint Makers** will include, but not be limited to all workers engaged in the mixing, testing, preparing and/or manufacturing of paint, coating, caulking, putty, sealants, etc. and handling of lead, color, oil, lacquer, varnish, synthetic resin, acrylic paints and coatings, etc., including any and all materials for the same.

(f)    **Floor and Decorative Coverings Workers:** Work will include, but not limited to: (1) measuring, cutting, fabrication, fitting, installing to be cemented, tacked or otherwise applied to its base and/or underlayment(s) wherever it may be, all materials whether used either as a decorative

6

covering, topping or as an acoustical appliance such as carpets of all types and designs, sheet rubber, sheet vinyl, pre finished hardwood floors, laminate floors and laminate floor systems, cork carpet, rubber tile, asphalt tile, tile, cork tile, interlocking tile, mastipave, composition in sheet or tile form and all derivatives of above; artificial turf and derivatives thereof, all resilient seamless materials such as epoxy, polyurethane, plastics and their derivatives, components and systems; (2) the fitting of all devices for the attachment of the above materials and the fitting of all decorative or protective trim to and adjoining the above materials which shall include the drilling and plugging of holes and attaching of strips, slats, nosing, etc., on any base and/or underlayment(s) where the above materials are to be installed or applied, such as drilling, plugging and slatting for installing or fastening carpet, the installing of all nosings, cap strips, corner beads and edgings of any material and the preparatory work of the craft for all of the aforesaid, which includes but is not limited to, substrate preparation and the application of all self leveling, trowelable and board underlayments; (3) the removal of the aforementioned installed material from its base and/or underlayment as required; (4) the cleaning of rugs and carpets and all drapery hanging, make-up and the installation of drapes and window treatments.

(G)    Sign and Display: Sign and Display Painters' work shall include, but not be limited to: (1) the making and installation of all signs and servicing of the same, designing, lettering and pictorial work of any kind including vinyl signs and vinyl substrates and the preparing for the finishing of same, be it by hand brush, roller, spray, mechanical or computer-aided and by any other method or process pertaining to same; (2) they shall have control of all branches, methods and processes of screen process work; tube bending and display work such as creating, designing, building and finishing of all display matter and its related operations used for advertising purposes, including all art work and lettering whether it is done by hand, mechanical or computer-aided or by any other method or process pertaining to same; (3) the construction, erection and maintenance of all billboards and all communication advertising will be done by members of this International Union.

(H)    Display Convention and Show Decorators: The display convention and show decorators'

work will include, but not be limited to: (1) the delivery, loading and unloading and the installation and removal of all exhibits (floor to ceiling) and related materials in connection with trade shows and conventions, including, but not limited to: trade show and convention booth assembly and disassembly; installation and removal of interior and exterior decorations, flags, drapes and other display materials; uncrating, assembly, installation, removal, disassembly and recrating of all commercial exhibits; (2) the installation and dismantling of furniture owned by the employer, the installation and removal of floor coverings and special event displays, (3) the construction, preparation, erection and maintenance of all signs, lettering, pictorial work, screen process work, show card writing, commercial exhibits and fabrication of advertising displays and pattern and sketch making, scale model making, the preparation of training aids and mockups and application of plastic, scotchlite and similar reflective materials.

(I)    Scenic Artists and Designers: Scenic Artists' and Designers' work will include, but not be limited to: models, sketches, carpenters drawings, painting for theatrical productions, motion picture settings and all various effects; the painting of properties and decorations which may be used to decorate stage, motion picture and TV settings, mural paintings, display creations, costumes and the art of make-up and its various effects.

(J)    Metal Polishers: Metal Polishers' work will include, but not be limited to: new construction and existing sites consisting of metal polishing, both initial and continuing maintenance which shall include, but not be limited to, coloring, lacquering, spraying, application of vinyl coatings, cleaning, polishing and finishing of ornamental and architectural iron, bronze, brass, nickel, aluminum, stainless steel and all metal specialty work.

(K)    All Tools, Equipment and Materials: (1) the handling, assembling, disassembling, operations, maintenance, storage and transporting of all tools, equipment and material used or that may be used by members of this International Union in performing their trade or work; (2) the loading and unloading of any and all materials, tools and equipment will be done by any members and units coming under the International Union's jurisdiction; (3) tools, material

8

and equipment, as used herein, shall include, but not to be limited to, brushes, rollers, spray painting equipment, coating applications, all miscellaneous hand and power driven tools, all robotic, computerized mechanical and manually operated abrasive equipment, shot, bead, water and related blasting equipment, containment systems, ventilation/dehumidification systems, vacuum recovery units, wet and dry vacuum systems and any and all related safety equipment, ladders, scaffolding, lifts and all other dedicated rigging, including the handling, erection and dismantling of same, the operation and maintenance of all types of compressors.

(L)    **Related Work:** Members of this International Union shall also have jurisdiction of: (1) all processing and procedures for decontaminated areas; (2) all clean-up of any of debris caused by or during the preparation and/or application of any work described in this Section.

(M)    **Technological Improvement Advancements, New or Substitute Systems or Process and/or New or Substitute Materials:** the jurisdiction of this International Union shall include and extend to any and all materials and technological improvements or advancements in any existing or new system, process or material that is referred to or incorporated in any of the provisions in the General Constitution or any Collective Bargaining Agreement to which the International or any of its subordinate bodies is a party.

## ARTICLE 3
## UNION SECURITY

3.1    All present employees who are members of the Union of the effective date of this agreement or on the date of execution of this agreement, whichever is the later, shall remain members of the Union in good standing as a condition of employment. All present employees who are not members of the Union and all employees who are hired hereafter shall become and remain members in good standing of the Union as a condition of employment on/or after the eighth (8th) day following the beginning of their employment, on and after the eight day following the effective date of this agreement, whichever is later.

9

# ARTICLE 4
## ADMINISTRATION DUES

4.1     Every Employer signatory to this agreement hereby agrees to check-off from wages of any employee employed by such employer during the term of this agreement, administration dues in the amount specified in the Union's bylaws and to remit said amount to the Union in the following manner:

(A)     The Union will notify the Employer in writing of the amount of administrative dues specified in the bylaws, and will submit to the Employer a copy of the bylaws or the applicable bylaw provision.

(B)     For each pay roll period, the Employer will deduct from the wages of each employee the amount specified in the bylaws based on the gross wages earned during said payroll period, and will accumulate said deductions to the end of the month. The Employer will remit said deduction to District Council 711 on or before the 15th of each month.

(C)     When a member of another District Council or Local Union works for his/her home Employer within the jurisdiction of District Council 711, the Employer will deduct Administration dues from the employee(s), from another District Council or Local Union, the amount specified in the bylaws of District Council 711 based on the gross wages earned during said payroll period, and accumulate said deductions to the end of the month. The Employer will remit said deductions to the District Council 711 on or before the 15th of each month.

# ARTICLE 5
## EXCLUSIVE HIRING HALL

The Union shall be the sole and exclusive source of referrals of applicants for employment as painters, tapers and glaziers.

The Employer shall have the right to reject any applicant for employment.

10

The Union shall select and refer applicants for employment without discrimination against such applicants by reason of membership or non-membership in the Union and such selection and referral shall not be affected in any way by rules, or regulations, bylaws, constitution provisions, or any other aspect or obligation of the Union membership policies or requirements. All such selection and referral shall be in accordance with the following procedures:

5.1    The Union shall establish and maintain an open and non-discriminatory referral system for the employment of journeymen and apprentice painters, tapers and glaziers.

5.2    The Employer, upon requesting referral of job applicants, shall call the zone where the job is located and specify the following to the Union:

(A)    Number of persons required

(B)    Work or project location

(C)    Type of work

(D)    Individuals requested by name

(E)    Specialty involved

(F)    Any information to assist with proper referrals

5.3    The Union shall refer workers to the Employer in the following manner and order:

(A)    If available, specifically requested individuals previously employed by said Employer may be recalled for a period of twenty four (24) months from date of layoff.

(B)    Those available whose names are entered on a seniority list, specialties included, posted and maintained by the Union.

11

5.4    The Employer shall have entire freedom of selectivity in hiring and may reject, layoff or terminate any person referred to it by the Union.

(A)    In the event the Union is unable to furnish qualified persons for employment, the employer may procure them from any other source or sources.

5.5    The selection of applicants for referrals shall be on a non-discriminatory basis. Seniority shall be based upon the length of employment in the trade of jurisdiction and in a particular area commencing on the first day of employment. After unemployment in the trade or jurisdiction for a one (1) year period, seniority shall commence upon the subsequent employment date.

5.6    An Employee who quits a job, except for medical necessity, or if fired for cause and terminated, may not be recalled by any other Employer and shall assume the position at the bottom of the referral list and, seniority notwithstanding, shall remain there so long as any other qualified applicant seeks referral. An employee who quits or is fired for cause and is terminated a second time during the length of the agreement shall no longer qualify for referral.

5.7    Employer requests for general foreman or foreman shall be honored without regard to the out of work list.

5.8    (A)    All employees must submit to an annual drug and alcohol test and will carry a card to certify testing and results thereof. The Employer has a right to demand a valid drug test as a requisite to employment. The Employer has the right to terminate upon non-compliance. After testing positive, the employee, at his expense, must certify that he/she is clean in writing to the Union.

(B)    In order to qualify for scheduled wage increase, all active employees must complete a minimum of ten (10) hours of safety training annually, after work hours. The Education and Training Fund shall maintain each person's status. Members will be issued a card certifying that they have completed training.

(C)    Employees will be encouraged to upgrade their skills at training seminars, after work hours, set up by the

12



Education and Training Fund, in cooperation with the Employers.

5.9    No provision of this agreement shall be based upon or in any way affected by Union membership, bylaws, regulations, constitutional provisions or any other aspect or obligation of Union membership, policies, or requirements. Membership or non-membership in the Union shall not be considered in placing the name of any qualified person on the seniority records of the Union and shall not in any way affect the seniority accorded anyone.

5.10    A notice incorporating the terms and conditions relating to the hiring system shall be conspicuously posted at the Union's office.

## ARTICLE 6
## WAGES & SCHEDULES

6.1    Classification of Painters/Tapers work:

(A)    New Construction of all kinds, except as described in (c).
(1) Paperhanging, Wall covering

(B)    Repainting, paperhanging work and preparation therefore on jobs where no major alterations occur, and where there are not more than three (3) other Union trades other than painter and allied trades present on that job, but excluding bridges, stacks, elevated tanks, and generating stations, the interior of all tanks and ground tanks over sixty (60) feet in height.

(C)    Painting of residences and apartment buildings up to three (3) stories if height.

(D)    Industrial:    Nuclear plants, Towers, Steeples, Dams, Hangers, Elevated tanks, Tank farms and refineries, excluding office and storage buildings. Any work that would require cables as a platform to work on.

(E)    Bridges: All bridges that span major waterways, railroad bridges, bridges over canyons, overpasses, viaducts and appurtenances. (Excluding pedestrian bridges in

13

Casinos, Condominiums, Hotels, Industrial plants, Educational Facilities, Hospitals and offices)

In the event of a dispute, the Joint Trade Board shall determine the classification of the specific project.

6.2     Spraying, sandblasting, lead abatement, pneumatic and power tools (over 115V), work on tanks, stacks, open steel, cables, swing scaffolds, and exterior work over three (3) stories; work above thirty (30) feet from pole trucks, scissor lifts or other lifting devices shall be at the listed wage rates.

6.3     Glaziers Installation (Rack) Schedule:

(A)     One (1) worker for door lights and similar sizes up to 42" x 84".

(B)     This does not apply to steel or wood sash of typical sizes and may be adjusted on prevailing rate projects.

(C)     On all plate glass:

Glass up to 170 united inches——————two workers
Glass from 171 united inches to 191 united inches— three workers
Glass from 191 united inches to 221 united inches— four workers
Glass from 221 united inches to 240 united inches—five workers
Glass from 240 united inches to 250 united inches—six workers
Glass from 250 united inches to 260 united inches—seven workers
Glass from 260 united inches to 272 united inches—eight workers
Glass from 272 united inches to 284 united inches—nine workers
Glass from 284 united inches to 290 united inches —ten workers
Glass from 290 united inches to 305 united inches —eleven workers
Glass from 305 united inches to 312 united inches —twelve workers

(D)     Rack schedule to be used as a guide for safety reasons. Job conditions and special circumstances shall be considered.

(E)     On 3/8 inch plate glass twenty five percent (25%) more workers shall be used. On 1/2 inch plate glass fifty percent (50%) more workers shall be used. On 3/4 inch plate glass one hundred percent (100% more men shall be used. On larger glass, abnormal settings, etc. additional workers shall be used for safety purposes. Special circumstances will be considered.

14



(F)    On insulating units, the total glass thickness shall determine the number of workers by the above rack schedule. At least fifty percent (50%) more workers shall be used on insulating units.

6.4    Increases for Painters, Paperhangers/Wall coverers for each 6.1 work classification
For **Painters** work classification 6.1 (A), as described in Article 6 Sec. 6.1 (A)

|  | 5/1/2006 | 5/1/07 | 11/1/07 | 5/1/08 | 11/1/08 | 5/1/09 | 5/1/10 |
|---|---|---|---|---|---|---|---|
| Increase | $1.35 | $1.00 | $1.00 | $1.05 | $1.05 | $2.10 | $2.20 |
| Package | $46.71 | $47.71 | $48.71 | $49.76 | $50.81 | $52.91 | $55.11 |

6.2 Spray, Swing scaffold, etc. shall be Ten (10%) percent above wage rate

For Paperhangers/Wall coverers work classification 6.1 (A) (1) as described in Article 6 Sec. 6.1 (A) 1

|  | 5/1/2006 | 5/1/07 | 11/1/07 | 5/1/08 | 11/1/08 | 5/1/09 | 5/1/10 |
|---|---|---|---|---|---|---|---|
| Increase | $2.35 | $1.00 | $1.00 | $1.05 | $1.05 | $2.10 | $2.20 |
| Package | $47.71 | $48.71 | $49.71 | $50.76 | $51.81 | $53.91 | $56.11 |

For Painters work classification 6.1 (B), as described in Article 6 Sec. 6.1 (B)

|  | 5/1/2006 | 5/1/07 | 11/1/07 | 5/1/08 | 11/1/08 | 5/1/09 | 5/1/10 |
|---|---|---|---|---|---|---|---|
| Increase | $1.55 | $0.80 | $0.80 | $0.84 | $0.84 | $1.68 | $1.76 |
| Package | $37.37 | $38.17 | $38.97 | $39.81 | $40.65 | $42.33 | $44.09 |

6.2 Spray, Swing scaffold, etc. shall be Ten (10%) percent above wage rate

For Paperhangers/ Wall coverers work classification 6.1 (B), as described in Article 6 Sec. 6.1 (B)

|  | 5/1/2006 | 5/1/07 | 11/1/07 | 5/1/08 | 11/1/08 | 5/1/09 | 5/1/10 |
|---|---|---|---|---|---|---|---|
| Increase | $2.55 | $0.80 | $0.80 | $0.84 | $0.84 | $1.68 | $1.76 |
| Package | $38.17 | $38.97 | $39.77 | $40.61 | $41.45 | $43.13 | $44.89 |

For Painters, Paperhangers/Wall coverers work classification 6.1 (C), as described in Article 6 Sec. 6.1 (C)

|  | 5/1/2006 | 5/1/07 | 11/1/07 | 5/1/08 | 11/1/08 | 5/1/09 | 5/1/10 |
|---|---|---|---|---|---|---|---|
| Increase | $0.54 | $0.65 | $0.65 | $0.68 | $0.68 | $1.37 | $1.43 |
| Package | $30.37 | $31.02 | $31.67 | $32.35 | $33.03 | $34.40 | $35.83 |
| Paperhanger | $30.91 | $31.56 | $32.21 | $32.89 | $33.57 | $34.94 | $36.37 |

## INDUSTRIAL

For Painters work classification 6.1 (D) Industrial, as described in Article 6 Sec. 6.1 (D)

|         | 5/1/2006 | 5/1/07  | 11/01/07 | 5/1/08  | 11/1/08 | 5/1/09  | 5/1/10  |
|---------|----------|---------|----------|---------|---------|---------|---------|
| Increase | $2.85   | $1.00   | $1.00    | $1.05   | $1.05   | $2.10   | $2.20   |
| Package  | $48.21  | $49.21  | $50.21   | $51.26  | $52.31  | $54.41  | $56.61  |

6.2 Spray, Swing scaffold, etc. shall be Ten (10%) percent above wage rate

Wage increases for work classification 6.1 (B) Industrial Repaint

Wage shall be eighty (80%) percent of the above 6.1 (D) wage rate

6.2 Spray, Swing scaffold, etc. shall be Ten (10%) percent above wage rate

## BRIDGE

Wage increases for work classification Bridge, as described in Article 6 In Sec 6.1 (E)

|          | 5/1/2006 | 5/1/07  | 5/1/08  | 5/1/09  | 5/1/10  |
|----------|----------|---------|---------|---------|---------|
| Increase |          | $4.00   | $4.00   | $4.00   | $4.00   |
| Package  | $54.03   | $58.03  | $62.03  | $62.03  | $66.03  |

Schedule A, B, C, D and E: For Wage and Benefits for all work classifications, Forman and Gen. Forman for May 1, 2006 to April 30, 2007 as attached hereto.

The Union shall advise the Employers of the increase distribution thirty days prior to the above date.

6.5     (A)     Apprentice rates shall be the following percentages of the base rate as described in work classification

First    4 months---------30%
5 to   8 months---------40%
9 to 12 months---------50%
13 to 16 months---------60%
17 to 20 months---------70%
21 to 24 months---------75%

16



25 to 28 months---------80%
29 to 32 months---------85%
33 to 36 months---------90%

(B)    The change in rate shall apply after regular attendance at apprentice school and passing regular skills test. Journeyman status after 6000 hours of training.

(C)    Fringe benefits shall be a percentage (%) of the base wage listed in wage classification 6.4 (A) as follows:

| Year | H&W | Pension | Annuity |
|------|-----|---------|---------|
| First | 13% | -0- | -0- |
| Second | 14% | .50 | 4% |
| Third | 14% | 1.00 | 8% |

6.6    Effective May 1, 2006 the Employer shall deduct $1.00 per hour from the pay of all painters, tapers and glaziers. The deductions shall be paid into the Vacation Fund of District Council 711.

6.7    On jobs of four (4) or more employees, one (1) person shall be designated as foreman. A general foreman shall be designated on jobs of fifteen (15) or more employees.

6.8    All employees shall be paid weekly at least 30 minutes prior to the end of the work day. Not more than three (3) days pay shall be held back for the period between the close of the pay period and pay day. A statement of earnings and deductions shall accompany the pay.

6.9    Employees shall be notified and paid in full at least thirty (30) minutes before being laid off at lunch or quiting time.

6.10    Employers who send employees to jobs outside the territorial jurisdiction shall pay the expense of travel, room and board.

6.11    Fringe benefit payment shall not apply to bonuses paid to key employees.

17

# ARTICLE 7
## HOURS & OVERTIME

7.1    The regular forty (40) hour week and eight (8) hour work day shall begin no earlier than 7:00 am and terminate no later than 5:30 pm, Monday through Friday. The Union and Employer shall agree upon a starting time other than 8:00 am.

7.2    (A)    Overtime work on Saturday and after the regular work day shall be at the rate of time and one half, except as in 7.2(C)

(B)    Work on Sunday and holidays shall be at the double time rate, except as in 7.2 (c)

(C)    For classifications 6.1(B) and 6.1(C) eight hour day, forty hour week (Monday through Sunday inclusive). All work over eight (8) hours in any one day or all work over forty (40) hours in any one week shall be paid at the rate of time and one half.

(D)    For work classification 6.1 (B) and (C), depending on job conditions, a ten (10) hour a day, four (4) day week may be established at regular rates without overtime compensation, (Monday through Sunday inclusive). The use of this Article must have the approval on the Union.

(E)    For work classification 6.1 (A), depending on job conditions, a ten (10) hour a day, four (4) day week may be established at the regular rates without overtime compensation, (Monday through Friday only). The use of this article must have the approval from DC711 Business Manager.

7.3    Employees shall be allowed five (5) minutes before lunch and ten (10) minutes before quitting time to wash and clean up, spray painters and sandblasters shall be allowed thirty (30) minutes at quitting time.

(A)    Employees shall receive an unpaid thirty (30) minute meal break after ten (10) hours of work.

18



(B)    Employees shall receive a ten (10) minute break during the first half of the work day.

7.4    Employees shall not report to the job earlier than fifteen (15) minutes prior to starting time. Foremen and general foremen may start thirty (30) minutes prior to starting time and remain thirty (30) minutes after quitting time.

7.5    Except for circumstances beyond the control of the employer, if an employee is not advised that there will be no work for him/her on an ensuing day and the employee reports for work at the proper time and then has no work assigned him/her, the Employer shall pay such employee two (2) hours pay.

(A)    Employers may require that employees remain on the job or in the shop for the periods indicated above for which they are paid.

(B)    In the event weather conditions require the stoppage of work on any day after work has begun, employees shall be paid to the next full hour.

7.6    If an employee fails to report to work and the Employer funds he/she cannot use the employee upon his/her return to work, the Employer shall have the option of either paying off the employee at once or requesting him/her to wait for any wages due him/her until the next regular pay day. Waiting time shall not enter into the settlement.

7.7    The following are recognized holidays: New Year's Day, Memorial Day, Independence Day, Labor Day, Presidential Election Day-afternoon (a full 8 hour day at regular wage is permitted prior to noon), Veterans Day, Thanksgiving Day, and Christmas Day.

7.8    In the event work is lost due to weather or job conditions, work may be accomplished on Saturday, Sunday at the regular straight time rate to make up for the lost time.

7.9    (A)    Ten percent (10%) shall be added to the previously indicated wage rates for any eight (8) hours work

19

outside the regular work day. Fifteen percent (15%) shall be added to the wage rates for any second shift outside the regular work day.

(B)    In addition to the added amounts in 7.9(A), when three (3) shifts exist, the second shift shall receive eight (8) hours pay for seven and one half (71/2) hours work; the third shift shall receive eight (8) hours pay for seven (7) hours work.

(C)    The above applies to work classification 6.1(A) only.

## ARTICLE 8
## CONTRACTUAL RELATIONS & OBLIGATIONS

8.1    One member of the firm is allowed to work with the tools and a contractor is one that employs, on average, at least one person throughout the year.

8.2    Each Employer shall carry comprehensive kinds of insurance such as, but not limited to, worker's compensation, public liability and property damage on equipment, automotive and otherwise, when used by its employees, as well as other coverage carried by custom or practice in this industry by contractors. Proof of such coverage is required, in writing, to the Union at least annually or more often if requested by the Union. In the event the insurance coverage is cancelled, the Union reserves the right to suspend this agreement, until the aforesaid insurance coverage has again been supplied and proof of such coverage, in writing, is received by the Union.

8.3    Each Employer with one or more employees agrees as a matter of policy to elect, petition and qualify to become immediately before the commencement of work, a covered Employer as permitted by the terms of the Unemployment and Temporary Disability Benefits Act of New Jersey. The Union shall be kept informed of the Employers' acts of compliance and proof of compliance or rejection by the State of New Jersey shall be immediately provided to the Union by the Employer. The purpose of this paragraph is to provide unemployment and temporary disability benefits for each employee on every job or in the shop. The temporary disability provision of the law, commonly known as the "State



20

Plan", shall be adhered to by each Employer for the benefit of the employees in the unit, unless the Employer has a state approved private plan.

8.4    The Employer agrees to provide immediate medical attention and hospitalization, if necessary, to any employee injured on the job, at no cost to the employee.

8.5    Except as qualified in 8.5(A), on or before the 15th of each month, the Employer shall remit to the Union or its Administrator the entire amounts deducted from wages, as required by this agreement and owing as well as all contributions required by this agreement as to each employee for the previous month.

    (A)    Employers who do not have an acceptable three (3) year record of payments in this jurisdiction shall make payments of all fringe benefits, vacation funds and administrative dues to the shop steward or other person designated by the Union on a weekly basis.

    (B)    If an Employer fails to make contributions in accordance with the agreement after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the Employer shall be liable for all costs of collection of the payments due together with attorney fees and such penalties as may be assessed by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedures or any "no strike" clause which may be provided or set forth elsewhere in this Agreement.

8.6    The Union agrees that journeymen will not be referred to a builder unless extenuating circumstances justifies the referral and the Council is consulted prior to providing any employees.

    1.    The use of one time agreements shall be used within the meaning of ONE TIME

8.7    In the event that a builder or general contractor owes monies for work performed on a job to a contractor who is signatory to an agreement with this Union, they will endeavor

21

to do everything legally possible to see that all just debts owed to the contractor shall have been settled satisfactorily.

**ARTICLE 9**
**WORKING CONDITIONS**

9.1    The use of spray equipment is allowed to paint acoustical surfaces, ceiling grid, furniture, bar-joist, structural steel, corrugated ceiling and walls (including pipes, ducts, conduit, hangers, steel, etc. adjacent thereto), wood walls and ceilings, where exposed joists are thirty (30) inches or less on centers, fin type radiation, floors, louvers and grating, block fill with backrolling; metal pan stairs and spindle railing, plastic and multi-color materials, lacquers and any other material deemed not brushable, and any and all work at housing projects. In the event a second employee is necessary in a spray painting operation, he/she shall also receive the spray rate provided he/she works in the immediate work area at all times the equipment is in use. He/She shall relieve and otherwise assist the other person.

(1)    The use of eighteen inch rollers on ceilings shall only be used for purpose of back rolling spray applications.

(A)    The Joint Board shall study other processes, materials and surfaces and shall determine those which shall be added to those mentioned herein.

(B)    The Business Manager shall be notified when spraying is contemplated.

9.2    The unrestricted use of tools of the painting trade is permitted on work classified in 6.1(A) (prevailing wage jobs); 6.1B; and 6.1C.

9.3    It is understood and agreed and recognized that traditional hand tools to perform work with, namely, hawks, trowels, bread pans, and broad knives, will be supplied by the Employees. The Employer shall furnish all other tools and equipment to work with and if at any time such tools or equipment of any material or work conditions shall constitute a hazard to health or physical safety, the Employer shall not permit his/her employees to use such tools, equipment or materials or to work under such conditions. Employees refusing to work with such tools, equipment or materials or

22



under such working conditions shall not be discriminated against by the Employer. Any disagreement arising hereunder shall be submitted to the Joint Trade Board as provided by this Agreement. No Employee shall be discriminated against for his/her refusal to work with or use stilts, or machine type tools for which they have not received training. There shall be no restrictions on the use of materials, tools, equipment or other labor-saving devices or on production output by employees; provided however the employee has been qualified by District Council 711 JATC Fund to the use of the tools involved. Past practice and policy is and shall continue to be recognized, meaning mechanical and machine type tools will not be used without the express consent and permission of the Union which will not be open to dispute, except for trained or experienced employees of DISCA members.

9.4    The Employer shall abide by the terms of the Safety Act of the State of New Jersey as well as those of the Federal OSHA.

## ARTICLE 10
## FRINGE BENEFIT FUND

10.1    The Employers and the Union have established an Education and Training Fund to be known as the District Council 711 Education and Training Fund. Effective May 1, 2006, each Employer shall contribute to the Apprenticeship and Training Fund the amounts indicated in Schedule A

10.2    The Agreement between the Employers and the Union parties to this Agreement regarding payments to the International Joint Painting, Decorating and Drywall Apprenticeship and the Manpower Training Fund is as follows:

(A)    Commencing with first day of May, 2006, and for the duration of this Agreement and any renewals or extensions thereof, the Employer, as defined in the Agreement and Declaration of Trust executed by and between the International Union of Painters and Allied Trades and Employer associations in the industry, agrees to make payments to the National Apprentice Fund for each employee covered by this Agreement, as follows:

23

(B)    For each hour, or portion thereof, for which an employee receives pay, the Employer shall make a contribution in the amount indicated in Schedule A to the above named Apprenticeship Fund.

(C)    For the purpose of this Article, each hour paid for, including hours attributable to show-up time and other hours for which pay is received by the employee shall be counted as wages for which contributions are payable.

(D)    Contributions shall be paid on behalf of any employee staring with the employee's first day of employment in a job classification covered by this Agreement. This includes, but is not limited to, apprentices, journeymen, and probationary employees.

(E)    The payments to the Training Fund required above shall be made to the National Training Fund which was established under Agreement and Declaration of Trust, dated April 1, 1967. The Employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust, as though he had actually signed the same.

10.3    International Union of Painters and Allied Trades Union and Industry Pension Fund.

The only agreement between the Employer(s) and the Union parties to this Agreement regarding pensions or retirement for employees covered by this Agreement is as follows:

1.    (A)    Commencing with the first day of May, 2006, and for the duration of the Agreement, and any renewals or extension thereof, the Employer agrees to make payments to the IUPAT Union and Industry Pension Fund for each employee covered by this Agreement, as follows:

(B)    For each hour or portion thereof for which an employee receives pay, the Employer shall make a contribution of in the amount indicated in Schedule A to the above named pension fund; allocations to the IUPAT Union and Industry Pension Plan and to the IUPAT Union and Industry annuity Plan shall be as indicated in Schedule A.

24



(C)    For the purpose of this Article, each hour paid for, including hours attributable to show-up time, and other hours for which pay is received by the employee in accordance with the Agreement, shall be counted as hours for which contributions are payable.

(D)    Contributions shall be paid on behalf of any employee starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but not limited to apprentices, helpers, trainees, and probationary employees.

(E)    The payments to the Pension Fund required above shall be made to the IUPAT Union and Industry Pension Fund, which was established under an Agreement and Declaration of Trust, dated April 1, 1967. The Employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust, as amended from time to time, as though he/she had actually signed the same.

2.    The Employer hereby irrevocably designates as its representatives on the Board of Trustees such Trustees as are now serving, or who will in the future serve, as Employer trustees, together with their successors. The Employer further agrees to be bound by all actions taken by the Trustees pursuant to the said Agreement and Declaration of Trust, as amended from time to time.

The Employer will not engage in any litigation against the Union, on a subrogation theory, contribution theory or otherwise, so as to obtain money judgment from it in connection with any work related disease, sickness, death, injury, or accident.

10.4    Health and Welfare Fund – By Agreement and Declaration of Trust dated June 1,1990, the Association and Union Established the Painters District Council 711 Health and Welfare Fund.

(A)    Employer contributions shall be in the amounts indicated in Schedule A.

10.5    Fund Trustees shall be selected as indicated in Article 17 Sec 17.1

25

# ARTICLE 11
## COOPERATION AND ADVANCEMENT FUNDS

11.1    Labor Management Cooperation Funds:

1.    Commencing as of the effective date of this Agreement, and for the duration of this Agreement, and any renewals or extensions thereof, the Employer agrees to make payments to the Painters and Allied Trades Labor Management cooperation Fund for each employee covered by this Agreement, as follows:

(A)    For each hour or portion thereof, for which an employee receives pay, the Employer shall make contribution of the amount indicated in Schedule A to the Fund.

(B)    For the purpose of this Article, each hour paid for, including hours attributable to show-up time, and other hours for which pay is received by the employee in accordance with the Agreement, shall be counted as hours for which contributions are payable.

(C)    Contributions shall be paid on behalf of any employee starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but not limited to, apprentices, journeymen, and probationary employees.

(D)    The Employer and Union signatory to this Agreement agree to be bound by and to the Agreement and Declaration of Trust as amended from time to time, establishing the Fund.

2.    The Employer hereby irrevocably designates as its representative on the Board of Trustees such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors.

3.    All contributions shall be made at such times and in such manner as the Trustees require; and the Trustees may at any time conduct an audit in accordance with the Agreement and Declaration of Trust.

26



**11.2    Industry Advancement Fund:**

1.    Effective May 1, 2006 each Employer shall make a contribution of three cents ($.03) per hour per Painter (contributions may be increased as determined by the Council), fifteen cents ($.15) per hour per Taper, and fifteen cents ($.15) per hour per Glazier for each hour worked by each employee to the "Industry Advancement Fund" heretofore established and administered by trustees appointed by each of the three (3) individual Associations solely for the advancement, and improvement of the trade and the payment of expenses in carry out such programs and responsibilities.

**11.3**    Stars program (Safety Training ~~Awards~~ Recognition) ~~By Agreement and Declaration of Trust date~~ ⟨date⟩ ~~between~~ the Association and Union Established the Painters District Council 711 Stars Program TO BE ADMINISTERD BY THE EDUCATION + TRAINING FUND.

(A) Employer contributions shall be $0.02 for each hour, or portion thereof, for which the employee receives pay.

**ARTICLE 12**
**POLITICAL ACTION FUND**

**12.1**    Employers signatory to this Agreement shall deduct from the wage of each Union employee, the voluntary sum of ten cents ($.10) for each hour worked as a non-deductible political contribution to the DC#711 Political Action Committee (PAC).

**12.2**    The obligation of the Employer shall apply only as to those employees who have voluntarily signed a valid deduction authorization card.

(A)    The Union shall advise the Employer of any employee who has not signed a deduction authorization card.

27

## ARTICLE 13
### SAFETY

13.1    The Employer shall, at all times, provide safe tools, materials and equipment and safe working conditions. If at any time, in the opinion of the employee, such tools, materials, or equipment or working conditions are unsafe and constitute a hazard to health or physical safety, the employee shall have the right to refuse to work with such tools, material and equipment or under such hazardous conditions unless or until they are made safe. No employee shall be dismissed, disciplined or otherwise discriminated against, nor shall his/her pay be withheld, for refusal to work with such unsafe tools, materials, or equipment or under such unsafe or hazardous working conditions. The final decision as to safety of tools and working conditions shall be made by the general foreman, foreman or the supervisory person competent in safety measures.

13.2    An employee who does not follow safety procedures or instructions and causes, thereby, and Employer to receive an OSHA fine, shall pay an amount equal to the lesser of 10% of the OSHA fine or twenty-five hundred dollars ($2,500.00) to the Joint Trade Board as determined by said board.

## ARTICLE 14
### UNION REPRESENTATIVES & SHOP STEWARDS

14.1    The Union Business Manager is the sole agent on behalf of the Union to take any action in respect to strikes or other interferences with work. There shall be no overtime work without the permission of the Business Manager.

14.2    The Business Manager and/or assistant shall have the right to visit any building, shop or job in the discharge of his/her duties.

14.3    At the discretion of the Union a shop or job steward shall be referred in all shops/jobs. Steward may be appointed from the workers on the job.

(A)    The shop steward may handle routine grievances on the job but is not authorized to call work stoppages or make any agreement which contradicts, changes, modifies or alters the terms of this Agreement.

28



(B)    In the event of emergent difficulties, he/she shall so notify the Business Representative.

(C)    Except for a general foreman and a foreman, the steward is senior and, provided he/she remains qualified to do the work, the shop or job steward shall be the last person laid off among the employees in the bargaining unit in any shop and/or job.

## ARTICLE 15
## SUBCONTRACTING

15.1    Subcontracting shall not be permitted except to signatory contractors whose employees receive comparable wages, hours of work and working conditions as hereunder.

(A)    Unemployed Union painters may take work on a contract basis not to exceed one thousand dollars ($1,000.00). The member must notify the Union before starting the job. If there is no objection based upon the fact that an Association member bid the job, the Union member may commence the work. A Union member in violation shall be brought before the Joint Trade Board and if found guilty, shall be fined one thousand dollars ($1,000.00) for the first offense, two thousand dollars ($2,000.00) for the second offense; and expelled from the Union for the third offense.

## ARTICLE 16
## PRESERVATION OF WORK CLAUSE

16.1    To protect and preserve, for the employees covered by this Agreement, all work they have performed and all work covered by this Agreement, and to prevent any device or subterfuge to avoid the protection and preservation of such work, it is agreed as follows: If the Employer performs on site construction work of the type covered by this Agreement, under its own name or the name of another, as a corporation, company, partnership, or other business entity, including a joint venture, wherein the Employer, through its officers, directors, partners, owners, or stockholders, exercises directly or indirectly (though family members or otherwise) management, control, or majority ownership, the terms and conditions of this Agreement shall be applicable to all such work.

29

16.2    All charges of violations of section 1 of this Article shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement on the handling of grievances and the final and binding resolution of disputes. As a remedy for violations of this Article, the Joint Trade Board or Arbitrator shall be able, at the request of the Union, to require an Employer to pay: 1) to affected employees covered by this Agreement, including applicants registered for employment by the Union the equivalent of wages those employees have lost because of the violations, and 2) into the affected Joint Trust Funds to which this Agreement requires contributions and delinquent contributions that resulted from the violations. The Joint Trade Board or Arbitrator shall be able also to provide any other appropriate remedies, whether provided by law or this Agreement. The Union shall enforce a decision of the Joint Trade Board or Arbitrator under this Article only through arbitration, judicial, or government (for example, the National Labors Relations Board) channels.

16.3    If, after an Employer has violated this Article, the Union and/or the Trustees of one or more Joint Trust Funds to which this Agreement requires contributions institute legal action to enforce an award by the Joint Trade Board remedying such violation, or defend an action that seeks to vacate such award, the Employer shall pay any accountants' and/or attorneys' fees incurred by the Union and/or the Joint Trust Funds, plus cost incurred by the Union and/or the Joint Trust Funds, plus costs of the litigation, that have resulted from such legal action provided, however, that if such litigation determines that the Employer is not in violation of this Article, the prevailing party shall be entitled to said fees from the losing party. This section does not affect other remedies, whether provided by law or this Agreement that may be available to the Union and/or Joint Trust Funds.

## ARTICLE 17
## JOINT TRADE BOARD

17.1    The parties shall establish and maintain a Joint Trade Board composed of ten (10) members, five (5) representing the Union (including the Business Manager) and five (5) representing the Council (including the Executive Director).



30

(A)    The Union and Employer members shall include representatives of the following trade: five (5) Painters.

(B)    Eight (8) members, four (4) representing each party, shall constitute a quorum. Decisions shall be made by majority vote provided that the union representatives and Association representatives shall have equal voting strength with respect to each vote. Members of the Joint Board shall choose a chairman and co-chairman to serve such terms as agreed upon by the Board, provided that one such officer shall represent each party.

17.2    The Joint Board shall meet regularly at least once every three (3) months. Special meetings may be called by the chairman or co-chairman when prompt hearing and decision is required in any dispute.

17.3    The Joint Board is empowered, to hear and decide all grievances and disputes which may arise between the parties as to the interpretation or application of this Agreement; to award or assess remedies, damages and penalties for violations of this Agreement provided, however, any assessment of damages shall not exceed Five Thousand Dollars ($5,000.00);to issue interpretive rulings or other rules and regulations as it deems necessary to give force and effect to the purpose and intention of this Agreement; to investigate all grievances and disputes submitted to it, including audits of records; to recommend amendments to or change in the Agreement but only upon the written request of both parties, Board in the performance of its duties, and to demand of those who repeatedly violate this Agreement the posting of a cash or surety bond to assure future compliance.

17.4    All grievances and disputes shall be submitted in writing to the chairman and co-chairman.

17.5    If all facilities to resolve disputes over the interpretation of the terms or conditions of an existing agreement have failed of settlement, both parties agree before strike or lockout, or the resort to proceedings before the National Labor Relations Board, State Government Boards or the courts, to submit the dispute to the Joint National Trade Board for binding decision. The Joint National Trade Board is

31

hereby authorized and empowered to delegate any question or issue submitted, to a committee of two (2), one (1) of whom shall be appointed by each of the respective presidents of the effected coalition member for the purpose of investigation, making recommendations to the Board, or, in fact, resolving or determining the particular issue, which determination shall be binding with the same force and effect as though rendered by the Board itself.

17.6    The remedies and sanctions specified in this section are in addition to other remedies and sanctions that may be permitted by other provisions of this agreement or by law.

17.7    There shall be no strike or lockout on any job over and grievance or dispute while it is being processed through this grievance procedure and until the said procedure has been exhausted. However, and not withstanding any contrary provision of this Agreement, the Union may remove employees from any job or jobs of an individual Employer who fails or refuses to pay wages and fringe benefits, or refuses to stand trial under these procedures, or fails to comply with a final and binding decision issued at any level of this grievance procedure. Nothing stated in this section shall preclude the Employer from resorting to the grievance procedure with respect to any action or sanction taken or imposed by the Union hereunder.

17.8    The Board shall maintain full and complete records and minutes of its proceedings which may be inspected at any reasonable time by the parties to this Agreement.

17.9    At the commencement of each contract year or upon beginning of work within the territory during each contract year, each Employer shall pay to the Joint Trade Board the sum of Fifty Dollars ($50.00).

(A)    All funds shall be used a determined by the Board for the purpose of advertising, advancing the trade, protecting the standards of work and employment, training employees in the use of new materials and work techniques, protecting the combined interests of employees and Employers alike, advancing the trade, educational programs, and the

32



payment of all expenses of the Board on carrying out said programs and responsibilities.

## ARTICLE 18
### SUCCESSOR CLAUSE

This Agreement, and any supplements thereto, hereinafter referred to collectively as "Agreement" shall be binding upon the parties hereto, their successors, administrators, executors and assignees.

In the event the Employer's business is, in whole or in part, sold, leased, transferred, or taken over by sale, transfer, lease, assignment, receivership, or bankruptcy proceedings, such business and cooperation shall continue to be subject to the terms and conditions this Agreement for the life thereof.

It is understood by this provision that the parties hereto shall not use any leasing or other transfer device to a third party to evade this Agreement. The Employer shall give notice of the existence of this Agreement and this provision to any purchaser, transferee, lessee, assignee, etc. of the business and operation covered by this agreement or any part thereof. Such notice shall be in writing with a copy of said notice forwarded to the Union, at the time the seller, transferor, or lessor executes a contract or transaction as herein described. The Union shall also be advises of the exact nature of the transaction, not including financial details.

In the event the Employer fails to require the purchaser, transferee, or lessee to assume the obligation of this Agreement, the Employer (including partners thereof) shall be liable to the Union, and to the employees covered for all damages sustained as a result of such failure to require assumption of the terms of this Agreement, but shall not be liable after the purchaser, transferee, or lessee has agreed in writing to assume to obligations of this agreement.

33

## ARTICLE 19
## GENERAL SAVINGS CLAUSE

If any article of this agreement should be invalid by operation of law or by any tribunal of competent jurisdiction, or if compliance with or enforcement of any article or section should be restrained by such tribunal pending a final determination as to its validity, the remainder of this Agreement or the application of such article or Section to persons or circumstances other than those as to which if has been invalid or as to which compliance with or enforcement of has been restrained, shall not be affected thereby.

In the event that any article or Section is held invalid or enforcement of or compliance with any Article or Section has been restrained, as above set forth, the affected parties shall meet at the request of the Union, for the purpose of arriving at a mutually satisfactory replacement for such Article or Section during the period of invalidity or restraint. If the parties do not agree on a satisfactory replacement within sixty (60) days after beginning of the period of invalidity or restraint, either party shall be permitted all legal or economic recourse in support of its demands notwithstanding any provision in this Agreement to the contrary.

34

## ARTICLE 20
## DURATION CLAUSE

20.1    Previously negotiated existing Agreement shall remain in full force and effect until and including March, 31 2011. Thereafter said Agreement shall be null and void.

20.2    This Agreement shall be in full force and in effect until and including March 31, 2011, and shall continue from year to year unless written notice of desire to cancel or terminate the agreement is served by either party upon the other not less than sixty (60) and not more than ninety (90) days prior to March 31st of any subsequent year.

20.3    Where no such cancellation of termination is served and the parties desire to continue said Agreement, but also desire to negotiate changes or revisions in this Agreement, either party may serve upon the other a written notice not less than sixty (60) and no more than ninety (90) days prior to March 31' of any subsequent contract year, advising that such party desires to revise or change terms or conditions of such agreement. The respective parties shall be permitted all legal or economic recourse to support their requests for revisions if the parties fail to agree thereon. Nothing herein shall preclude the parties from making revisions or changes in this Agreement, by mutual consent, at any time during its term.

IN WITNESS WHEREOF the parties hereto have set their hands and seals, this 29 day of AUGUST , 2006 to be effective as of MAY 1 2006;
Except as to those provisions where it has been otherwise agreed between the parties.

PAINTERS DISTRICT COUNCIL #711
STATE OF NEW JERSEY
International Union of Painters
and Allied Trades

8-29-06
Date

GARDEN STATE COUNCIL, INC.

08/29/06
Date

35

36 - 37



**SCHEDULE A**
Painters
Wage rates effective
May 1, 2006 through April 30, 2007
**Work Classification 6.1 (A) New Construction of all kinds**

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | Journeyman Education & Training 2% | LMCI | FTI | IAF | Stars |
|------|--------------|------------------|----------------------|-----------------------------------|------|-----|-----|-------|
| $32.00 | $4.00 | $3.84 | $6.08 | $0.64 | $0.05 | $0.05 | $0.03 | $0.02 |
| | | | | | | | | Package Rate $46.71 |

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | Foreman Education & Training 2% | LMCI | FTI | IAF | Stars |
|------|--------------|------------------|----------------------|--------------------------------|------|-----|-----|-------|
| $35.20 | $4.00 | $4.23 | $6.69 | $0.71 | $0.05 | $0.05 | $0.03 | $0.02 |
| | | | | | | | | Package Rate $50.98 |

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | General Foreman Education & Training 2% | LMCI | FTI | IAF | Stars |
|------|--------------|------------------|----------------------|----------------------------------------|------|-----|-----|-------|
| $36.80 | $4.00 | $4.42 | $7.00 | $0.74 | $0.05 | $0.05 | $0.03 | $0.02 |
| | | | | | | | | Package Rate $53.11 |

Deducted from Member

| | |
|---|---|
| Administration Dues | 5% of Gross Wage |
| PAC | $0.10 per hour |
| Vacation Fund | $1.00 per hour |

38



SCHEDULE A
Painters
Wage Rates effective
May 1, 2006 through April 30, 2007
**Work Classification 6.2**

### Journeyman

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | Education & Training 2% | LMCI | FTI | IAF | Stars |
|------|------|------|------|------|------|------|------|------|
| $35.20 | $4.00 | $4.23 | $6.69 | $0.71 | $0.05 | $0.05 | $0.03 | $0.02 |

Package Rate $50.98

### Foreman

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | Education & Training 2% | LMCI | FTI | IAF | Stars |
|------|------|------|------|------|------|------|------|------|
| $38.72 | $4.00 | $4.65 | $7.36 | $0.78 | $0.05 | $0.05 | $0.03 | $0.02 |

Package Rate $55.66

### General Foreman

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | Education & Training 2% | LMCI | FTI | IAF | Stars |
|------|------|------|------|------|------|------|------|------|
| $40.48 | $4.00 | $4.86 | $7.70 | $0.81 | $0.05 | $0.05 | $0.03 | $0.02 |

Package Rate $58.00

Deducted from Member

| | |
|------|------|
| Administration Dues | 5% of Gross Wage |
| PAC | $0.10 per hour |
| Vacation Fund | $1.00 per hour |

39



SCHEDULE A
Paperhanger/wall covering
Wage rates effective
May 1, 2006 through April 30, 2007
**Work Classification 6.1 (A) 1 Paperhanger**

**Journeyman**

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | Education & Training 2% | LMCI | FTI | IAF | Stars |
|------|------|------|------|------|------|------|------|------|
| $32.75 | $4.00 | $3.93 | $6.23 | $0.66 | $0.05 | $0.05 | $0.03 | $0.02 |

Package Rate $47.72

**Foreman**

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | Education & Training 2% | LMCI | FTI | IAF | Stars |
|------|------|------|------|------|------|------|------|------|
| $36.03 | $4.00 | $4.33 | $6.85 | $0.72 | $0.05 | $0.05 | $0.03 | $0.02 |

Package Rate $52.08

**General Foreman**

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | Education & Training 2% | LMCI | FTI | IAF | Stars |
|------|------|------|------|------|------|------|------|------|
| $37.67 | $4.00 | $4.52 | $7.16 | $0.76 | $0.05 | $0.05 | $0.03 | $0.02 |

Package Rate $54.26

Deducted from Member

| | |
|------|------|
| Administration Dues | 5% of Gross Wage |
| PAC | $0.10 per hour |
| Vacation Fund | $1.00 per hour |

40

SCHEDULE B
Paperhanger/wall covering
Wage rates effective
May 1, 2006 through April 30, 2007
**Work Classification 6.1 (B) Paperhanger**

### Journeyman

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | Education & Training 2% | LMCI | FTI | IAF | Stars |
|------|--------------|------------------|----------------------|-------------------------|------|-----|-----|-------|
| $25.85 | $4.00 | $3.07 | $4.86 | $0.52 | $0.05 | $0.05 | $0.03 | $0.02 |

Package Rate $38.18

### Foreman

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | Education & Training 2% | LMCI | FTI | IAF | Stars |
|------|--------------|------------------|----------------------|-------------------------|------|-----|-----|-------|
| $28.14 | $4.00 | $3.38 | $5.35 | $0.57 | $0.05 | $0.05 | $0.03 | $0.02 |

Package Rate $41.59

### General Foreman

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | Education & Training 2% | LMCI | FTI | IAF | Stars |
|------|--------------|------------------|----------------------|-------------------------|------|-----|-----|-------|
| $29.42 | $4.00 | $3.53 | $5.59 | $0.59 | $0.05 | $0.05 | $0.03 | $0.02 |

Package Rate $43.28

Deducted from Member

| | |
|---|---|
| Administration Dues | 5% of Gross Wage |
| PAC | $0.10 per hour |
| Vacation Fund | $1.00 per hour |

41

SCHEDULE B
Painters
Wage rates effective
May 1, 2006 through April 30, 2007
**Work Classification 6.1 (B)**

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | Journeyman Education & Training 2% | LMCI | FTI | IAF | Stars |
|------|------|------|------|------|------|------|------|------|
| $24.97 | $4.00 | $3.00 | $4.75 | $0.50 | $0.05 | $0.05 | $0.03 | $0.02 |

Package Rate $37.37

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | Foreman Education & Training 2% | LMCI | FTI | IAF | Stars |
|------|------|------|------|------|------|------|------|------|
| $27.47 | $4.00 | $3.30 | $5.22 | $0.55 | $0.05 | $0.05 | $0.03 | $0.02 |

Package Rate $40.69

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | General Foreman Education & Training 2% | LMCI | FTI | IAF | Stars |
|------|------|------|------|------|------|------|------|------|
| $28.72 | $4.00 | $3.45 | $5.46 | $0.58 | $0.05 | $0.05 | $0.03 | $0.02 |

Package Rate $42.36

**Deducted from Member**

| | |
|------|------|
| Administration Dues | 5% of Gross Wage |
| PAC | $0.10 per hour |
| Vacation Fund | $1.00 per hour |

42



### SCHEDULE B
### Painters
Wage rates effective
May 1, 2006 through April 30, 2007
### Work Classification 6.2 Repaint

#### Journeyman

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | Education & Training 2% | LMCI | FTI | IAF | Stars |
|------|------|------|------|------|------|------|------|------|
| $27.47 | $4.00 | $3.30 | $5.22 | $0.55 | $0.05 | $0.05 | $0.03 | $0.02 |
| | | | | | | | | Package Rate $40.69 |

#### Foreman

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | Education & Training 2% | LMCI | FTI | IAF | Stars |
|------|------|------|------|------|------|------|------|------|
| $30.22 | $4.00 | $3.63 | $5.75 | $0.61 | $0.05 | $0.05 | $0.03 | $0.02 |
| | | | | | | | | Package Rate $44.36 |

#### General Foreman

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | Education & Training 2% | LMCI | FTI | IAF | Stars |
|------|------|------|------|------|------|------|------|------|
| $31.59 | $4.00 | $3.79 | $6.01 | $0.64 | $0.05 | $0.05 | $0.03 | $0.02 |
| | | | | | | | | Package Rate $46.18 |

Deducted from Member

| | |
|------|------|
| Administration Dues | 5% of Gross Wage |
| PAC | $0.10 per hour |
| Vacation Fund | $1.00 per hour |

43



SCHEDULE C
Painters
Wage rates effective
May 1, 2006 through April 30, 2007
**Work Classification 6.1 (C)**

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | **Journeyman** Education & Training 2% | LMCI | FTI | IAF | Stars |
|---|---|---|---|---|---|---|---|---|
| $20.57 | $2.85 | $2.47 | $3.91 | $0.42 | $0.05 | $0.05 | $0.03 | $0.02 |

Package Rate $30.37

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | **Foreman** Education & Training 2% | LMCI | FTI | IAF | Stars |
|---|---|---|---|---|---|---|---|---|
| $26.63 | $2.85 | $2.72 | $4.30 | $0.46 | $0.05 | $0.05 | $0.03 | $0.02 |

Package Rate $33.11

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | **General Foreman** Education & Training 2% | LMCI | FTI | IAF | Stars |
|---|---|---|---|---|---|---|---|---|
| $23.66 | $2.85 | $2.84 | $4.50 | $0.48 | $0.05 | $0.05 | $0.03 | $0.02 |

Package Rate $34.48

Deducted from Member
| Administration Dues | 5% of Gross Wage |
|---|---|
| PAC | $0.10 per hour |
| Vacation Fund | $1.00 per hour |

44



**SCHEDULE C**
Painters
Wage rates effective
May 1, 2006 through April 30, 2007
**Work Classification 6.2 (C)**

**Journeyman**

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | Education & Training 2% | LMCI | FTI | IAF | Stars |
|---|---|---|---|---|---|---|---|---|
| $22.63 | $2.85 | $2.72 | $4.30 | $0.46 | $0.05 | $0.05 | $0.03 | $0.02 |

Package Rate $33.11

**Foreman**

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | Education & Training 2% | LMCI | FTI | IAF | Stars |
|---|---|---|---|---|---|---|---|---|
| $24.90 | $2.85 | $2.99 | $4.74 | $0.50 | $0.05 | $0.05 | $0.03 | $0.02 |

Package Rate $35.86

**General Foreman**

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | Education & Training 2% | LMCI | FTI | IAF | Stars |
|---|---|---|---|---|---|---|---|---|
| $26.03 | $2.85 | $3.13 | $4.95 | $0.52 | $0.05 | $0.05 | $0.03 | $0.02 |

Package Rate $37.63

Deducted from Member

| Administration Dues | 5% of Gross Wage |
|---|---|
| PAC | $0.10 per hour |
| Vacation Fund | $1.00 per hour |

45

**SCHEDULE D**
Painters
Wage Rates effective
May 1, 2006 through April 30, 2007
**Work Classification, 6.1 (D) Industrial**

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | **Journeyman** Education & Training 2% | LMCI | FTI | IAF | Stars |
|---|---|---|---|---|---|---|---|---|
| $33.11 | $4.00 | $3.98 | $6.29 | $0.67 | $0.05 | $0.05 | $0.03 | $0.03 |
| | | | | | | | Package Rate | $48.21 |

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | **Foreman** Education & Training 2% | LMCI | FTI | IAF | Stars |
|---|---|---|---|---|---|---|---|---|
| $36.43 | $4.00 | $4.38 | $6.93 | $0.73 | $0.05 | $0.05 | $0.03 | $0.02 |
| | | | | | | | Package Rate | $52.62 |

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | **General Foreman** Education & Training 2% | LMCI | FTI | IAF | Stars |
|---|---|---|---|---|---|---|---|---|
| $38.08 | $4.00 | $4.57 | $7.24 | $0.77 | $0.05 | $0.05 | $0.03 | $0.02 |
| | | | | | | | Package Rate | $54.81 |

**Deducted from Member**

| | |
|---|---|
| Administration Dues | 5% of Gross Wage |
| PAC | $0.10 per hour |
| Vacation Fund | $1.00 per hour |

46



### SCHEDULE D
Painters
Wage rates effective
May 1, 2006 through April 30, 2007
Work Classification 6.2 Industrial

#### Journeyman

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | Education & Training 2% | LMCI | FTI | IAF | Stars |
|------|------|------|------|------|------|------|------|------|
| $36.43 | $4.00 | $4.38 | $6.93 | $0.73 | $0.05 | $0.05 | $0.03 | $0.02 |
| | | | | | | | | Package Rate $52.62 |

#### Foreman

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | Education & Training 2% | LMCI | FTI | IAF | Stars |
|------|------|------|------|------|------|------|------|------|
| $40.08 | $4.00 | $4.81 | $7.62 | $0.81 | $0.05 | $0.05 | $0.03 | $0.02 |
| | | | | | | | | Package Rate $57.47 |

#### General Foreman

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | Education & Training 2% | LMCI | FTI | IAF | Stars |
|------|------|------|------|------|------|------|------|------|
| $41.90 | $4.00 | $5.03 | $7.97 | $0.84 | $0.05 | $0.05 | $0.03 | $0.02 |
| | | | | | | | | Package Rate $59.89 |

Deducted from Member

| | |
|------|------|
| Administration Dues | 5% of Gross Wage |
| PAC | $0.10 per hour |
| Vacation Fund | $1.00 per hour |

47

SCHEDULE B
Painters
Wage Rates effective
May 1, 2006 through April 30, 2007
**Work Classification, 6.1 (D) Industrial Repaint**

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | **Journeyman** Education & Training 2% | LMCI | FTI | IAF | Stars |
|------|------|------|------|------|------|------|------|------|
| $26.49 | $4.00 | $3.18 | $5.04 | $0.53 | $0.05 | $0.05 | $0.03 | $0.02 |
| | | | | | | | | Package Rate $39.39 |

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | **Foreman** Education & Training 2% | LMCI | FTI | IAF | Stars |
|------|------|------|------|------|------|------|------|------|
| $29.14 | $4.00 | $3.50 | $5.54 | $0.59 | $0.05 | $0.05 | $0.03 | $0.02 |
| | | | | | | | | Package Rate $42.92 |

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | **General Foreman** Education & Training 2% | LMCI | FTI | IAF | Stars |
|------|------|------|------|------|------|------|------|------|
| $30.47 | $4.00 | $3.66 | $5.79 | $0.61 | $0.05 | $0.05 | $0.03 | $0.02 |
| | | | | | | | | Package Rate $44.68 |

Deducted from Member

| Administration Dues | 5% of Gross Wage |
|------|------|
| PAC | $0.10 per hour |
| Vacation Fund | $1.00 per hour |

48



## SCHEDULE B
### Painters
### Wage Rates effective
### May 1, 2006 through April 30, 2007
### Work Classification, 6.2 (D) Industrial Repaint

**Journeyman**

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | Education & Training 2% | LMCI | FTI | IAF | Stars |
|------|------|------|------|------|------|------|------|------|
| $29.14 | $4.00 | $3.50 | $5.54 | $0.59 | $0.05 | $0.05 | $0.03 | $0.02 |

Package Rate $42.92

**Foreman**

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | Education & Training 2% | LMCI | FTI | IAF | Stars |
|------|------|------|------|------|------|------|------|------|
| $32.06 | $4.00 | $3.85 | $6.10 | $0.65 | $0.05 | $0.05 | $0.03 | $0.02 |

Package Rate $46.81

**General Foreman**

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | Education & Training 2% | LMCI | FTI | IAF | Stars |
|------|------|------|------|------|------|------|------|------|
| $33.52 | $4.00 | $4.03 | $6.37 | $0.67 | $0.05 | $0.05 | $0.03 | $0.02 |

Package Rate $48.74

Deducted from Member

| | |
|------|------|
| Administration Dues | 5% of Gross Wage |
| PAC | $0.10 per hour |
| Vacation Fund | $1.00 per hour |

49

SCHEDULE E
Bridge Painters
Wage Rates effective
May 1, 2006 through April 30, 2007
**Work Classification, Bridge**

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | **Journeyman** Education & Training 2% | LMCI | FTI | IAF | Stars |
|---|---|---|---|---|---|---|---|---|
| $37.50 | $4.00 | $4.50 | $7.13 | $0.75 | $0.05 | $0.05 | $0.03 | $0.02 |
| | | | | | | | | Package Rate $54.03 |

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | **Foreman** Education & Training 2% | LMCI | FTI | IAF | Stars |
|---|---|---|---|---|---|---|---|---|
| $40.20 | $4.00 | $4.83 | $7.64 | $0.81 | $0.05 | $0.05 | $0.03 | $0.02 |
| | | | | | | | | Package Rate $57.63 |

| Wage | Pension Fund | Annuity Fund 12% | Health & Welfare 19% | **General Foreman** Education & Training 2% | LMCI | FTI | IAF | Stars |
|---|---|---|---|---|---|---|---|---|
| $43.10 | $4.00 | $5.18 | $8.19 | $0.87 | $0.05 | $0.05 | $0.03 | $0.03 |
| | | | | | | | | Package Rate $61.47 |

Deducted from Member

| | |
|---|---|
| Administration Dues | 5% of Gross Wage |
| PAC | $0.10 per hour |
| Vacation Fund | $1.00 per hour |

50

IN WITNESS WHEREOF the parties hereto set their hand and seals the day and year and period extended by Article 20.2

Effective:    May 1, 2006   To:   March 31, 2011

The undersigned, an Employer in the **Painting and Paperhanging** industry and all work being performed as outlined in Article 2, have read the foregoing Agreement, familiar with its provisions, accept and agree to be bound by all its terms and conditions set forth in this Agreement.

At the commencement of each contract or upon beginning of work within the territory during each contract year, each Employer shall pay to the Joint Trade Board the sum of Fifty dollars ($50.00). (See Article 17.9)

Business name _____

Business address _____ State _____ Zip code _____

Phone # _____ Fax # _____

Federal ID # _____

Workmen Compensation Insurance Co. and Policy # _____

Unemployment Compensation Commission (U.C.C. #) _____

Temporary Disability Benefits Insurance (T.D.B. #) _____

Signed _____ day of _____ 20____

Employers Signature & Title _____

Printed name of Employer _____

For the Union
Patrick J. Brennan, Business Manager/Secretary Treasurer of District Council 711
International Union of Painters and Allied Trades, State of New Jersey
The original (completed) form MUST BE MAILED to District Council 711
2116 Ocean Heights Ave.
EHT. NJ 08234

EMPLOYER COPY

P3B

T03700    DC 711

IN WITNESS WHEREOF the parties hereto set their hand and seals the day and year and period extended by Article 20.2

Effective:  May 1, 2006  To:  April 30, 2011

The undersigned, an Employer in the **Painting and Paperhanging** industry and all work being performed as outlined in Article 2, have read the foregoing Agreement, familiar with its provisions, accept and agree to be bound by all its terms and conditions set forth in this Agreement.

At the commencement of each contract or upon beginning of work within the territory during each contract year, each Employer shall pay to the Joint Trade Board the sum of Fifty dollars ($50.00). (See Article 17.9)

THE PAINTING COMPANY
_____
Business name
6969 INDUSTRIAL PARKWAY
PLAIN CITY, OH  43064
_____
Business address State Zip code

RECEIVED
THE PAINTING COMPANY

— JUL 2 7 2006

JOB #_____
G/L #_____

Phone # 614-873-1334        Fax # 614-873-1809
APPLICATION AND DEPOSIT SENT VIA FEDEX ON 08/16/06 -
POLICY EFFECTIVE DATE IS 08/17/06.  WC COMPANY & POLICY # FORTHCOMING.
Workmen Compensation Insurance Co. and Policy #

311-224-860-000
_____
Unemployment Compensation Commission (U.C.C. #)

311-224-860-000
_____
Temporary Disability Benefits Insurance (T.D.B. #)

Signed AUG 0 4 2006 day of _____ 20____

Employers Signature & Title _____  VICE PRESIDENT

Printed name of Employer _____ THE PAINTING COMPANY

For the Union _____
Patrick J. Brennan, Business Manager/Secretary Treasurer of District Council 711
International Union of Painters and Allied Trades, State of New Jersey

The original (completed) form MUST BE MAILED to District Council 711
                              2116 Ocean Heights Ave.
                              EHT   NJ   08324

UNION COPY

FILED
JAMES BONINI
CLERK

07 JUN -8 PM 3: 52

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

**THE PAINTING COMPANY,**
6969 Industrial Parkway
Plain City, Ohio 43064

       Plaintiff,

  vs.

**DISTRICT COUNCIL NO. 9,**
**INTERNATIONAL UNION OF**
**PAINTERS AND ALLIED TRADES,**
**A.F.L.-C.I.O.,**
45 West 14th Street
New York, NY 10011

**DISTRICT COUNCIL 15, LOCAL 159,**
**INTERNATIONAL UNION OF**
**PAINTERS AND ALLIED TRADES,**
**A.F.L.-C.I.O.,**
1701 Whitney Mesa #105
Henderson, NV 89014

**DISTRICT COUNCIL 711,**
**INTERNATIONAL UNION OF**
**PAINTERS AND ALLIED TRADES,**
**A.F.L.-C.I.O.,**
2116 Ocean Heights Ave.
Egg Harbor Township, NJ 08234

**INTERNATIONAL PAINTERS AND**
**ALLIED TRADES INDUSTRY**
**PENSION FUND,**
1750 New York Ave., N.W., Suite 501
Washington, D.C. 20006-5301

CASE NO. **2 : 07 cv 550**

**JUDGE GRAHAM**
JUDGE

**MAGISTRATE JUDGE KEMP**

**COMPLAINT FOR DECLARATORY**
**JUDGMENT**

**ALLIED TRADE LABOR**
**MANAGEMENT COOPERATION**
**FUND,**
% International Painters and Allied Trades
Industry Pension Fund as agent,
1750 New York Ave., N.W., Suite 501
Washington, D.C. 20006-5301

**POLITICAL ACTION**
**TOGETHERNESS FUND,**
% International Painters and Allied Trades
Industry Pension Fund as agent,
1750 New York Ave., N.W., Suite 501
Washington, D.C. 20006-5301

**FINISHING TRADES INSTITUTE**
**FUND,**
% International Painters and Allied Trades
Industry Pension Fund as agent,
1750 New York Ave., N.W., Suite 501
Washington, D.C. 20006-5301

and

**PAINTING INDUSTRY ANNUITY**
**FUND,**
% International Painters and Allied Trades
Industry Pension Fund as agent,
1750 New York Ave., N.W., Suite 501
Washington, D.C. 20006-5301

       Defendants.

Plaintiff The Painting Company ("Painting Co.") for its Complaint for Declaratory

Judgment hereby states and alleges as follows:

## INTRODUCTION AND PARTIES

1.      This is an action for declaratory judgment under 28 U.S.C. § 2201, et seq. and

29 U.S.C. § 185(a). This action seeks to resolve a present controversy between Painting Co. and

Defendants, District Council No. 9, International Union of Painters and Allied Trades, A.F.L.-

C.I.O. ("D.C. 9"), District Council No. 15, Local 159, International Union of Painters and Allied

Trades, A.F.L.-C.I.O. ("D.C. 15"), District Council No. 711, International Union of Painters and Allied Trades, A.F.L.-C.I.O. ("D.C. 711"), International Painters and Allied Trades Industry Pension Fund ("Pension Fund"), Allied Trade Labor Management Cooperation Fund ("LMCI Fund"), Political Action Togetherness Fund ("PAC Fund"), Finishing Trades Institute Fund ("FTI Fund"), and Painting Industry Annuity Fund ("Annuity Fund"), (hereinafter referred to together as "Defendants" or the "Funds"). The dispute between the parties is whether Painting Co. is contractually obligated to make contributions to the Funds for work performed outside the scope and jurisdiction of pre-hire labor agreements Painting Co. entered into with D.C. 9, D.C. 15, and D.C. 711. (*See* Trade Agreement with D.C. 9, attached hereto as *Exhibit A*.)[1]

2.      Painting Co. is a corporation organized and operating under the laws of the State of Ohio and has its principal place in Plain City, Ohio. Painting Co. is an "employer" under 29 U.S.C. § 185.

3.      D.C. 9 is a labor organization with geographical jurisdiction in the New York Greater Metropolitan Region, which includes Brooklyn, Queens, Bronx, Manhattan, Staten Island, Nassau, Soffolk, Westchester and Putnam counties (hereinafter the "New York Metro Area"), and is a "labor organization" under 29 U.S.C. § 185.

4.      D.C. 15 is a labor organization with geographical jurisdiction in Nevada, and is a "labor organization" under 29 U.S.C. § 185.

5.      D.C. 711 is a labor organization with geographical jurisdiction in New Jersey, and is a "labor organization" under 29 U.S.C. § 185.

6.      Pension Fund is located in Washington, D.C. and is organized for the benefit of workers throughout the United States and is a "labor organization" under 29 U.S.C. § 185. Upon

---

[1] To date, Painting Co. has unable to obtain copies of the pre-hire agreements with D.C. 15 and D.C. 711.

information and belief, Pension Fund is the collection agent for D.C. 9, D.C. 15, D.C. 711, LMCI Fund, PAT Fund, FTI Fund, and Annuity Fund.

7.    Upon information and belief, LMCI Fund is located in Washington, D.C. and is organized for the benefit of workers throughout the United States and is a "labor organization" under 29 U.S.C. § 185.

8.    Upon information and belief, PAC Fund is located in Washington, D.C. and is organized for the benefit of workers throughout the United States and is a "labor organization" under 29 U.S.C. § 185.

9.    Upon information and belief, FTI Fund is located in Washington, D.C. and is organized for the benefit of workers throughout the United States and is a "labor organization" under 29 U.S.C. § 185.

10.    Upon information and belief, Annuity Fund is located in Washington, D.C. and is organized for the benefit of workers throughout the United States and is a "labor organization" under 29 U.S.C. § 185.

## JURISDICTION AND VENUE

11.    By virtue of 29 U.S.C. § 185, the Court has federal subject matter jurisdiction over this action as this is a breach of contract dispute between an employer and numerous labor organizations.

12.    The Court also has jurisdiction over this matter by virtue of 28 U.S.C. § 2201 as there is an actual controversy between Painting Co. and Defendants, which this Court is authorized to resolve by declaratory judgment.

13.    Venue is proper in this Court because the Court has jurisdiction over all of the parties.

14.   Painting Co. is a citizen of Ohio because that is the state in which it was incorporated and in which it has its principal place of business.

15.   D.C. 9 is a citizen of New York because that is the state in which it has its principal place of business.  Through its authorized officers and/or agents, D.C. 9, with actual and/or apparent authority, is acting as an agent for unidentified union members within the jurisdiction of this Court.

16.   D.C. 15 is a citizen of New York because that is the state in which it has its principal place of business.  Through its authorized officers and/or agents, D.C. 15, with actual and/or apparent authority, is acting as an agent for unidentified union members within the jurisdiction of this Court.

17.   D.C. 711 is a citizen of New York because that is the state in which it has its principal place of business.  Through its authorized officers and/or agents, D.C. 711, with actual and/or apparent authority, is acting as an agent for unidentified union members within the jurisdiction of this Court.

18.   Pension Fund is a citizen of Washington, D.C. because that is the jurisdiction in which it has its principal place of business.  Upon information and belief, Pension Fund conducts systematic and continuous activities within the state of Ohio.  Through its authorized officers and/or agents, Pension Fund, with actual and/or apparent authority, is acting as an agent for unidentified union members within the jurisdiction of this Court.

19.   Upon information and belief, LMCI Fund is a citizen of Washington, D.C. because that is the state in which it has its principal place of business.  Upon information and belief, LMCI Fund conducts systematic and continuous activities within the state of Ohio.

Through its authorized officers and/or agents, LMCI Fund, with actual and/or apparent authority, is acting as an agent for unidentified union members within the jurisdiction of this Court.

20.    Upon information and belief, PAC Fund is a citizen of Washington, D.C. because that is the state in which it has its principal place of business. Upon information and belief, PAC Fund conducts systematic and continuous activities within the state of Ohio. Through its authorized officers and/or agents, PAC Fund, with actual and/or apparent authority, is acting as an agent for unidentified union members within the jurisdiction of this Court.

21.    Upon information and belief, FTI Fund is a citizen of Washington, D.C. because that is the state in which it has its principal place of business. Upon information and belief, FTI Fund conducts systematic and continuous activities within the state of Ohio. Through its authorized officers and/or agents, FTI Fund, with actual and/or apparent authority, is acting as an agent for unidentified union members within the jurisdiction of this Court.

22.    Upon information and belief, Annuity Fund is a citizen of Washington, D.C. because that is the state in which it has its principal place of business. Upon information and belief, Annuity Fund conducts systematic and continuous activities within the state of Ohio. Through its authorized officers and/or agents, Annuity Fund, with actual and/or apparent authority, is acting as an agent for unidentified union members within the jurisdiction of this Court.

## **RELEVANT FACTS**

23.    In or about May 2005, Painting Co. desired to enter into one or more contracts for painting work in the New York Metro Area. However, Painting Co. had no employees in the area to perform the contemplated work. Moreover, Painting Co. was led to believe that it was required to use employees represented by D.C. 9 on the contemplated work.

24.     Thus, Painting Co. Vice President, David L. Asman, spoke with an officer/agent of D.C. 9 by telephone in regard to a pre-hire labor agreement D.C. 9 provided to Painting Co. (*See* Trade Agreement, Ex. A.) Upon information and belief, this officer/agent of D.C. 9 is since deceased. In addition, Painting Co. President Jeffrey Asman, discussed the pre-hire agreement with an officer/agent of D.C. 9 named Anthony Buscema.

25.     Painting Co. subsequently executed the pre-hire agreement, which became effective May 1, 2005.

26.     When the pre-hire agreement was executed, Painting Co. had no bargaining unit employees working in the New York Metro Area, which, upon information and belief represents D.C. 9's geographic jurisdiction. Thus, D.C. 9 was not the exclusive bargaining representative for any of Painting Co.'s employees.

27.     To induce Painting Co. to enter into the pre-hire agreement, D.C. 9, through its officers, agents and/or employees, knowingly, intentionally, and falsely assured Painting Co. that it intended the pre-hire agreement to cover the New York Metro Area only. Moreover, the pre-hire agreement, itself, states that it governs only the New York Metro Area.

28.     Painting Co. entered into the pre-hire agreement in reliance upon D.C. 9's representations.

29.     In or about September 2006, Painting Co. desired to enter into one or more contracts for painting work in Nevada. However, Painting Co. had no employees in the area to perform the contemplated work. Moreover, Painting Co. was led to believe that it was required to use employees represented by D.C. 15 on the contemplated work.

30.     Thus, Painting Co. Vice President, David L. Asman, met with a officer/agent of D.C. 15 and entered into a pre-hire labor agreement with D.C. 15, effective July 1, 2004.

31.     When the pre-hire agreement was executed, Painting Co. had no bargaining unit employees working in Nevada, which, upon information and belief represents D.C. 15's geographic jurisdiction. Thus, D.C. 15 was not the exclusive bargaining representative for any of Painting Co.'s employees.

32.     In or about August 2006, Painting Co. desired to enter into one or more contracts for painting work in New Jersey. However, Painting Co. had no employees in the area to perform the contemplated work. Moreover, Painting Co. was led to believe that it was required to use employees represented by D.C. 711 on the contemplated work.

33.     Thus, Painting Co. Vice President, David L. Asman, met with D.C. 711 officer/agent, Joseph Sanchelli, and entered into a pre-hire labor agreement with D.C. 711, effective May 1, 2006.

34.     When the pre-hire agreement was executed, Painting Co. had no bargaining unit employees working in New Jersey, which, upon information and belief represents D.C. 711's geographic jurisdiction. Thus, D.C. 711 was not the exclusive bargaining representative for any of Painting Co.'s employees.

35.     In addition to other terms and conditions of the contemplated employment, the pre-hire agreement with D.C. 9 obligated Painting Co. to make contributions towards the Funds for work performed in D.C. 9's jurisdiction during its term.

36.     Though Painting Co. currently does not have a copy of the pre-hire agreements with D.C. 15 and D.C. 711, upon information and belief, those pre-hire agreements obligated Painting Co. to make contributions towards the Funds for work performed in D.C. 15's and D.C. 711's jurisdiction during their respective terms.

37.    The D.C. 9 pre-hire agreement also purports to require Painting Co. to abide by any obligation contained in countless unidentified collective bargaining agreements throughout the United States. In addition, the D.C. 9 pre-hire agreement purports to require Painting Co. to make contributions to the Funds for any work it performs throughout the United States whether or not Painting Co. uses members of D.C. 9 or any other labor union for such work.

38.    Upon information and belief, pre-hire agreements with D.C. 15 and D.C. 711 also purport to require Painting Co. to abide by any obligation contained in unidentified collective bargaining agreements throughout the United States and purport to require Painting Co. to make contributions to the Funds for any work it performs throughout the United States whether or not Painting Co. uses members of D.C. 15, D.C. 711 or any other labor union for such work.

39.    Upon information and belief, the purpose of these provisions in each pre-hire agreement was to benefit union members generally as opposed to employees within the bargaining unit by requiring Painting Co. to adhere to unknown, yet-to-be-seen collective bargaining agreements and to make contributions to the Funds for work performed outside of D.C. 9's, D.C. 15's, and D.C. 711's jurisdiction regardless of whether such contributions benefit bargaining unit members or Painting Co. employees. These provisions were intended and drafted to effectively require Painting Co. to cease doing business with non-union workers and non-union sub-contractors throughout the United States. Accordingly, these provisions were and are illegal and, thus, void and/or voidable and unenforceable. *See* 29 U.S.C. 158.

40.    The D.C. 9 pre-hire agreement also purports to allow D.C. 9 to unilaterally modify any provision of the pre-hire agreement and to determine the nature and extent of its and Painting Co.'s performance without first obtaining Painting Co.'s agreement or consent. Thus, the entire pre-hire agreement is illusory and, thus, void and/or voidable and unenforceable.

41.    Painting Co. has concluded all of its work in the New York Metro Area. Painting Co. fulfilled all of its obligations under the pre-hire agreement while engaged in work within the New York Metro Area.

42.    Painting Co. has concluded all of its work in Nevada. Painting Co. fulfilled all of its obligations under the pre-hire agreement with D.C. 15 while engaged in work within its jurisdiction.

43.    Painting Co. has concluded all of its work in New Jersey. Painting Co. fulfilled all of its obligations under the pre-hire agreement with D.C. 711 while engaged in work within its jurisdiction.

44.    Since concluding its work in New Jersey, Nevada, and the New York Metro Area, Painting Co. has performed no work and has employed no bargaining unit employees in New Jersey, Nevada, or the New York Metro Area.

45.    Moreover, since concluding its work in New Jersey, Nevada, and the New York Metro Area, Painting Co. has not employed a single person represented by a labor organization in any location.

46.    However, on May 30, 2007, Pension Fund, on its own behalf and on behalf of the other Funds and D.C. 9, D.C. 15, and D.C. 711, sent Painting Co. a letter demanding payment of $669,631.82 under the various pre-hire agreements, of which it asserted $527,587.35 was for past-due contributions to the Funds for work performed in jurisdictions other than D.C. 9's, D.C. 15's, and D.C. 711's and $142,044.47 was for liquidated damages, interest, attorney's fees, and audit costs. (*See* May 30, 2007 Ltr., attached hereto as *Exhibit B*.)

47.    In that letter, Pension Fund, on behalf of all Defendants, threatened to file suit for breach of the various pre-hire agreements against Painting Co. unless Painting Co. agreed to pay back the above-stated amounts it purportedly owes under the agreements. (*See id.*)

48.    At all relevant times, the overwhelming majority of the work Painting Co. performs is and has been located in Ohio.    Thus, the overwhelming majority of the fund contributions sought by Defendants arise from work Painting Co. performed in Ohio.

49.    The pre-hire agreements are unenforceable in as much as their purported fines, penalties, and liquidated damages provisions impose unlawful and unreasonable penalties upon Painting Co.

## COUNT ONE

### CLAIM FOR DECLARATORY JUDGMENT

50.    Painting Co. incorporates as if fully rewritten herein the allegations contained in the preceding paragraphs in this Complaint.

51.    A real and justiciable controversy now exists between the Defendants and Painting Co. requiring that this Court declare their rights and liabilities under the pre-hire agreements.

52.    Painting Co. has exhausted all applicable administrative remedies under the pre-hire agreements.    In the alternative, attempting to exhaust applicable administrative remedies under the pre-hire agreements would be futile.

53.    Painting Co. is entitled to a declaration that the D.C. 9 pre-hire agreement is, in whole or in part, illegal, void, voidable, illusory and/or unenforceable as a matter of public policy in as much as (1) Painting Co. was fraudulently induced to enter it and (2) the agreement

purports to give D.C. 9 unlimited discretion to determine the nature and extent of its and Painting Co.'s performance.

54.    Painting Co. is entitled to a declaration that the pre-hire agreements are, in whole or in part, illegal, void, voidable, illusory and/or unenforceable as a matter of public policy in as much as they (1) purport to require Painting Co. to comply with the terms of unidentified collective bargaining agreements throughout the United States; (2) purport to require Painting Co. to make contributions for work other than work performed within the jurisdictions of D.C. 9, D.C. 15, and D.C. 711; (3) violate 29 U.S.C. § 158; and (4) purport to impose illegal penalties upon Painting Co. for breach.

55.    In addition and/or in the alternative, Painting Co. is entitled to a declaration that (1) the pre-hire agreements do not require Painting Co. to comply with agreements other than the respective pre-hire agreements themselves; (2) that the pre-hire agreements do not require Painting Co. to make fund contributions other than for work performed within the respective jurisdictions of D.C. 9, D.C. 15, and D.C. 711; (3) that Painting Co. is not in breach of the pre-hire agreements; and (4) that Painting Co. is not liable for liquidated damages, fees, penalties, and/or fines under the pre-hire agreements.

## DEMAND FOR RELIEF

WHEREFORE, Painting Co. demands that the Court enter judgment in favor of Painting Co. and against the Defendants as follows:

A.    Declaring that the pre-hire agreement between Painting Co. and D.C. 9 is void and unenforceable in as much as (1) D.C. 9 fraudulently induced Painting Co. to enter it and (2) the agreement purports to give D.C. 9 unlimited discretion to determine the nature and extent of its and Painting Co.'s performance;

B.     Declaring that the pre-hire agreements between Painting Co. and D.C. 9, D.C. 15, and D.C. 711 are void and unenforceable in as much as they (1) purport to require Painting Co. to comply with the terms of unidentified collective bargaining agreements in areas outside of the respective jurisdictions of D.C. 9, D.C. 15, and D.C. 711; (2) purport to require Painting Co. to make contributions for work other than work performed within the respective jurisdictions of D.C. 9, D.C. 15, and D.C. 711; (3) violate 29 U.S.C. § 158; and (4) purport to impose illegal penalties upon Painting Co. for breach;

C.     Declaring that, because the pre-hire agreements are unenforceable in the above respects, Painting Co. cannot be found, as a matter of fact or law, to have breached the pre-hire agreements; and

D.     Granting such other and further relief, whether legal or equitable, as the Court may find appropriate, including costs and reasonable attorneys fees.

Respectfully submitted,

William C. Moul (0001904) (Trial Attorney)
Bill.Moul@thompsonhine.com
THOMPSON HINE, LLP
10 West Broad Street, Suite 700
Columbus, Ohio
43215-3435
Tel. (614) 469-3200
Fax: (614) 469-3361

*Attorneys for Plaintiff The Painting Company*

11293512.7

13

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**THE PAINTING COMPANY,**
6969 Industrial Parkway
Plain City, Ohio 43064

       Plaintiff,

    vs.

**DISTRICT COUNCIL NO. 9,
INTERNATIONAL UNION OF
PAINTERS AND ALLIED TRADES,
A.F.L.-C.I.O.,**
45 West 14th Street
New York, NY 10011

**DISTRICT COUNCIL 15, LOCAL 159,
INTERNATIONAL UNION OF
PAINTERS AND ALLIED TRADES,
A.F.L.-C.I.O.,**
1701 Whitney Mesa #105
Henderson, NV 89014

**DISTRICT COUNCIL 711,
INTERNATIONAL UNION OF
PAINTERS AND ALLIED TRADES,
A.F.L.-C.I.O.,**
2116 Ocean Heights Ave.
Egg Harbor Township, NJ 08234

**INTERNATIONAL UNION PAINTERS
AND ALLIED TRADES INDUSTRY
PENSION FUND,**
1750 New York Ave., N.W., Suite 501
Washington, D.C. 20006-5301

CASE NO. 2:07-CV-550

JUDGE GRAHAM

MAGISTRATE JUDGE KEMP

**AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
DAMAGES**

**PAINTERS AND ALLIED TRADES
LABOR MANAGEMENT
COOPERATION INITIATIVE,**
% International Painters and Allied Trades
Industry Pension Fund as agent,
1750 New York Ave., N.W., Suite 501
Washington, D.C. 20006-5301

**POLITICAL ACTION
TOGETHERNESS FUND,**
% International Painters and Allied Trades
Industry Pension Fund as agent,
1750 New York Ave., N.W., Suite 501
Washington, D.C. 20006-5301

and

**FINISHING TRADES INSTITUTE,**
% International Painters and Allied Trades
Industry Pension Fund as agent,
1750 New York Ave., N.W., Suite 501
Washington, D.C. 20006-5301

      Defendants.

Plaintiff The Painting Company ("Painting Co.") for its Amended Complaint hereby

states and alleges as follows:

## INTRODUCTION AND PARTIES

1.      This is an action for declaratory judgment and damages under 28 U.S.C. § 2201,

et seq. and 29 U.S.C. § 185(a).  This action seeks to resolve a present controversy between

Painting Co. and Defendants, District Council No. 9, International Union of Painters and Allied

Trades, A.F.L.-C.I.O. ("D.C. 9"), District Council No. 15, Local 159, International Union of

Painters and Allied Trades, A.F.L.-C.I.O. ("D.C. 15"), District Council No. 711, International

Union of Painters and Allied Trades, A.F.L.-C.I.O. ("D.C. 711") (the preceding Defendants are

sometimes referred to collectively as the "Union Defendants"), International Union Painters and

Allied Trades Industry Pension Fund ("Pension Fund"), Painters and Allied Trades Labor

Management Cooperation Initiative ("LMCI Fund"), Political Action Togetherness Fund ("PAC Fund"), and Finishing Trades Institute ("FTI Fund"), (hereinafter referred to together as "Defendants" or the "Funds").   The dispute between the parties is whether Painting Co. is contractually obligated to make contributions to the Funds for work performed outside the scope and jurisdiction of pre-hire labor agreements Painting Co. entered into with D.C. 9, D.C. 15, and D.C. 711.   (*See* Trade Agreement with D.C. 9, attached hereto as *Exhibit A*.)

2.    Painting Co. is a corporation organized and operating under the laws of the State of Ohio and has its principal place of business in Plain City, Ohio.  Painting Co. is an "employer" under 29 U.S.C. § 185.

3.    D.C. 9 is a labor organization with geographical jurisdiction in the New York Greater Metropolitan Region, which includes Brooklyn, Queens, Bronx, Manhattan, Staten Island, Nassau, Soffolk, Westchester and Putnam counties (hereinafter the "New York Metro Area"), and is a "labor organization" under 29 U.S.C. § 185.

4.    D.C. 15 is a labor organization with geographical jurisdiction in Nevada, and is a "labor organization" under 29 U.S.C. § 185.

5.    D.C. 711 is a labor organization with geographical jurisdiction in New Jersey, and is a "labor organization" under 29 U.S.C. § 185.

6.    Pension Fund is located in Washington, D.C. and is organized for the benefit of workers throughout the United States and is a "labor organization" under 29 U.S.C. § 185.  Upon information and belief, Pension Fund is the collection agent for D.C. 9, D.C. 15, D.C. 711, LMCI Fund, PAT Fund, FTI Fund, and Annuity Fund.  "Pension Fund" administers both a pension plan and an annuity plan which may be impacted by the matters set forth herein.

7.    Upon information and belief, LMCI Fund is located in Washington, D.C. and is organized for the benefit of workers throughout the United States and is a "labor organization" under 29 U.S.C. § 185.

8.    Upon information and belief, PAC Fund is located in Washington, D.C. and is organized for the benefit of workers throughout the United States and is a "labor organization" under 29 U.S.C. § 185.

9.    Upon information and belief, FTI Fund is located in Washington, D.C. and is organized for the benefit of workers throughout the United States and is a "labor organization" under 29 U.S.C. § 185.

## JURISDICTION AND VENUE

10.    By virtue of 29 U.S.C. § 185, the Court has federal subject matter jurisdiction over this action as this is a breach of contract dispute between an employer and numerous labor organizations.

11.    The Court also has jurisdiction over this matter by virtue of 28 U.S.C. § 2201 as there is an actual controversy between Painting Co. and Defendants, which this Court is authorized to resolve by declaratory judgment.

12.    This Court has jurisdiction over all Defendants under 29 U.S.C. § 1132(e)(2) and/or because Defendants: (1) transact business in Ohio; (2) conduct systematic and continuous activities within Ohio; (3) negotiated contracts with Ohio residents with partial performance to take place in Ohio; and (4) through their authorized officers and/or agents, with actual and/or apparent authority, are acting as agents for unidentified union and non-union members in Ohio.

13.    Venue is proper in this Court because the Court has jurisdiction over all of the parties and a substantial part of the events or omissions giving rise to Painting Co.'s claim occurred in the Southern District of Ohio.

14.     Painting Co. is a citizen of Ohio because that is the state in which it was incorporated and in which it has its principal place of business.

15.     D.C. 9 is a citizen of New York because that is the state in which it has its principal place of business.

16.     D.C. 15 is a citizen of New York because that is the state in which it has its principal place of business.

17.     D.C. 711 is a citizen of New Jersey because that is the state in which it has its principal place of business.

18.     Pension Fund is a citizen of Washington, D.C. because that is the jurisdiction in which it has its principal place of business.

19.     Upon information and belief, LMCI Fund is a citizen of Washington, D.C. because that is the jurisdiction in which it has its principal place of business.

20.     Upon information and belief, PAC Fund is a citizen of Washington, D.C. because that is the jurisdiction in which it has its principal place of business.

21.     Upon information and belief, FTI Fund is a citizen of Washington, D.C. because that is the jurisdiction in which it has its principal place of business.

## RELEVANT FACTS

22.     In or about May 2005, Painting Co. desired to enter into one or more contracts for painting work in the New York Metro Area.  However, Painting Co. had no employees in the area to perform the contemplated work.  Moreover, Painting Co. was led to believe that it was required to use employees represented by D.C. 9 on the contemplated work.

23.     Thus, a representative of Painting Co. spoke with an officer/agent of D.C. 9 by telephone in regard to a pre-hire labor agreement D.C. 9 provided to Painting Co.  (*See* Trade Agreement, Ex. A.)  Upon information and belief, this officer/agent of D.C. 9 is since deceased.

In addition, Painting Co. President Jeffrey Asman, discussed the pre-hire agreement with an officer/agent of D.C. 9 named Anthony Buscema.

24. Painting Co. subsequently executed the pre-hire agreement, which became effective May 1, 2005.

25. When the pre-hire agreement was executed, Painting Co. had no bargaining unit employees working in the New York Metro Area, which, upon information and belief represents D.C. 9's geographic jurisdiction. Thus, D.C. 9 was not the exclusive bargaining representative for any of Painting Co.'s employees.

26. To induce Painting Co. to enter into the pre-hire agreement, D.C. 9, through its officers, agents and/or employees, falsely made representations to Painting Co. to the effect that Painting co. need only be concerned about payment of union wages and benefits for work done by Painting Co. employees within the geographic area covered by D.C. 9 in the New York Metro Area. Moreover, the pre-hire agreement, itself, states that it governs only the New York Metro Area.

27. Painting Co. entered into the pre-hire agreement in reliance upon D.C. 9's representations.

28. In or about September 2006, Painting Co. desired to enter into one or more contracts for painting work in Nevada. However, Painting Co. had no employees in the area to perform the contemplated work. Moreover, Painting Co. was led to believe that it was required to use employees represented by D.C. 15 on the contemplated work.

29. Thus, Painting Co. Vice President, David L. Asman, had a telephone conference with an officer/agent of D.C. 15 and entered into a pre-hire labor agreement with D.C. 15, effective July 1, 2004. (*See* Trade Agreement with D.C. 15, Exhibit B.) To induce Painting Co.

to enter into the pre-hire agreement, D.C. 15, through its officers, agents, and employees, and with intent to cause reliance on the part of Painting Co., which in fact occurred, falsely made representations to Painting Co. to the effect that Painting Co. only needed to be concerned about payment of union wages and benefits for work done by Painting Co. employees within the geographic area served by D.C. 15.

30.     When the pre-hire agreement was executed, Painting Co. had no bargaining unit employees working in Nevada, which, upon information and belief represents D.C. 15's geographic jurisdiction.  Thus, D.C. 15 was not the exclusive bargaining representative for any of Painting Co.'s employees.

31.     In or about August 2006, Painting Co. desired to enter into one or more contracts for painting work in New Jersey.  However, Painting Co. had no employees in the area to perform the contemplated work.  Moreover, Painting Co. was led to believe that it was required to use employees represented by D.C. 711 on the contemplated work.

32.     Thus, Painting Co. Vice President, David L. Asman, met with D.C. 711 officer/agent, Joseph Sanchelli, and entered into a pre-hire labor agreement with D.C. 711, effective May 1, 2006.  (*See* Trade Agreement with D.C. 711, Exhibit C.)

33.     When the pre-hire agreement was executed, Painting Co. had no bargaining unit employees working in New Jersey, which, upon information and belief represents D.C. 711's geographic jurisdiction.  Thus, D.C. 711 was not the exclusive bargaining representative for any of Painting Co.'s employees.

34.     In addition to other terms and conditions of the contemplated employment, the pre-hire agreement with D.C. 9 obligated Painting Co. to make contributions towards the Funds for work performed in D.C. 9's jurisdiction during its term.

35.     With respect to the pre-hire agreements with D.C. 15 and D.C. 711, those pre-hire agreements obligated Painting Co. to make contributions towards the Funds for work performed in D.C. 15's and D.C. 711's jurisdiction during their respective terms.

36.     It is claimed by Defendants that the D.C. 9 pre-hire agreement requires Painting Co. to abide by any obligation contained in countless unidentified collective bargaining agreements throughout the United States which Painting Co. is not a party to as it is otherwise a non-union contractor.  It is claimed by Defendants that the D.C. 9 pre-hire agreement requires Painting Co. to make contributions to the Funds for any work it performs throughout the United States whether or not Painting Co. uses members of D.C. 9 or any other labor union for such work.  Painting Co. disagrees with the Defendants' interpretation of the agreement.

37.     It is also claimed by Defendants that the pre-hire agreements with D.C. 15 and D.C. 711 also purport to require Painting Co. to abide by any obligation contained in unidentified collective bargaining agreements throughout the United States which Painting Co. is not a party to as it is otherwise a non-union contractor.  It is further claimed by these Defendants that the D.C. 15 and D.C. 711 pre-hire agreements require Painting Co. to make contributions to the Funds for any work it performs throughout the United States whether or not Painting Co. uses members of D.C. 15, D.C. 711 or any other labor union for such work.  Painting Co. disagrees with the Defendants' interpretation of these agreements.

38.     Upon information and belief, it is the Defendants' claim that the purpose of these provisions in each pre-hire agreement was to benefit union members generally as opposed to employees within the bargaining unit by requiring Painting Co. to adhere to unknown, yet-to-be-seen collective bargaining agreements and to make contributions to the Funds for work performed outside of D.C. 9's, D.C. 15's, and D.C. 711's jurisdiction regardless of whether such

contributions benefit bargaining unit members or Painting Co. employees. To the extent these provisions were intended and drafted to effectively require Painting Co. to cease doing business with non-union workers and non-union sub-contractors throughout the United States, they are illegal and, thus, void and/or voidable and unenforceable. *See* 29 U.S.C. § 158.

39.    The D.C. 9 pre-hire agreement also purports to allow D.C. 9 to unilaterally modify any provision of the pre-hire agreement and to determine the nature and extent of its and Painting Co.'s performance without first obtaining Painting Co.'s agreement or consent. Thus, the entire pre-hire agreement is illusory and, thus, void and/or voidable and unenforceable.

40.    Painting Co. has concluded all of its work in the New York Metro Area. Painting Co. fulfilled all of its obligations under the pre-hire agreement while engaged in work within the New York Metro Area.

41.    Painting Co. has concluded all of its work in Nevada. Painting Co. fulfilled all of its obligations under the pre-hire agreement with D.C. 15 while engaged in work within its jurisdiction.

42.    Painting Co. has concluded all of its work in New Jersey. Painting Co. fulfilled all of its obligations under the pre-hire agreement with D.C. 711 while engaged in work within its jurisdiction.

43.    Since concluding its work in New Jersey, Nevada, and the New York Metro Area, Painting Co. has performed no work and has employed no bargaining unit employees in New Jersey, Nevada, or the New York Metro Area.

44.    Moreover, since concluding its work in New Jersey, Nevada, and the New York Metro Area, Painting Co. has not employed a single person represented by a labor organization in any location.

45.     However, on May 30, 2007, Pension Fund, on its own behalf and on behalf of the other Funds and D.C. 9, D.C. 15, and D.C. 711, sent Painting Co. a letter demanding payment of $669,631.82 under the various pre-hire agreements, of which it asserted $527,587.35 was for past-due contributions to the Funds for work performed in jurisdictions other than D.C. 9's, D.C. 15's, and D.C. 711's and $142,044.47 was for liquidated damages, interest, attorney's fees, and audit costs. (*See* May 30, 2007 Ltr., attached hereto as *Exhibit D*.)

46.     Ultimately, Pension Fund, on its own behalf and on behalf of the other Funds, filed suit for breach of the various pre-hire agreements against Painting Co. in the District Court for the District of Columbia in the action styled "International Painters and Allied Trades Industry Pension Fund v. The Painting Company, case number 1:07-CV-1070 ("the D.C. case"). However, the Union Defendants are not parties to the D.C. case, and the underlying contractual dispute between the Painting Co. and the Union Defendants must be determined as a condition precedent to any rights of the Funds.

47.     At all relevant times, the overwhelming majority of the work Painting Co. performs is and has been located in Ohio.  Thus, the overwhelming majority of the fund contributions sought by Defendants arise from work Painting Co. performed in Ohio.  In many cases, Painting Co. has already paid for equivalent pension benefits to its non-union employees as a result of statewide "prevailing wage" laws such as exist in Ohio.  Thus, to the extent that the Defendants seek payment for employees who worked on "prevailing wage" projects, the payments sought by the Funds would be duplicative and create an unfair and illegal double-payment.

Case 7:07-cv-01070-RMU   Document 5-9   Filed 10/01/2007   Page 11 of 15

48.   The pre-hire agreements are unenforceable in as much as their purported fines, penalties, and liquidated damages provisions impose unlawful and unreasonable penalties upon Painting Co.

49.   The provisions of the pre-hire agreements relied upon by the Defendants to support their claims against the Painting Co. should not be interpreted as requiring said payments because they do not unambiguously confer such an obligation, and therefore said provisions should not be interpreted to require payment by Painting Co.

50.   To the extent that the pre-hire agreements can be interpreted as requiring payment to the Funds, they are illegal under 29 U.S.C. § 186 because employers are prohibited from contributing money to labor organizations.

51.   The payments sought by the Defendants are unlawful because the pre-hire agreements do not provide a detailed basis on which payments are to be made.

52.   The payments sought by the Defendants are also unlawful to the extent they seek payments provided for in contracts executed after the pre-hire agreements.

53.   The payments sought by the Defendants are also unlawful because such payments are not held in trust for the benefit of the actual employees of Painting Co. and their families and dependents.

54.   The payments sought by the Defendants are also unlawful to the extent that they deprive the actual employees of Painting Co. of their right to determine their collective bargaining status.

Case 1:07-cv-01070-RMU    Document 5-9    Filed 10/01/2007    Page 12 of 15

## COUNT ONE

## CLAIM FOR DECLARATORY JUDGMENT

55.    Painting Co. incorporates as if fully rewritten herein the allegations contained in the preceding paragraphs in this Complaint.

56.    A real and justiciable controversy now exists between the Defendants and Painting Co. requiring that this Court declare their rights and liabilities under the pre-hire agreements.

57.    Painting Co. has exhausted all applicable administrative remedies under the pre-hire agreements.  In the alternative, attempting to exhaust applicable administrative remedies under the pre-hire agreements would be futile for a number of reasons, including but not limited to the fact that Painting Co. currently faces a collection action brought by the Funds.

58.    Painting Co. is entitled to a declaration that (1) the pre-hire agreements do not require the payments described by Defendants; and (2) to the extent that the agreements are interpreted otherwise, the provisions referred to above should be declared to be, in whole or in part, illegal, void, voidable, illusory and/or unenforceable as a matter of law.

59.    In addition and/or in the alternative, Painting Co. is entitled to a declaration that (1) the pre-hire agreements do not require Painting Co. to comply with agreements other than the respective pre-hire agreements themselves; (2) that the pre-hire agreements do not require Painting Co. to make fund contributions other than for work performed within the respective jurisdictions of D.C. 9, D.C. 15, and D.C. 711; (3) that Painting Co. is not in breach of the pre-hire agreements; and (4) that Painting Co. is not liable for liquidated damages, fees, penalties, and/or fines under the pre-hire agreements.

60.    In addition and/or in the alternative, Painting Co. is entitled to a declaration which provides a full accounting and/or determination of the Painting Co.'s rights and obligations under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001-1046.

61.    In addition and/or in the alternative, Painting Co. is entitled to a declaration that to the extent that the pre-hire agreements are ultimately interpreted as requiring payment to the Funds, Defendants D.C. 9 and D.C. 15 are liable to the Painting Co. for amounts owed to the Funds because of the fraudulent inducements set forth above.

**DEMAND FOR RELIEF**

WHEREFORE, Painting Co. demands that the Court enter judgment in favor of Painting Co. and against the Defendants as follows:

A.    Declaring that the pre-hire agreements between Painting Co. and D.C. 9 and D.C. 15 are void and unenforceable in as much as (1) D.C. 9 and D.C. 15 fraudulently induced Painting Co. to enter them and (2) the pre-hire agreement with D.C. 9 purports to give D.C. 9 unlimited discretion to determine the nature and extent of its and Painting Co.'s performance;

B.    Declaring that the pre-hire agreements between Painting Co. and D.C. 9, D.C. 15, and D.C. 711 are (1) properly interpreted as not requiring the payments to the Funds sought by Defendants, or (2) alternatively, if interpreted as demanded by Defendants, the provisions referred to above are void and unenforceable for the reasons set forth above;

C.    Declaring that, because the pre-hire agreements are unenforceable in the above respects, Painting Co. cannot be found, as a matter of fact or law, to have breached the pre-hire agreements;

13

D.    Providing a full accounting and/or determination as to the parties' rights and responsibilities under ERISA and each respective pre-hire agreement;

E.    Damages against D.C. 9 and D.C. 15 for all amounts of additional payments that Painting Co. is required to pay to the Funds; and

F.    Granting such other and further relief, whether legal or equitable, as the Court may find appropriate, including costs and reasonable attorneys fees.

Respectfully submitted,

/s/ William C. Moul
William C. Moul (0001904) (Trial Attorney)
Bill.Moul@thompsonhine.com
THOMPSON HINE LLP
10 West Broad Street, Suite 700
Columbus, Ohio
43215-3435
Tel. (614) 469-3200
Fax: (614) 469-3361

*Attorney for Plaintiff The Painting Company*

14

**CERTIFICATE OF SERVICE**

I hereby certify that on August 15, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel registered to receive electronic notices, and I hereby certify that I have mailed by United States Postal Service to any non-CM/ECF participants.

      /s/ William C. Moul

An Attorney for Plaintiff

11293512.9